IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: 4:22-cr-199 |
| Plaintiff, | |
| | **DEFENDANT WENDT'S BRIEF IN SUPPORT OF WENDT'S MOTION TO SUPPRESS** |
| vs. | |
| BRADLEY EUGENE WENDT, | |
| Defendant. | |

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................................................. 2

II.  BACKGROUND .................................................................................................. 2

   A.  Search Warrants ................................................................................................ 2

   B.  Wendt's Employment Following Execution of the Search Warrants ................................ 3

III. ARGUMENT ....................................................................................................... 11

   A.  The Warrants Are General Warrants In Violation Of The Fourth Amendment ................ 11

   B.  The Government Obtained And Used Wendt's Protected Statements Against Him In Violation Of *Garrity v. New Jersey* ............................................................................ 16

IV.  CONCLUSION ................................................................................................... 21

1

## I.   INTRODUCTION

Defendant Bradley Eugene Wendt ("Wendt") submits this brief in support of his motion to suppress. Specifically, Wendt moves to suppress two categories of evidence: (1) Wendt's cell phone, email account, Facebook account, and computers seized pursuant to various search warrants; and (2) communications with Adair City Officials that were protected by *Garrity v. New Jersey*, 385 U.S. 493, 499 (1967) ("*Garrity*"). Accordingly, Wendt respectfully requests a full evidentiary hearing consistent with the requirements of *Kastigar*.

## II.   BACKGROUND

Wendt hereby incorporates the background information he provided in his related filings. In addition, Wendt provides the following background information specific to this filing:

### A.   Search Warrants

There are four search warrants relevant to the issues raised in this motion: (1) the August 25, 2022 search warrant executed at 302 Audubon Street, Adair, Iowa 50002 which resulted in the search and seizure of Wendt's cell phone (Case No. 4:22-mj-546) (the "First Phone Warrant"); (2) the May 18, 2022 search warrant for Wendt's Facebook account (Case No. 4:22-mj-323) (the "Facebook Warrant"); (3) the May 18, 2022 search warrant for Wendt's Hotmail account (Case No. 4:22-mj-323) (the "Email Warrant"); and (4) the January 11, 2023 search warrant for Wendt's cell phone (Case No. 4:23-mj-019) (the "Second Phone Warrant") (collectively referred to as, the "Warrants").

In addition, the Government appears to have seized computers from Wendt's home, *see* Case No. 1:22-mj-175, and his business, *see* Case No. 4:22-mj-547, pursuant to similar search warrants. The Government has not indicated that it intends to download the contents of these

computers, but, to the extent it does, Wendt hereby requests they be suppressed for the same reasons as set forth below.

### B.     Wendt's Employment Following Execution of the Search Warrants

On August 31, 2022, Special Agent Kelly Etnier and FBI Special Agent Kevin Kohler came to see Wendt at the Adair Police Station. They had apparently set that meeting up by falsely indicating to Wendt that they wanted to collaborate on a case with him as the local police chief. Wendt even had his fellow Adair Police Officer, Sawyer Ocheltree, sit in on the meeting as a training opportunity. However, by the conclusion of the interview, it become clear that they had not been forthright with Wendt and that the investigation was about him. Nonetheless, Wendt continued to answer all their questions and remained confused about why he would be the target of an investigation.

As part of their elaborate plan on August 31, the Government conducted raids in the town of Adair and surrounding communities. Dozens of federal agents from the FBI and ATF executed search warrants at Wendt's home, his gun stores in Anita and Denison (both named BW Outfitters), and even the Adair Police Station. They interviewed not only Wendt, but friends, family, employees, fellow law enforcement officers, current and former Adair City Council members, and the Mayor of Adair. The agents went so far as to take firearms out of the Adair Police Station and the Adair police vehicle. For a town of about 800 people, this was obviously a big deal for the City of Adair.

During these activities on August 31, the Adair City Council was present at the Adair City Hall – which is also where the Adair Police Station is located. Immediately following Wendt's interview with the agents, the Mayor and City Council began questioning Wendt about what happened. *See, e.g.*, Dkt. #74, Govt.'s Ex. 2, at 3. Further, while the Government is correct

that Wendt signed a request for a closed-door session with the City Council on August 31, it is not correct in its assertion that it was something Wendt came up with on his own to somehow proactively and completely voluntarily begin making his case to the City Council. *Id*. at Govt. Ex. 1. For obvious reasons, the City Council was going to address this immediately, it was going to require information from Wendt, and it presented Wendt with this request because Wendt must be the one to request a closed-door session under the law. Further, it is our understanding the Adair City Attorney, Clint Fichter, was present and consulted with on August 31st. Further, it is our understanding the City of Adair fully intended to comply with both the letter and spirit of Iowa Code 80F throughout this process. Iowa Code § 80F.1. As a result, Wendt was put on paid administrative leave.

After August 31, Wendt went on a pre-planned hunting trip and was out from approximately September 3 to September 15. On September 14, 2022, the City Council held its regularly scheduled meeting. At that meeting, the City Council held another closed-door session to discuss Wendt's employment. Though Wendt was not present for that session, the City Council clearly discusses information that they had obtained from Wendt – including information about selling machine guns registered to the City of Adair to buy new models and that they had increased in value when sold. *See* Govt.'s Ex. 5. In other words, the City Council is evaluating Wendt's employment status based on the information it obtained from him. In addition, the City Council explicitly not only states that this is to evaluate employee conduct but makes clear the Iowa Law Enforcement Bill of Rights applies and even references the City's handbook in that regard. *Id*. The referenced portion of the City's handbook is attached. *See* **Exhibit A**.

4

On October 3, the City of Adair sent Wendt a letter from the Mayor regarding the

employee investigation. The letter provides, in relevant part, as follows:

> This letter serves as notice of an investigation being conducted into violations of
> personnel standards and is offered in compliance with Iowa Code 80F. Under the
> standard of Iowa Code 80F, any information obtained in this investigation cannot
> be used against you in any criminal proceedings and will be considered a
> confidential employee record.
> . . . .
> We are offering you an opportunity to respond to questions regarding these
> purchases in writing or through an in-person interview. You may have an attorney
> provide your responses or attend such in-person interview.
> . . . .
> You may also provide any other information that you feel is pertinent to this
> situation.
> . . . .
> Please be advised that this investigation may result in reprimand or termination of
> your employment.

This letter is protected by *Garrity* and Iowa Code § 80F.1(20) and therefore will be provided *ex*

*parte* to the Court. *See* **Exhibit X**. In addition, it is important to point out the City of Adair

explicitly disavows any false distinction between the demand to answer questions and the

opportunity to provide information – it makes clear, correctly, that it is all protected.

On October 26, through counsel, Wendt provided some information in response to the

Mayor's requests. This letter is protected by *Garrity* and Iowa Code § 80F.1(20) and therefore

will be provided *ex parte* to the Court. This letter was submitted to the Adair City Attorney in

coordination with the City Council meeting rescheduled to take place later that day. *See* **Exhibit**

**XX**. At the October 26 City Council meeting, Wendt appeared and another closed-door session

was held. *See* Govt.'s Ex. 6. The City again makes clear that this information provided in the

hearing is protected. The City Council asked Wendt follow-up questions, Wendt answered those

questions, and the City Council subsequently voted to reinstate Wendt.

On November 15, 2022, the Government calls an Adair City Council member before the grand jury. *See* Dkt. #46-1, Ex. 1; Govt.'s Ex. 1, at 19-23. In fact, the Government explicitly questioned a City Council member about this closed-door session. *Id*. The Government confirmed that it was a closed-door session regarding Wendt's employment. *Id*. However, all it appears the Government was interested in was how to get it.

It is our understanding that the Government and the Adair City Attorney even had a dispute over the confidentiality of these records. It is our understanding the Adair City Attorney raised this issue with the Government and asserted the privileged nature of them. As a matter of fact, in an apparent effort to get the records over any objection regardless of confidentiality pursuant to Iowa Code § 80F, the Government even provided a case to the City that explicitly identified the following:

> If an officer whose compelled statements are subpoenaed by a federal grand jury is eventually indicted, he is entitled to a hearing at which the government must prove that the indictment was not based in any way on the officer's compelled statements or the fruits of those statements. See <u>Kastigar v. United States</u>, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

> When compelled statements are produced in response to a grand jury subpoena, this strict Kastigar prohibition give the government strong incentive to employ what it calls a "<u>Garrity</u> screening team" to remove compelled statements of the target of the federal investigation, including investigative fruits of those statements, before the subpoenaed material is given to the grand jury or the prosecution team.

*In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d. 768, 772 (8th Cir. 2020). That case is a controlling Eighth Circuit case from 2020 that arose out of this District. And the clear import of the case is that, while *Garrity*-protected information may be subject to grand jury subpoenas, the government should employ a *Garrity*-screening team because there are dire consequences if it accesses protected information. Moreover, it is important to keep in mind that this is the warning regardless of any intentional, reckless, or bad faith conduct on the part of the

government. It is our understanding the Government provided this case to the Adair City

Attorney **on or before January 9, 2022**.

On December 11, 2022, the Government filed an indictment charging Wendt. Thereafter,

Wendt was put on unpaid administrative leave. There were subsequent City Council meetings on

December 19, 2022 and January 11, 2023 where this matter was again discussed with the City

Council reinstated Wendt at the January 11 meeting.

On **January 10, 2023**, the Court held a hearing on Wendt's appeal of his release

condition under 18 U.S.C. § 3142. At that hearing, the Government revealed for the first time

that it had obtained and reviewed recordings of the closed-door portions of the city council

sessions regarding Wendt's employment. Specifically, the Government stated the following to

the Court:

> First of all, at page 3 of Mr. Klinefeldt's reply, he notes that in support of his
> request to possess firearms that the City of Adair reinstated Mr. Wendt as the
> police chief after the execution of the search warrants in August. I would note that
> Mr. Wendt is currently 1 of 2 officers in a town of 800 people. I have listened to a
> recording of the city council meeting at which Mr. Wendt was reinstated, and it
> was made clear in that recording that a large justification for reinstating Mr.
> Wendt was the fact that this other – this single other officer was being forced to
> work excessive hours to provide police services to the City of Adair, so that was a
> driving force behind the decision to reinstate Mr. Wendt.
>
> More importantly for today's purposes, Your Honor, Mr. Wendt's reinstatement
> was facilitated by more lies to the City of Adair. In that audio recording of that
> city council meeting, the mayor of the City point blank asked Mr. Wendt if he
> personally gained from his possession – position as police chief with respect to
> machine guns, and Mr. Wendt said no. As alleged in the indictment, that is a false
> statement. He has profited to the tune of at least $75,000 or so for the transfer of
> these machine guns that he obtained purportedly for the police department.

Dkt. #97, at 32-33. In other words, the Government is telling the Court explicitly that Wendt lied

to the Mayor and covered up the sales of machine guns registered to the City of Adair for more

money than he purchased them – and that is how he was able to get reinstated.

The Government's proffer of this evidence to the Court on January 10 is important for several reasons. First, it is important to the hearing because the Government used this proffer of evidence to both undermine Wendt's credibility with the Court as well as undermine the significance of the City of Adair's decision to reinstate its police chief. Second, as demonstrated in this brief, the Government's review of this recording – let alone its use of it – was a flagrant disregard of Wendt's rights. Third, the Government violated both Rule 26.2 and Rule 16 by not disclosing it to Wendt until three weeks after the hearing and two and a half weeks after the Rule 16 deadline – and, then, only as part of a filing for its own purposes.

But perhaps most importantly, the Government's proffer to the Court was important because it was false. The recording states as follows:

> **Mayor**: Just your ***personal opinion***, Brad, do you think you used your position at the Adair PD for personal gain? Did you make a personal gain because of your position at Adair? Working for the town?

> **Wendt**: Actually, I lost money ***on the whole thing***. We lose money on the machine gun shoots every year. And we lose, well, when I buy the machine guns I'm way in the hole. The only way I will ever make the gain is in the end when I retire if I sell the machine guns that I bought. So, currently, no I have not made a personal gain yet ***in the whole situation***.

> . . . .

> **Mayor**: ***So the four you said that the City of Adair had title of and then transferred, did you make money on the transfer***?

> **Wendt**: ***Yeah, but I turned around and reinvested it in more guns***.

Govt.'s Ex. 6, at to 35:50 - 37:36 (emphasis added).[1] ***Earlier in the recording***, Wendt likewise discusses the sale of those machine guns. *Id*. at 18:45. Also, the City Council discuss this information in its ***September 14 closed door session***, which the prosecution team had also

---

[1] By citing this record and any other statements, Wendt does not waive any privileges or protections. Rather, it is necessary for him to be able to make a record on this issue.

listened to prior to the January 10 hearing. As a matter of fact, in the very portion of Special

Agent Kohler's 302 regarding his interview of the Mayor on August 31, that the Government

cites in support of its self-serving motion for *in-camera* review of the recording, Special Agent

Kohler reports the following:

> After WENDT was interviewed by the FBI and ATF today, but before BYARS
> was interviewed by the FBI, WENDT at the city council meeting stated he had
> purchased six machine guns for the APD. WENDT stated that he was going to
> sell these six machine guns in order to buy a different gun. WENDT also stated
> that he was selling the guns for more than what he paid for them, and he felt that
> he should because there [sic] value was worth more now, than when he had
> purchased them.

Dkt. #74, at 2 (citing Govt.'s Ex. 2, at 3). That FBI 302 is dated **September 2, 2022**. *Id*.

Though the January 10 hearing was the first time counsel for Wendt heard about the

Government accessing these recordings, the issue was so apparent that Wendt's counsel

immediately notified the Court and the Government in the hearing that they believed there was a

*Garrity* issue. Counsel for Wendt immediately followed up in writing with the Government

regarding the *Garrity* problem and has continued to do so since that hearing.

During this time, Wendt has been attempting to get the discovery necessary to properly

address this issue. The Court has indicated that, according to Wendt's own recent filing, he has

had most of the discovery for over two months now. Dkt. #120, at 3. To clarify, that portion of

Wendt's brief was only discussing Rule 16 materials. As the filing later indicates, Wendt

believes there is a lot of discovery that has not been disclosed to Wendt at all – including, for

example, materials from the ATF NFA Division and any substantive case related

communications with witnesses. Specific to this issue, the Government continues to refuse to

provide copies of the most significant discovery. In particular, the Government refuses to

provide copies of the grand jury transcripts, interview reports, interview recordings, or other substantive case-related communications.

The Government has not in any way produced to Wendt a majority of the discovery. As demonstrated by the Government's Discovery Index, what the Government has provided copies of mostly consists of Wendt's interview, copies of his own documents, and pictures the Government took while executing the search warrants (as well as documents from cooperator Jonathan Marcum's case).

The discovery the Government has <u>not</u> produced copies of – and only offered to let Wendt review at its office under significant restrictions – includes the following:

1.  August 31, 2022 SW Interview Recordings (11 Interviews) (No Bates Stamp)

2.  August 31, 2022 Search Warrant Reports (6 Reports) (Bates Stamp ## 535-42)

3.  Grand Jury Transcripts (15 witnesses) (Bates Stamp ## 543-954)

4.  ATF Interview Reports (ROIs) (71 Reports) (Bates Stamp ## 855-2546)

5.  ATF Pictures of Machine Gun Shoot (No Bates Stamp)

6.  ATF Videos of Machine Gun Shoot (No Bates Stamp)

7.  FBI Interview Reports (302s) (35 Reports) (Bates Stamp ## 12907-13005)

8.  FBI Interview Report & Photos re: Dan Shamie (Bates Stamp ## 13031-34)

9.  FBI Interview Report re: Jack Chuang & Recording (Bates Stamp ## 13035-40)

10. FBI Reports re: Bank Records (Bates Stamp ##13064-110)

*See* Government's Discovery Index.

As such, it is impossible for Wendt to analyze what the Government may have been told by Adair City Officials about statements from Wendt as well as perform any kind of analysis of what may have been tainted by the *Garrity*-protected statements. As the Court indicated in its

ruling, *Garrity* applies to not just a compelled statement but also the fruit of that statement. Dkt. #120, at 3. In other words, it is important to know: (1) what was communicated to Wendt by Adair city officials from August 31, 2022 onward; (2) what Wendt communicated to those officials; (3) what information the Government possesses about those communications; and (4) how the Government may have used that information. Since August 31, 2022, the Government has been communicating with multiple Adair city officials (including the Mayor, the City Attorney, and Council members) by text, telephone, in-person interviews, and grand jury appearances. As set forth in Wendt's motion to compel, the Government has not provided him with the necessary discovery to properly address this issue.

## III.   ARGUMENT

### A.   The Warrants Are General Warrants In Violation Of The Fourth Amendment

Fourth Amendment rights are "not mere second-class rights but [those that] belong in the catalog of indispensable freedoms. . . . Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *In re Grand Jury Proceedings*, 716 F.2d 493, 497 n.5 (8th Cir. 1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting)).

As a part of those protections, the Fourth Amendment prohibits general search warrants. *Andresen v. Maryland*, 427 U.S. 463, 480 (1976). Specifically, a warrant must have a "particular description" of the items to be seized to protect the significant privacy concerns implicated by "a general, exploratory rummaging in a person's belongings." *In re Grand Jury Proceedings*, 716 F.2d at 480. "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Id.* (internal quotation marks omitted) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)). "A description is sufficiently particular when it enables the searcher to reasonably

ascertain and identify the things authorized to be seized." *U.S. v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988) (internal quotation marks omitted) (citation omitted). Thus, the question in evaluating whether a warrant is particular enough is whether it "allow[s] the executing officer to distinguish between items that may and may not be seized." *Id.* at n.12.

The First and Second Phone Warrants (the "Phone Warrants") are insufficiently particular and violate the Fourth Amendment. When a search involves electronic devices, courts have instructed the government "to exercise caution to ensure that warrants describe with particularity the things to be seized and that searches are narrowly tailored to uncover only those things described." *United States v. Winn*, 79 F. Supp. 3d 904, 919 (S.D. Ill. 2015) (internal quotation marks omitted) (quoting *United States v. Mann*, 592 F.3d 779, 786 (7th Cir. 2010)). These limits are especially important to protect individuals' Fourth Amendment rights in a digital age because, as the Supreme Court described in *Riley v. California*, 573 U.S. 373 (2014), "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house." *Id.* at 396.

In *In re Grand Jury Proceedings*, the Eighth Circuit held a search warrant for the premises of a bail bonding business was invalid because it authorized a search for all records for a seven-year period without specifying transactions, files, or categories of documents. *In re Grand Jury Proceedings*, 716 F.2d at 497. The warrant authorized the government to seize "all records" at the bail bonding business for a seven-year period. *Id.* The Eighth Circuit found:

> [t]he scope of the search was otherwise unlimited: the warrant did not indicate that the documents sought pertained to any specific transactions, did not identify the offenses on which evidence was sought, and did not confine the search to any particular files or categories of documents. In the absence of any clearly demonstrated necessity, the seven-year period covered by the search warrant is excessive and unreasonable.

*Id.*

The general warrant in *In re Grand Jury Proceedings* authorized the rummaging through all of the bail bondsman's business files to seek any information related to the "generic" crime of interstate fraud. *Id.* Such a general warrant creates "the very risk of excessive intrusions by law enforcement authorities into private affairs that the fourth amendment was intended to guard against." *Id.* at 498.

Further, broad statements listing the types of records ordinarily kept by a business and not tied to any specific transaction do not satisfy the particularity standard. *Id.* ("Although the Supreme Court in *Andresen v. Maryland, supra,* suggested that a list of document types satisfies the particularity requirement when the warrant expressly relates the documents to a single transaction under investigation, the warrant in this case contained no such limitation. Unlike *Andresen,* we have no fixed or specific transaction to which any of the documents sought in the instant case can be related.").

Moreover, reference to a federal statute does not alone save a general search warrant. *Id.* at 497 ("[R]eference to a general statute certainly will not satisfy the Fourth Amendment's particularity requirement when the police could have more precisely described the evidence that they were seeking or included other limiting features."); *see also Winn*, 79 F. Supp. 3d at 921 ("An unadorned reference to a broad federal statute does not sufficiently limit the scope of a search warrant."); *United States v. Roche*, 614 F.2d 6, 8 (1st Cir. 1980) (referring to the federal mail fraud statute and finding "limitation by so broad a statute is no limitation at all."); *United States v. Spilotro*, 800 F.2d 959, 965 (9th Cir. 1986) (affirming suppression of information obtained by search warrant where its only limitation was to evidence of the violation of thirteen broad criminal statutes).

"The magnitude of the privacy invasion of a cell phone search utterly lacking in temporal limits cannot be overstated." *Commonwealth v. Snow*, 486 Mass. 582, 593-94 (Mass. 2021); *Richardson v. Johnson*, 481 Md. 423, 466 (Md. 2022) (holding a cell phone warrant without any temporal restriction violated the particularity requirement of the Fourth Amendment); *Taylor v. State*, 260 A.3d 602, 616 (Del. 2021) (finding the entire cell phone should have been suppressed where the warrant failed to limit the search of the cell phone to "any relevant time frame"); *United States v. Winn*, 79 F. Supp. 3d at 921 (granting motion to suppress cell phone where warrant did not contain any time limit); *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 459 (S.D.N.Y. 2013) (granting motion to suppress and noting temporal restriction is "indic[ium] of particularity") (citation omitted).

"Federal Courts of Appeals have concluded that warrants lacking temporal constraints, where relevant dates are available to the police, are insufficiently particular." *Wheeler v. State*, 135 A.3d 282, 307 (Del. 2016) ("*Wheeler*") (citing *United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006) (stating that witness tampering warrant was overbroad because it failed to limit by relevant dates when police had access to such dates); *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999) ("Failure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad.").

The Supreme Court, in *United States v. Leon,* 468 U.S. 897 (1984), provided a "good faith" exception to the exclusionary rule for evidence seized in violation of the Fourth Amendment. *Id*. The Supreme Court noted that suppression is still an appropriate remedy, for example, where a warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.* at 923. Under the good faith exception, evidence obtained in violation of the Fourth Amendment may still be introduced unless:

'[P]olice conduct [was] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.' Deterrence is implicated where an officer engages in 'deliberate, reckless, or grossly negligent conduct,' as well as in circumstances that demonstrate 'recurring or systemic negligence.'

*Zemlyansky*, 945 F. Supp. 2d at 465.

Notably, "if the officer may properly be charged with the knowledge that a valid search warrant contains an essential temporal component, an officer who fails to record the relevant time frame has committed a 'deliberate, reckless, or grossly negligent' act." *United States v. Carroll*, No. 12 Cr. 57, 2012 WL 5350364, at *6 (E.D.N.C. Oct. 29, 2012) (citation omitted) (noting that "deliberate" means "sufficiently deliberate that it can be deterred," not "intentional misconduct").

Moreover, "[a] reasonably well-trained officer should know that a warrant must provide guidelines for determining what evidence may be seized." *Leary*, 846 F.2d at 609 (suppressing evidence and finding good faith could not apply where the warrant was so broad it left officers to their own discretion as to what could be seized). The issue is not whether the officers were well-meaning in their search, but rather whether "they reasonably concluded that the warrant in their possession authorized the search they conducted." *Zemlyansky*, 945 F. Supp. 2d at 476 (citation omitted).

Here, the Government was allowed to execute general search warrants that lacked the requisite constitutional particularity. The Phone Warrants failed to contain a date limit – which alone should be fatal. However, beyond that, the Government (1) did not just search but seized all of the devices and accounts; (2) did so without any particularity about what was actually relevant to the investigation; (3) failed to do any sort of second stage responsiveness review; and (4) failed to have approved any privilege protocol. *See, e.g., In re Search of Info. Associated with*

*the Facebook Account Identified by Username Aaron.Alexis That Is Stored at Premises Controlled by Facebook, Inc.*, 21 F. Supp. 3d 1, 8 (D.D.C. 2013). In sum, it was permitted to search and seize all of Wendt's most personal information without regard to whether it was, in fact, relevant to the investigation or whether it was privileged.

> **B.      The Government Obtained And Used Wendt's Protected Statements Against Him In Violation Of *Garrity v. New Jersey***

The Supreme Court held in *Garrity* that it is a violation of the Fifth and Fourteenth Amendments for the government to "use the threat of discharge to secure incriminatory evidence against an employee." *Garrity*, 385 U.S. at 499 (stating "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights"). A law enforcement officer cannot be required to choose between self-incrimination and job forfeiture. *Id.* at 496 ("The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent."). And while a police officer may be compelled by the government to answer questions, it is a Constitutional violation "when the compelled statement, or the fruit of that statement, is used against the officer in a subsequent criminal proceeding." *In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d. at 772 (citations omitted). Specifically, (1) an officer cannot be coerced, by the threat of loss of employment, to make statements that may be used in a subsequent criminal proceeding; and (2) an officer cannot be terminated for refusing to waive his or her Fifth Amendment rights. *Gardner v. Broderick*, 392 U.S. 273 (1968).

The State of Iowa has helped protect those rights with the Iowa Law Enforcement Bill of Rights, Iowa Code § 80F. And while Iowa Code § 80F helps guide cities and provides protections for law enforcement officers, it cannot be read in any way as limiting the constitutional rights identified in *Garrity*.

The majority of Circuit Courts that have ruled on whether a defendant's *Garrity* rights have been violated apply a two-part subjective-objective test. *Compare United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988) ("*Friedrick*"); *U.S. v. Vangates*, 287 F.3d 1315, 1322 (11th Cir. 2002) ("*Vangates*"); *with United States v. Indorato*, 628 F.2d 711 (1st Cir. 1980) ("*Indorato*").[2]

Most recently, the Ninth Circuit adopted the subjective-objective test in *United States v. Wells*, 55 F.4th 784, 796 (9th Cir. 2022) finding:

> It is apparent that the courts that have addressed *Garrity*'s application to government employment policies (or similar background rules alleged to create implicit coercion in the public employment context) have coalesced around a similar framework. Under this framework, courts consider both the public employee's subjective belief and the objective reasonableness of that belief to determine whether the employee's statements were improperly coerced.

> We too conclude that in the absence of a direct threat of loss of employment, this framework is appropriate for assessing whether government employment policies violate the rule in *Garrity*. The core of the Fifth Amendment is the protection against coerced self-incriminating testimony. And for an employee to be coerced, he must both be objectively threatened with a substantial adverse employment consequence for refusing to incriminate himself and be subjectively aware of that penalty. Although assessment of these objective and subjective elements will turn on the facts of each case, it is only when both elements are satisfied that the employee is denied the "free choice to admit, to deny, or to refuse to answer" incriminating questions, and thus entitled to suppression of his statements absent a grant of immunity.

*United States v. Wells*, 55 F.4th 784, 797 (9th Cir. 2022) (citations omitted).

---

[2] Under the *Indorato* reasoning, a defendant's *Garrity* protections attach when a defendant is told their employment will be terminated and a statute or ordinance requires discharge. *Indorato*, 628 F.2d at 716. However, other circuits have interpreted the *Indorato* decision differently. *See, e.g., Vangates*, 287 F.3d at 1322 n.7 (noting that *Indorato* "did not embrace a specific test" and "[e]ffectively, . . . found that the officer's subjective belief that his testimony was compelled was not objectively reasonable."; *United States v. Trevino*, 215 F. App'x 319, 321 (5th Cir. 2007) ("[N]either *Indorato* or *Garrity* rules out the possibility that implied threats could violate a defendant's *Garrity* rights.").

Under the two-part subjective-objective test, a defendant "must have subjectively believed that he was compelled to give a statement upon threat of loss of job[,]" and the belief must be "*objectively reasonable* at the time the statement was made." *Vangates*, 287 F.3d at 1322 (emphasis in original).

A defendant's testimony that they believed they would be subject to discipline if they did not give a statement is sufficient to show a subjective belief. *Id.* (finding the defendant's statements at a pretrial hearing were "sufficient to evince a subjective belief that she was 'compelled to give a statement upon threat of loss of job'" even though she did not explicitly say she felt her testimony was "compelled"); *State v. Weichman*, 871 N.W.2d 768, 775 (Neb. 2015) (finding testimony by the defendant that he thought he would be fired if he did not give statement showed subjective belief); *State v. Chavarria*, 131 N.M. 172, 177 (N.M. Ct. App. 2001) (finding the same).

A subjective belief is objectively reasonable if it "derive[s] from actions taken by the state" that create "the impression that the refusal to give a statement will be met with termination of employment." *Vangates*, 287 F.3d at 1323. Importantly, under this test, explicit threats of job loss are not required to show coercion. *See e.g.*, *Friedrick*, 842 F.2d at 399 (finding statements were coerced because the threat of termination was strongly implied, even though there "were no pink slips, no suspensions, no threats of discharge"); *Chavarria*, 33 P.3d at 928 (finding coercion and suppressing statements even though the officer was not "explicitly told he would be terminated if he did not talk . . . those conclusions were logical and reasonable ones to draw from the totality of the circumstances.").

The existence of a statute, regulation, or policy subjecting an employee to termination for failing to provide a statement is relevant in determining whether a statement was given

18

voluntarily. *See United States v. Camacho*, 739 F. Supp. 1504, 1516 (S.D. Fla. l990) (finding coercion and granting motion to suppress where officers were aware of an ordinance that provided for the termination of an employee who attempted to invoke their Fifth Amendment rights, even though the investigators never specifically threatened firing).

Here, it is objectively reasonable for Wendt to fear termination from his job when the ATF and FBI showed up to search his workplace in the presence of his supervisors and colleagues. It would be completely illogical for Wendt not to fear job loss when the ATF and FBI are searching his office in a criminal investigation targeting him personally.

Once an officer gives a coerced statement, it is protected and cannot be used in a subsequent criminal prosecution. *See Garrity*, 385 U.S. at 500.

> The Fifth Amendment bars the government from compelling self-incriminating testimony from individuals. If the government nevertheless decides to require an individual to testify, it must offer him immunity that puts him in "substantially the same position as if [he] had claimed his privilege."
>
> In a later prosecution of the individual, the government cannot use his immunized testimony itself or any evidence that was tainted—substantively derived, "shaped, altered, or affected,"—by exposure to the immunized testimony. Nor can the government use it to develop investigatory leads, to focus an investigation on a witness, or to motivate another witness to give incriminating testimony.

*United States v. Slough*, 641 F.3d 544, 549 (D.C. Cir. 2011) (internal citations omitted).

In situations where an officer of the government is compelled to testify over his or her Constitutional right not to do so, "a critical function of the government is to engage in a long established standard practice to insure that no immunized statement of a subject officer is used against that officer in a federal criminal prosecution." *United States v. Bowen*, 969 F. Supp. 2d 546, 583, 585 (E.D. La. 2013) (granting a motion for a new trial after an experienced attorney was selected as the taint team leader and due to a "mistake" turned over *Garrity* protected information to the trial team). That function is of such "grave importance" that the "Criminal

Section of the DOJ's Civil Rights Division is charged with insuring the protection of those

officers' rights under *Garrity* and *Kastigar*." *Id.* at 583. Moreover, the Eighth Circuit has held

that an officer "whose compelled statements are subpoenaed by a federal grand jury is eventually

indicted[,]" the officer "is entitled to a hearing at which the government must prove that the

indictment was not based in any way on the officer's compelled statements or the fruits of those

statements." *In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d. at 772

(citing *Kastigar v. United States*, 406 U.S. 441 (1972)).

The Eighth Circuit recognizes that a *Garrity* review in addition to *Kastigar* protections

properly protects a defendant's rights:

> When compelled statements are produced in response to a grand jury subpoena, this strict <u>Kastigar</u> prohibition gives the government strong incentive to employ what it calls a "<u>Garrity</u> screening team" to remove compelled statements of the target of the federal investigation, including investigative fruits of those statements, before the subpoenaed material is given to the grand jury or to the prosecution team. At least two of our fellow circuits have concluded that this "<u>Garrity</u> review procedure," combined with <u>Kastigar</u> protections if the target is criminally prosecuted, provide sufficient Fifth Amendment protection from improper use of the compelled statements.

*Id.* at *5 (citations omitted). Again, this is the very case the Government apparently provided to

the City prior to using the communications against Wendt at a hearing. It is not clear yet how

else the Government has used these communications against him.

Here, the Government violated Wendt's *Garrity* rights and did so in the most egregious

fashion. As an initial matter, the communications were clearly protected. Moreover, from the

very outset, the Government had to have known, or at least should have known, that the nature of

its investigation and how it executed the search warrants would immediately put Wendt's

employment in jeopardy and cause the City to start asking him questions. Further, the City

clearly intended the communications to be protected and, more importantly, it would be

completely reasonable for a veteran law enforcement officer to believe he would receive the protections of *Garrity*. Yet the Government bypassed all the signs and signals that these communications were protected and made absolutely no effort to prevent accessing them. To the contrary, the Government sought them out despite their clear protections. The Government went so far as to consciously disregard the warning in the very case it sent the City regarding these communications – including refusing to abide by DOJ policy issued to protect against this kind of problem. Finally, the Government then not only used the protected communications against Wendt in a hearing but misstated them to the Court and then violated his discovery rights by not providing the recordings to him to rebut them.

## IV.    CONCLUSION

In conclusion, Wendt respectfully requests that the Court require the production of relevant discovery; (2) hold an evidentiary hearing consistent with the full protections of *Kastigar*; and, then, (3) dismiss the case or, in the alternative, suppress the above-identified evidence.

Dated: April 19, 2023                    **FAEGRE DRINKER BIDDLE & REATH LLP**


                                         */s/ Nicholas A. Klinefeldt*
                                         Nicholas A. Klinefeldt, AT0008771
                                         Rachel A. Yaggi, AT0014994
                                         801 Grand Avenue, 33rd Floor
                                         Des Moines, IA 50309
                                         Telephone: (515) 248-9000
                                         Fax: (515) 248-9010
                                         *Nick.Klinefeldt@faegredrinker.com*
                                         *Rachel.yaggi@faegredrinker.com*

                                         ***ATTORNEYS FOR DEFENDANT WENDT***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of April, 2023, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

*/s/ Paulette Ohnemus*

US.356855238.03