IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No.  4:22-cr-00199-SHL-HCA |
| vs. | | |
| BRADLEY EUGENE WENDT and ROBERT ALLEN WILLIAMS, | | **ORDER ON MOTIONS TO SUPPRESS, QUASH, AND RETURN PROPERTY AND APPEAL FROM MAGISTRATE JUDGE RULING** |
| Defendants. | | |

In this heavily litigated criminal case, Defendants Bradley Eugene Wendt and Robert Allen Williams have filed motions to suppress, quash, and return seized property on the basis of alleged Fourth and Fifth Amendment violations. The parties also have numerous discovery disputes, one of which has now been appealed to the undersigned. For reasons set forth in detail below, the Court rules as follows:

(1) Wendt's Motion to Suppress (ECF[1] 127) is GRANTED IN PART and DENIED IN PART. Some of Wendt's statements during the City of Adair's investigation into his conduct are protected from use by the Government, and thus the Court must hold a *Kastigar* hearing to determine whether the Indictment resulted wholly from evidence independent of the protected statements. The remainder of the statements are not protected, nor were Wendt's Fourth Amendment rights violated by the scope of search warrants obtained by the Government in connection with the investigation.

(2) Williams's Motion to Quash, to Return Seized Property, and to Suppress (ECF 135), and Wendt's Joinder (ECF 139) are DENIED. The search warrants in question, on their face, do not violate the particularity requirement of the Fourth Amendment, nor were they issued without probable cause or otherwise in violation of Williams's or Wendt's constitutional rights. The Government is, however, expected to follow the privilege protocol ordered by Chief Magistrate Judge Helen Adams.

(3) Williams's Appeal from Magistrate Judge Ruling (ECF 169) is DENIED. Chief Judge Adams correctly concluded that the Court does not have the authority to grant the relief Williams seeks with respect to production of copies of witness statements, grand jury transcripts, and other materials.

---

[1] All references to "ECF __" are to the docket entry on the electronic case filing system. When page numbers are included, they refer to the auto-populated page numbers at the top of each page, which may be different than the page numbers inserted by the parties at the bottom.

## I.     FACTUAL BACKGROUND

*A.     Findings of Fact Related to Wendt's Motion to Suppress Arising Out of Alleged Fifth Amendment Violations.*

The Court finds the following facts by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). As of May 2022, federal law enforcement officers were investigating Wendt for possible violations of federal law during and in connection with his employment with the City of Adair, Iowa. On May 18, 2022, United States Magistrate Judge Celeste Bremer issued search warrants for Facebook and Hotmail accounts associated with Wendt. (ECF 171-4; ECF 171-5.) On August 25, 2022, Chief United States Magistrate Judge Helen Adams issued search warrants for several properties, including Wendt's residence and Adair City Hall. (ECF 171-7; ECF 171-8; ECF 171-9.). The warrant for Wendt's residence authorized law enforcement officers to seize, *inter alia*, "mobile phones." (ECF 171-9, p. 8.)

Agents executed the warrants on August 31, 2022, as part of a coordinated operation in Adair, which is a small town in west central Iowa with a population of approximately 800 people. (Tr.[2] 13–14.) Unsurprisingly, the presence of federal law enforcement agents at City Hall that day attracted the attention of, among others, the town's Mayor and City Council members, some or all of whom ended up being interviewed. (Tr. 16, 20.) A law enforcement agent also spoke to a group of City officials collectively to explain the "general nature of what was happening." (Tr. 16.) There were somewhere between six and twelve law enforcement officers present, not including City of Adair police officers. (Tr. 17.)

At some point that day, an agent explained there were "no charges pending or imminent," but they were serving a warrant relating to "law letters" signed by Wendt for the acquisition of automatic weapons. (Tr. 18.) It was clear from how the warrants were executed and what the agents said that this was a criminal investigation targeting Wendt in connection with actions taken by him in his role as Police Chief. (Tr. 18–19, 21.) City Attorney Clint Fichter talked to Wendt that day to try to understand what had led to the execution of the search warrants. (Tr. 23; Tr. 66–67.) Other members of City Government also asked Wendt questions, either that day or during ensuing days or weeks. (Tr. 23–24; Tr. 66–67.) The inquiries from City officials did not necessarily arise in the context of formal City Council meetings; instead, given the unusual flurry of activity, City officials were talking about what happened in a more informal way—"like a social situation almost." (Tr.

---

[2] All references to "Tr. __" are to the rough draft transcript from the evidentiary hearing on May 11, 2023.

25.) No one on that day or at any other time told Wendt that he had to answer questions or be fired. (Tr. 69, 70.)

Either during or after the execution of the search warrants on August 31, 2022, the Mayor and City Council convened a meeting. (Tr. 24.) Wendt came in and out of the meeting, first to explain that law enforcement officers were executing a search warrant and later to provide information about the nature of the investigation. (Id.). Later in the day, Wendt was placed on paid leave by the Mayor and City Administrator. (Tr. 26.)

At some point, the City Council directed City Attorney Clint Fichter to perform an investigation. (Tr. 22; Tr. 26–27.) Fichter's testimony was vague on the exact date this occurred, with him expressing confidence on one occasion that it did not happen on August 31 (Tr. 26 ("Not that day.")), but later suggesting it happened the same day Wendt was placed on paid leave, which was August 31 after all (Tr. 26–27). Fichter's confusion on dates persisted throughout his testimony, culminating with him admitting, "I'm sorry. I don't recall my dates very well." (Tr. 32.) For example, he testified that he had "partially completed" his investigation by the time of a City Council meeting on September 14, including interviewing some witnesses. (Tr. 29.) This testimony is inconsistent with the recording of the September 14 City Council meeting, which shows that Fichter had not conducted an investigation as of that date beyond a call to the U.S. Attorney's Office to try to obtain information. (ECF 74-6.)[3] In Fichter's words (during the City Council meeting, not during his testimony):

> There's just so much we don't know with this. I had talked with [the Mayor] about, we had reached out to a couple investigators that I've worked with that could come in and do an HR investigation. I really don't think it's that hard of a situation to investigate because pretty much what we need is— I've made a request to the U.S. Attorney's Office to get anything related to [Wendt's] workplace conduct released to us . . . what we need to do is investigate his workplace conduct . . . we should investigate his workplace conduct and then come up with some kind of written document and give [Wendt] a chance to get interviewed and all that stuff and come up with some factual based [report] and put that in front of you and let you make a decision. That will protect you as individuals and protect the City for whatever decision we make.

---

[3] The parties agreed that the Court should admit as evidence and review the recordings of the September 14 and October 26 City Council meetings. (Tr. 72.)

(Id., 9:30–11:00.) Given the inconsistency between dates identified in Fichter's testimony and reliable information elsewhere in the record, the findings of fact in the next paragraph intentionally disregard substantial portions of Fichter's testimony as to dates of relevant events. These findings instead are based on the recording of the City Council meeting on September 14 and reasonable inferences drawn therefrom.

Prior to September 14, Fichter had taken preliminary steps to try to obtain information about Wendt's situation, including communications with the U.S. Attorney's Office. Fichter had not, however, begun any formal investigation because he needed to confirm with the City Council what they wanted him to do. The fledgling investigation was discussed during a closed-session City Council meeting on September 14. During the meeting, Council members discussed whether Wendt had done anything illegal, with most saying they did not know one way or the other. (Id., 2:45–3:17.) One Council member claimed, however, that he was told by an FBI agent that Wendt "had broken no laws." (Id., 2:38–2:43.) Someone (possibly the same person) also said Wendt had "paid for everything," defended Wendt's right to use City letterhead for "law letters," and said, "Everything [Wendt] did, had to be approved by the ATF." (Id., 5:09–5:25; 6:35–6:40.) This member was highly supportive of Wendt and, in context, it seems clear that the original source of much of his information was Wendt himself. Later, a Council member (again, probably the same person) said more expressly that he talked about the situation with Wendt, who claimed to have done nothing wrong. (Id., 26:03–26:22.) A different Council member then said one of his concerns was that Wendt "sat here" and admitted selling the guns for substantially more than he paid for them, which, in the member's view, was troubling because Wendt was only able to buy the guns in the first place by purporting to do so on behalf of the City. (Id., 26:25–27:10.) More discussion ensued, in part revolving around things Wendt said, but also involving statements made by law enforcement agents, with some Council members defending Wendt and others expressing concerns. (Id., 27:11–31:00.) Ultimately, the members agreed to "leave the status quo the way it is" and authorized Fichter to "continue gathering this information." (Id., 31:10–31:40; Tr. 33.) Wendt himself was not present for the September 14 meeting; instead, he was on a pre-scheduled vacation.

The City of Adair is a "close-knit community" with "all different levels of personal relationships," and thus City officials could have received information from Wendt in a variety of settings. (Tr. 31.) City officials have a fiduciary duty to the City to gather facts and information,

although investigatory powers are "usually exercised through [the City Attorney]." (Tr. 31.) On October 3, 2022, Fichter sent a letter to Wendt from the City, signed by the Mayor, notifying Wendt of "an investigation being conducted into violations of personnel standards . . . in compliance with Iowa Code 80F." (Tr. 31–32; ECF 129-1 ("Ex. X").) The letter informed Wendt that "any information obtained in this investigation cannot be used against you in any criminal proceedings and will be considered a confidential employee record." (Ex. X.) The letter summarized the City's understanding of the substance of the FBI and ATF investigation into Wendt's purchases of firearms, then stated:

> We are offering you an opportunity to respond to questions regarding these purchases in writing or through an in-person interview. You may have an attorney provide your responses or attend such in-person interview.
>
> The questions the City needs to resolve are the following:
>
> 1.  How many Law Letters were sent by you on behalf of the City of Adair for the purchase or demonstration of automatic weapons?
>
> 2.  How many weapons were purchased on behalf of the City of Adair because of these Law Letters? If automatic weapons were purchased, were any sold by you and how many were in your possession or in the City's possession on August 31, 2022.
>
> 3.  Did you communicate to the ATF or FBI that any automatic weapons purchased were to be bought with City funds and for City use?
>
> 4.  Did you communicate that the City of Adair had three or more full-time officers in the Police Department in any of the Law Letters?
>
> You may also provide any other information that you feel is pertinent to this situation.
>
> If you wish to respond in writing, please do so by October 7, 2022. If you request an in-person interview to be held at a date and time prior to 4:00 PM on October 7, 2022.
>
> Please be advised that this investigation may result in reprimand or termination of your employment.

(Id.) In Fichter's view, Wendt had an obligation "[u]nder the personnel manual" to answer these inquiries, with disciplinary action possible for failure to comply, including termination. (Tr. 42; Tr. 47.) Wendt interpreted the letter to mean that if he did not respond, he would be terminated. (Tr. 68.) He acknowledged, however, that the letter does not say this expressly. (Tr. 69.)

Fichter testified that the October 3 letter merely "confirm[ed]" Wendt's rights under Iowa Code Chapter 80F, which, in Fichter's view, applied with equal force to information Wendt

provided before October 3 so long as Wendt provided such information in response to a solicitation, as opposed to information he might have volunteered. (Tr. 43.) Fichter never, however, told Wendt that he had to answer questions or else would be fired, nor did he ever hear anyone else say this. (Tr. 58.) Wendt admits that no City official ever communicated this type of ultimatum to him. (Tr. 69–70.)

Wendt responded to the October 3 letter via letter from his counsel dated October 26, 2022. (Tr. 43–44; ECF 129-2 ("Ex. XX").) The City Council also held a closed-session meeting on October 26, which Wendt attended with his criminal defense counsel. (Tr. 44–45.) Relatively early in the meeting, the Mayor asked Wendt if he had any comments or "[do] you just want to sit and listen?" (ECF 74-7, 11:00–11:15.) Wendt responded, "[i]f you have any questions, I can answer the ones that I can, I guess." (Id.) The Mayor and Council members indeed asked Wendt questions during the meeting, which he answered. (Id., 17:20–21:30.) At one point, in the midst of a response to a specific question, Wendt made what appears to have been a side comment to his attorney along the lines of, "I don't know if you want me to answer that one. . . ." (Id., 18:50–19:00.) There also appears to have been vague discussion during the meeting of Wendt's written responses to the October 3 letter. (*See generally* id., 12:00–14:00.) At the conclusion of the meeting, the City Council voted to reinstate Wendt. (Tr. 47.)

Sometime after Wendt's reinstatement, the grand jury issued a subpoena to the City asking for records relating to Wendt. (Id.) This led to dialogue between Fichter and Assistant United States Attorney Ryan Leemkuil about attorney-client privilege issues, Iowa Code Chapter 80F, and related topics. (Tr. 48–50.) Fichter was concerned about producing information that might be protected under Iowa Code § 80F.1, but AUSA Leemkuil provided Fichter with a copy of a recent Eighth Circuit case, *In re Grand Jury Subpoena Dated August 14, 2019*, 964 F.3d 768 (8th Cir. 2020), that addressed the interplay between federal grand jury subpoenas and section 80F.1. (Tr. 53; Tr. 55.) The City ultimately withheld its October 3 letter and Wendt's October 26 written response from its production but produced recordings of the closed-session City Council meetings dated September 14 and October 26, among other materials. (Tr. 48–49.)

On November 15, 2022, an Adair City Council member testified before the grand jury investigating Wendt. Wendt alleges that, during the grand jury testimony, the "Government explicitly questioned a City Council member about this closed-door session [on October 26, 2022]." (ECF 127-1, p. 6.) This allegation does not appear to be supported by the exhibits cited by

Wendt, which instead involve discussion of *other* City Council meetings from prior months and years. The Court has not, however, reviewed the grand jury testimony itself because the parties agreed to a two-stage process in which the Court would first decide whether Wendt's statements were entitled to protection at all. If so, the Court would hold a second hearing to take evidence on whether and how the protected statements were used.

On December 14, 2022, the grand jury returned a twenty-count Indictment against Wendt and Williams. (ECF 2.) The Indictment is twenty-seven pages in length but does not appear to mention any statements made by Wendt during the closed-door session of the Adair City Council on October 26, 2022. (Id.) However, during a hearing on January 10, 2023, AUSA Leemkuil stated that he had "listened to a recording" of that session and asserted that it included what the Government interpreted as a false statement made by Wendt. (ECF 97, pp. 32–33.) Wendt argues the statement was not false when given a fair reading; more importantly, however, he argues that it was protected and should not have been reviewed or used by the Government at all.

Following Wendt's indictment, the City Council held meetings in December 2022 and January 2023 during which Wendt's status was again discussed. (Tr. 55–56.) Wendt may have answered questions during those meetings (Tr. 56), although the Court has not been provided with recordings of the meetings or any description of what he said. The Court also does not know whether recordings of those meetings were provided to the Government. It is undisputed, however, that the Government never implemented a "taint team" to shield the prosecution team from statements made by Wendt that might be protected. (Tr. 84–85.)

B.     *Factual and Procedural Background Relating to Wendt's and Williams's Motions to Suppress Arising Out of Alleged Fourth Amendment Violations.*

The Government applied for numerous search warrants over the course of the investigation into Wendt and Williams, including, as relevant here, the following: (i) May 18, 2022, application for information associated with Facebook account https://www.facebook.com/bradley.wendt.18 (ECF 171-4); (ii) May 18, 2022, application for information associated with Microsoft account b-wendt@hotmail.com (ECF 171-5); (iii) August 25, 2022, application for Wendt's residence in Denison, Iowa (ECF 171-9); (iv) December 7, 2022, application for information associated with Yahoo account bigiron7694@yahoo.com (ECF 171-1); (v) December 7, 2022, application for information associated with Facebook account https://www.facebook.com/rob.williams.127 (ECF 171-2); and (vi) January 11, 2023, application for Wendt's cell phone (ECF 133-2). Each

application resulted in the issuance of a search warrant on the same date by a United States Magistrate Judge.

Williams moves to suppress evidence obtained from the December 7 warrants to Yahoo and Facebook. (ECF 135.) Wendt joins in Williams's motion and, separately, moves to suppress evidence obtained from the May 18 warrants to Facebook and Microsoft, the August 25 warrant for his residence (which, as relevant here, also authorized seizure of his cell phone), and the January 11 warrant for his cell phone. (ECF 127; ECF 139.) For reasons explained in detail below, the adjudication of the Fourth Amendment issues in Wendt's and Williams's Motions to Suppress does not require further factual development beyond the face of each warrant. Specific details pertaining to each warrant will be provided, in context, below.

## II.   LEGAL BACKGROUND AND ANALYSIS – WENDT'S MOTION TO SUPPRESS PURSUANT TO THE FIFTH AMENDMENT.

### A.   Background.

The Fifth Amendment protects against compelled self-incrimination. *See, e.g.*, *United States v. Montgomery*, 100 F.3d 1404, 1406 (8th Cir. 1996). Pursuant to *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967), the Fifth Amendment privilege "extends to statements a government employee is compelled to make under the threat of removal from public office." *United States v. Moten*, 551 F.3d 763, 766 (8th Cir. 2008) (citing *Garrity*). "The privilege does not bar the government from compelling a public official to answer. 'Rather, the Constitution is violated only when the compelled statement, or the fruit of that statement, is used against the officer in a subsequent criminal proceeding.'" *Id.* (quoting *In re Grand Jury Subpoenas Dated Dec. 7 & 8*, 40 F.3d 1096, 1102 (10th Cir. 1994)). Wendt bears the burden of proving for *Garrity* purposes that he was "compelled" to make statements by his government employer. *See id.*; *see also United States v. Burge*, No. 08 CR 846, 2009 WL 2972915, at *3 (N.D. Ill. Sept. 11, 2009). If he meets this burden, "the government must show that any evidence used or derived has a 'legitimate source wholly independent of the compelled testimony.'" *United States v. McGuire*, 45 F.3d 1177, 1182 (8th Cir. 1995) (quoting *Kastigar v. United States*, 406 U.S. 441, 460 (1972)).

Courts have reached different conclusions about when a statement is "compelled" for *Garrity* purposes. Some interpret the *Garrity* protections narrowly and hold that the privilege applies only when: "(1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment

. . .; and (2) there is a statute or municipal ordinance mandating such procedure." *United States v. Indorato*, 628 F.2d 711, 716 (1st Cir. 1980). Other courts interpret the privilege more broadly and merely require the person under investigation to show that "[he] in fact believed his [] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." *United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988); *accord United States v. Vangates*, 287 F.3d 1315, 1322 (11th Cir. 2002). Finally, a third line of cases takes *United States v. Friedrick* a half-step further by applying the privilege anytime the person under investigation reasonably believes "substantial penalties were likely to result from his refusal to answer questions" even if those penalties stop short of termination. *McKinley v. City of Mansfield*, 404 F.3d 418, 436 n.20 (6th Cir. 2005).

The Eighth Circuit has not definitively addressed the issue. In *Diebold v. Civil Service Commission of St. Louis County*, the Court rejected a *Garrity* argument in a situation where there was "no requirement that [the person under investigation] waive his immunity under the fifth amendment. Nor is there a threat that he will be fired simply for invoking that privilege." 611 F.2d 697, 701 (8th Cir. 1979). Later cases reiterate that a government employee must be "compelled" to make statements before *Garrity* applies but have not explained what form the compulsion must take. *See In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d at 772 (quoting *Moten*, 551 F.3d at 766)). There is nothing in Eighth Circuit precedent to establish, however, that *Garrity* applies only when a statute or ordinance formally mandates termination of a government official who refuses to answer questions. The Court therefore will decline to follow the strict approach adopted by the First Circuit in *United States v. Indorato* and instead will apply the subjective/objective test used by the D.C. and Eleventh Circuits; which is to say, Wendt must establish: (1) he subjectively believed, based on something communicated to him by his superior(s), that he would lose his job for refusing to respond to questions; and (2) his belief was objectively reasonable. *See Vangates*, 287 F.3d at 1322; *Friedrick*, 842 F.2d at 395.

In addition to the *Garrity* privilege, a defendant's statements are protected from use or disclosure (or, sometimes, both) when made in response to a promise of immunity. *See Kastigar*, 406 U.S. at 453. These protections apply even when the promise of immunity is made by a state agency and the defendant is later prosecuted federally. *See Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964), *abrogated on other grounds by United States v. Balsys*, 524 U.S. 666 (1998). Accordingly, when a state "compel[s] a defendant's testimony through an immunity grant,

the federal Government cannot take advantage of that testimony in order to obtain a conviction." *United States v. Barker*, 542 F.2d 479, 483 (8th Cir. 1976).

> B. *Wendt Has Established that Some of His Statements Are Protected and Therefore Is Entitled to a <u>Kastigar</u> Hearing.*

Although the Court is applying the subjective/objective test for determining when statements are compelled for *Garrity* purposes, it is important to understand what "compelled" does—and does not—mean in this context. In one sense, a government official always feels "compelled" to answer questions posed by a supervisor; after all, it is difficult to imagine a government employer (or any other employer, for that matter) tolerating a subordinate's refusal to answer questions or provide information. But this cannot possibly be enough to trigger *Garrity*, as it would mean that any statement made by a government official in response to any question from a supervisor is privileged, no matter the context. Nothing in *Garrity* or its progeny suggests such a wide net. *See United States v. Najarian*, 915 F. Supp. 1460, 1478 (D. Minn. 1996) ("[W]e have yet to uncover any decision in which *Garrity* has been applied solely because a public employee was importuned to provide an interview."). "*Garrity*'s protections are not invoked solely because a public employee is faced with the uncomfortable choice of attempting to explain his conduct or remain silent, thereby risking that the government employer might terminate or discipline him based on independent evidence of wrongdoing." *United States v. Hutley*, No. 1:10-CR-127-MSH/AJB, 2010 WL 4223741, at *9 (N.D. Ga. Aug. 27, 2010).

At the other end of the spectrum is the situation where a government employer has opened a formal investigation into a particular official's conduct and wants to question that official as part of the investigation. *Garrity* is clearly implicated if the supervisor communicates to the official that failure to answer questions in and of itself will give rise to termination. In other words, *Garrity* protection attaches if the direct cause of termination will be the failure to speak, as opposed to the underlying events or issues that prompted the investigation in the first place. *See Diebold*, 611 F.2d at 701 (*Garrity* applies when there is a threat of termination "simply for invoking that [fifth amendment] privilege").

This case falls somewhere in the middle. When law enforcement officers executed search warrants and interviewed witnesses in Adair on August 31, 2022, City officials understandably wanted information from Wendt about what was happening, and Wendt understandably concluded his job was in jeopardy. Wendt argues that these two things, when combined with language in the

City employee manual stating that "failure to provide information" may lead to disciplinary action, are enough to establish that he was "compelled" to provide information starting on August 31, 2022. He therefore argues that *Garrity* protects every answer he provided to the Mayor, City Attorney, or any City Council member from that date forward about events underlying the investigation.

The Court disagrees with Wendt's broad application of *Garrity*, *see Hutley*, 2010 WL 4223741, at *9, and instead believes his statements must be broken down into three categories for purposes of the *Garrity* analysis: (i) those made prior to October 3, 2022; (ii) those made in response to the formal letter from the City dated October 3, 2022; and (iii) those made to City officials informally after October 3, 2022.

      1.  <u>Statements Made by Wendt Prior to October 3, 2022, Are Not Protected.</u>

With respect to the first category, Wendt has not proven that he made "compelled statements" on August 31 when the City Attorney (and possibly others) asked him questions amid the flurry of activity at City Hall. No one told Wendt on that date that he would be fired unless he answered questions, nor did he present evidence of a coercive atmosphere such as being put in an interview room, denied access to counsel, placed under surveillance, or "directed" to respond to questions. *See United States v. Camacho*, 739 F. Supp. 1504, 1518–21 (S.D. Fla. 1990) (discussing these and similar factors in determining whether statements made by officers to their superiors were "compelled"). Instead, at most, City officials were simply trying to understand in real time what led to the search warrants as they were being executed or shortly thereafter. Any obligation Wendt felt to respond to these inquiries is not enough to make his statements "compelled" under *Garrity*. *See id.* (refusing to suppress on-scene statements made by officers in immediate aftermath of incident); *see also Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) ("The Fifth Amendment is violated only by the combined risks of both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers.").

Similarly, to the extent Wendt made other statements to City officials in the weeks leading up to October 3, 2022, he has not proven they were "compelled" for *Garrity* purposes. For the most part, the record indicates that any such statements were made freely and voluntarily because Wendt wanted his side of the story to come out, not because he felt any compulsion to speak. During the September 14 closed-session City Council meeting, for example, one Council member provided information that, in context, must have been derived from conversations with Wendt.

The member was unabashedly supportive of Wendt, however, and the information he provided put a "spin" on the investigation that was highly favorable to Wendt. Wendt has not proven that he was compelled to provide this information, and thus *Garrity* does not protect his statements. *See Najarian*, 915 F. Supp. at 1482 (rejecting *Garrity* argument where defendant "openly and, by every appearance, freely submitted to intensive, public interrogation [and] willfully pledged his continuing cooperation"); *Hutley*, 2010 WL 4223741, at *10 ("Being afforded an opportunity to present one's side is not the equivalent of being compelled to speak.").

The Court reaches the same conclusion with respect to Wendt's conversations with other City officials prior to October 3. Wendt was never told he had to participate in these conversations or be terminated, which is reason enough to conclude the statements do not violate *Garrity*. *See Vangates*, 287 F.3d at 1324. Moreover, Wendt has not provided enough context for the conversations to allow the Court to understand what he even said, much less why he felt compelled to speak at all. *See Burge*, 2009 WL 2972915, at *3 ("[I]t is the defendant's initial burden to show that the statements at issue are entitled to protection under *Garrity*. . . ."). It does not appear from the record, for example, that any of these statements were made during a City Council meeting or in any other formal atmosphere where coercion was present beyond Wendt's mere desire to try to save his job in the face of "independent evidence of wrongdoing." *Hutley*, 2010 WL 4223741, at *9.

Finally, although Wendt claims he felt compelled by the City of Adair employee handbook to respond to questions at risk of termination, it is clear under Iowa Code § 80F.1 that he did not actually face such a "Hobson's choice." To the contrary, section 80F.1 provides an officer with a panoply of rights anytime there is an investigation and states that the officer "shall not be discharged, disciplined, or threatened with discharge or discipline in retaliation for exercising the rights of the officer enumerated in this section." *Id.*, § 80F.1(16). Thus, if Wendt had insisted on making statements only in a formal "interview" where he would be protected by use immunity, *see id.*, §§ 80F.1(1)(e) and (6), the City could not have punished him for doing so. Wendt's willingness to answer questions in an informal setting instead—which section 80F.1(d) refers to as an "informal inquiry"—does not make those statements compelled because he did not truly face the dilemma of answering questions or losing his job. *See Hill*, 160 F.3d at 471; *Hutley*, 2010 WL 4223741, at *9.

2. Formal Statements Made by Wendt Orally and in Writing in Response to the City's Letter Dated October 3, 2022 Are Protected.

The analysis changes on October 3, 2022. On that date, the City sent a letter to Wendt notifying him of the formal investigation governed by Iowa Code § 80F.1 and stating that "any information obtained in this investigation cannot be used against you in any criminal proceedings and will be considered a confidential employee record." (Ex. X.) After making this promise of immunity, the letter "offer[ed]" Wendt the "opportunity to respond" in writing or orally (or both) to four lines of inquiry, which tracked the City's understanding of the federal investigation. (Id.) The letter did not expressly tell Wendt he would be terminated for refusing to respond, but it also did not tell him he was not obligated to respond. (Id.) It did, however, say that the "investigation may result in reprimand or termination of your employment." (Id.)

The application of *Garrity* to these facts is complicated. On one hand, the Government correctly argues that the October 3 letter was designed to comply with Iowa Code § 80F.1, not *Garrity* or other principles of federal law. Moreover, the letter used permissive language by "offering [Wendt] an opportunity to respond" rather than telling him responses were required or that he would be disciplined or terminated for refusing to answer. (Id.) On the other hand, however, the City's letter told Wendt, point blank, that "any information obtained in this investigation cannot be used against you in any criminal proceedings and will be considered a confidential employee record." (Id.) This promise of immunity inverts the *Garrity* fact pattern: Wendt was not expressly threatened with job loss for refusal to testify, but he was promised that his responses would not be used against him in a criminal proceeding.

The Court concludes that Wendt's direct responses to the October 3 letter cannot be used against him—although it believes the on-point authority is not *Garrity* itself, but rather *Murphy v. Waterfront Commission of New York Harbor*, which held that the federal government may not use testimony given following a promise of immunity under state law. 378 U.S. at 79. As applied here, *Murphy* prohibits the Government from using statements obtained by the City from Wendt in direct response to the City's promise of use immunity. *See Barker*, 542 F.2d at 483; *see also Balsys*, 524 U.S. at 682 (explaining that it would be "intolerable" for a state prosecutor to grant immunity that did not insulate witnesses from having their testimony used against them in federal proceedings). Accordingly, the Court must hold a *Kastigar* hearing to determine whether the Government can prove that Wendt's indictment and prosecution "rests on *wholly* independent evidence" from

Wendt's direct responses to the October 3 letter. *United States v. Garrett*, 797 F.2d 656, 665 (8th Cir. 1986).

The Court rejects the Government's position that Iowa Code § 80F.1 did not apply to the City's investigation into Wendt's conduct. (ECF 157, pp. 4–5.) The Government's argument is based on a highly technical interpretation of section 80F.1 that starts with the definition of "[f]ormal administrative investigation," which means, in relevant part, "an investigative process ordered by a commanding **officer** of an agency or commander's designee. . . ." Iowa Code § 80F.1(1)(c) (emphasis added). The Government argues that because "officer" is defined elsewhere in the statute to include (as relevant here) only "law enforcement officer[s]," *id.* at § 80F.1(1)(f), the Mayor and City Council members are not "commanding officers" and therefore cannot trigger an investigation governed by section 80F.1.

The Government's argument fails once the words "officer" and "commanding officer" are considered in their statutory context, as they must be. *See Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021). Indeed, section 80F.1(1) itself says the definitions should not be given effect if "context otherwise requires." With this guidance in mind, it is notable that section 80F.1 uses the word "officer" more than 130 times but the phrase "commanding officer" only once. In each of the 130-plus places where the word "officer" appears by itself, it clearly refers to the <u>target</u> of the investigation, complaint, or adverse action. By contrast, in the one place where the phrase "commanding officer" appears, it refers to someone in charge of the agency that employs the "officer." The phrase "commanding officer" therefore does not subsume the definition of "officer," but rather is a standalone phrase with a different meaning. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("The definition of words in isolation, however, is not necessarily controlling in statutory construction."). In other words, a "commanding officer" must be someone with supervisory authority over an "officer" but need not be a law enforcement officer; instead, in appropriate circumstances, it can be a mayor, city administrator, or other non-law-enforcement official.

Holding otherwise would undermine the protections the Iowa Legislature wanted to give to "officers" when it enacted section 80F.1. For example, under the Government's logic, police chiefs likely would not be protected by section 80F.1 because they usually report to non-law-enforcement officials like the city council, mayor, and/or city administrator. If these supervising officials are not "commanding officers" for purposes of the statute, a police chief will not be

entitled to the protections contained therein when an investigation is opened into the chief's conduct. The impact would be especially acute in rural communities like Adair that have few officers, some or all of whom report directly to the mayor, city council, or other city officials. Under the Government's interpretation, the highest-ranking police officers in these small towns would have no protection under section 80F.1 for investigations ordered by their direct supervisors. There is nothing in the text of section 80F.1 to suggest the Iowa Legislature wanted to exclude police chiefs from the protections contained therein, nor that the Legislature wanted to put officers in rural communities on worse footing than those in bigger cities. Instead, the Court concludes that Wendt's statements were entitled to protection under section 80F.1 when made in direct response to the City's promise of immunity.

It is important to understand which statements are covered by the Court's ruling. Wendt's written answers to the City's questions (Exhibit XX) clearly were made in direct response to the City's promise of immunity, and thus the Government may not use those written answers in this case. The record shows, however, that the Government has never seen those written answers because the City withheld them from its response to the grand jury subpoena. The impact of this portion of the Court's ruling is therefore minimal and simply means Exhibit XX will remain under seal and *ex parte*.

The closer and more impactful question is how to handle Wendt's oral statements during the closed-session City Council meeting on October 26, 2022. Wendt was represented by counsel during the meeting, and the record shows that he did not feel "compelled" to respond to all questions posed to him in the *Garrity* sense. In fact, the Mayor started the relevant portion of the meeting by asking Wendt if he had any comments, or "[do] you just want to sit and listen?" (ECF 174-7, 11:00–11:15.) Wendt responded, "[i]f you have any questions, I can answer the ones that I can, I guess." (Id.). When he later began answering questions, Wendt made what appears to have been a side comment to his attorney along the lines of, "I don't know if you want me to answer that one. . ." before proceeding to give a response. (Id., 18:50–19:00.) The Court finds, based on its review of the recording and other evidence, that Wendt's statements during the October 26 meeting were not "compelled" for *Garrity* purposes. *See Hutley*, 2010 WL 4223741, at *9.

*Murphy* is a different story. Whether compelled in the *Garrity* sense or not, Wendt's answers to the questions posed during the October 26 meeting were made against the backdrop of the City's promise of immunity in the October 3 letter. And while there is some uncertainty in the

record about whether the City Council meeting was meant to serve as the formal "interview" referenced in that letter, the Court resolves that uncertainty in Wendt's favor because: (a) no one from the City ever said otherwise; (b) the meeting occurred on the same date Wendt provided his written responses to the October 3 letter; and (c) there is nothing in the record to suggest a formal "interview" happened on any other date. In other words, the Court finds as a matter of fact that the closed-session City Council meeting on October 26 was the "interview" for which Wendt was promised immunity. The Government therefore may not use statements made by Wendt during that meeting in this prosecution. As Government counsel admittedly has already heard Wendt's statements from the closed-session meeting, the Government will bear the burden of proving, *inter alia*, that the Indictment did not result from these statements.

There is an important caveat to the Court's analysis. The City's October 3 letter promised more immunity than the City was empowered to grant and thus will not be enforced exactly as written. Iowa Code § 80F.1(6) only grants immunity to a law enforcement officer for answers provided by the officer during an "interview." The word "interview," in turn, "means the questioning of an officer who is the subject of a complaint pursuant to the formal administrative investigation procedures of the investigating agency . . . ." *Id.* at § 80F.1(1)(e). By promising immunity for "any information obtained in this investigation" (as opposed to merely promising immunity as to Wendt's responses during an "interview") the City went beyond the scope of the statute. The (federal) Government is not bound by the overbroad scope of the City's promise. *See United States v. Gibson*, 4 F. Supp. 3d 1089, 1095 (S.D. Iowa 2014) (refusing to enforce promise of immunity made by agent who did not have authority to make such promise); *see also United States v. Johnson*, 861 F.2d 510, 512 (8th Cir. 1988) (immunity agreements are not binding if "the government's offer of immunity or the defendant's acceptance was based on a mistake in law or fact"). Instead, to the extent the City's investigation yielded information from sources other than Wendt about his conduct or from Wendt himself in settings outside the October 26 meeting, the Government will not have violated *Murphy* by reviewing or using that information. *See In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d at 772 ("[T]he privilege only prohibits the use of compelled statements and their fruits against the person making the compelled statements. Thus, it does not prohibit a grand jury or government investigators from using compelled statements *of other officers* against the target of the investigation.").

16

Finally, the Court does not have sufficient information to determine whether any statements made by Wendt during City Council meetings in December 2022 and January 2023 are protected—or, for that matter, whether the Government even has recordings of those meetings anyway. In an abundance of caution, the Court will temporarily prohibit the Government from using any statements made by Wendt during those meetings in this prosecution pending further development of the record. This should not, however, be interpreted as a definitive ruling that those statements are protected under *Murphy* or *Garrity*.

> 3.  Informal Statements Made by Wendt After October 3, 2022, Are Not Protected.

One category of statements remains. Wendt has implied that he made statements to City Council members and other City officials after October 3, 2022, separate and apart from his written responses to the October 3 letter and oral statements at City Council meetings. The Court concludes, for several reasons, that these informal statements are not protected by *Garrity*, *Murphy*, or other governing law.

First, Wendt has not identified any such statements and therefore has per se failed to "demonstrate[] that [he] was compelled to testify by [his] government employer." *Moten*, 551 F.3d at 766; *see also Burge*, 2009 WL 2972915, at *3 ("[I]t is the defendant's initial burden to show that the statements at issue are entitled to protection under *Garrity*. . . .").

Second, the City's October 3 letter contemplated a formal investigation involving written responses or "an in-person interview" for which Wendt was entitled to have counsel present. (*See* Ex. X.) In this respect, the letter tracked Iowa Code § 80F.1(1)(e), which draws a distinction between responses provided during an "interview" (which are protected) and responses to "questioning as part of any informal inquiry" (which are not). Against this backdrop, Wendt could not reasonably have believed that he was compelled under *Garrity* to respond to inquiries outside the "formal" process or entitled to immunity under *Murphy* for any responses he chose to make to such informal inquiries. *See Diebold*, 611 F.2d at 701 (rejecting *Garrity* argument where there "exists here no requirement that [the government official] waive his immunity under the fifth amendment. Nor is there a threat that he will be fired simply for invoking that privilege"). Instead, as noted above, Wendt had the right under section 80F.1(16) to decline to answer the City's questions without fear of reprisal. *See Hill*, 160 F.3d at 471.

Third, as noted above, the record indicates that some (and perhaps most) of Wendt's informal communications were with a City Council member who supports him and believes he is

being wrongfully prosecuted. The Government has provided evidence, for example, that this Council member called Wendt on the same day the member testified before the grand jury, presumably for the purpose of discussing that testimony. Furthermore, as described above, the recordings of City Council meetings reflect a member—presumably the same person—vocally defending Wendt, often by repeating the arguments and facts that appear to underlie Wendt's defense in the criminal case. The member also voted twice in favor of reinstating Wendt to his position as Police Chief. The Court is unable to locate any authority suggesting that *Garrity* or *Murphy* protect a person's voluntary and exculpatory statements to a supportive third party outside the confines of a formal investigation. *See Najarian*, 915 F. Supp. at 1482.

       4.  <u>Summary.</u>

      Wendt's written responses to the City's October 3, 2022 letter are protected from disclosure and therefore will remain *ex parte* and under seal. Wendt's oral statements during City Council meetings on October 26, 2022, are likewise protected to the extent made in response to questions from City officials. His statements during the City Council meetings on December 19 or 22[4], 2022, and January 11, 2023, also should be treated as protected for the time being, pending further development of the record. As Government counsel has admittedly listened to a recording of the October 26 meeting, the Court must hold a *Kastigar* hearing to determine whether Wendt's Indictment resulted from wholly independent evidence. *Garrett*, 797 F.2d at 665. The Court expects the Government to disclose, in the manner set forth in the next paragraph (including subparts), whether it has listened to recordings of the December 2022 or January 2023 meetings.

      The Court will hold the *Kastigar* hearing on July 10, 2023, at 10:00 a.m. If this date and time are unavailable for one or both sides, Counsel is permitted to inform the Court by email and to provide alternative dates after conferring with opposing counsel. In advance of the hearing, the Court orders as follows:

    (1)  On or before June 16, 2023, the Government must provide to Wendt's counsel electronic or hardcopies of: (a) all grand jury transcripts of all grand jury witnesses who were present for the October 26, December 19/22, and/or January 11 City Council meetings; (b) all witness statements from City officials (including, but not necessarily limited to, the Mayor, City Council members, and City Attorney) from on or after October 26, 2022; and (c) any other grand jury transcripts or witness statements from on or after October 26 that refer directly or indirectly to the substance of statements made by Wendt during the October 26, December 19/22, and/or January 11 City

---

[4] The record is unclear on the date. (Tr. 55; Tr. 56; Tr. 77.)

Council meetings. These copies will be governed by the terms of the Stipulated Protective Order dated January 25, 2023. (ECF 69).[5]

(2) On or before June 20, 2023, the Government must file a report that includes a professional statement signed by all members of the prosecution team describing all direct and derivative uses that have been made of the statements determined by this ruling to be protected.

(3) On or before June 27, 2023, Wendt may file a response to the Government's report identifying additional information, if any, he believes he needs from the Assistant United States Attorneys (as opposed to law enforcement agents) regarding their direct and derivative use of the protected statements.

(4) On or before June 30, 2023, each side may file a supplemental brief explaining their respective positions on whether, and to what extent, the Government made direct or derivative use of the statements determined by this ruling to be protected. These supplemental briefs must be specific and include, e.g., references to paragraphs of the Indictment that the party believes are tainted by the protected statements.

(5) The Court does not anticipate requiring testimony from any Assistant United States Attorney(s) during the *Kastigar* hearing; instead, to the extent additional information is needed from them, the Court will obtain it through questions-and-answers between the bench and counsel table, as would occur in any other hearing. *See Moten*, 551 F.3d at 766–67 (noting that several witnesses testified but the Assistant United States Attorney merely "represented" relevant information). If either side believes sworn testimony from one or more Assistant United States Attorneys is necessary (as opposed to professional statements from counsel table), it should say so, and explain why, in the filings on June 20 and June 27, respectively. The Court will decide in advance of the hearing whether to allow such testimony. Regardless of the Court's ruling on testimony, however, all Assistant United States Attorneys directly involved in prosecuting the case should be present for the *Kastigar* hearing.

(6) Other than as described in this paragraph, the Court leaves for each side to decide for itself what evidence or testimony to present in the *Kastigar* hearing, keeping in mind the governing legal standards and allocation of the burden of proof.

The Court will end this section of its ruling with two observations. <u>First</u>, in light of the protections given by Iowa Code § 80F.1, this case illustrates how important it is for federal prosecutors to be sensitive to potential *Garrity* and *Murphy* issues when investigating and prosecuting Iowa state and local government officials for possible violations of federal law. *See In*

---

[5] The Court recognizes that the Government ordinarily would not be obligated to provide copies of grand jury transcripts or witness statements at this stage of the case. *See* Fed. R. Crim. P. 16(a)(2) and (3); 18 U.S.C. § 3500. The Court is nonetheless ordering early disclosure of the copies because otherwise Wendt will not have the ability to provide those transcripts or statements to the Court in his filings as part of helping the Court understand the derivative use, if any, made by the Government of his protected statements. *See* Fed. R. Crim. P. 6(e)(2)(E)(ii) (authorizing courts to order disclosure of grand jury matters "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury"). All witness statements and grand jury transcripts must be filed under seal. The parties do not need to seek further Court approval prior to doing so.

*re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d at 772 (urging the Government to use a "*Garrity* screening team" to avoid Fifth Amendment problems). <u>Second</u>, but conversely, the case also illustrates how important it is for those state and local government officials (and, perhaps more importantly, city and county attorneys) to understand the scope and purpose of section 80F.1. Here, as explained above, the Court's ruling has hinged on the City's promise of immunity to Wendt in the October 3 letter.  But the City withheld that letter from what it produced in response to the grand jury subpoena. Meaning: federal prosecutors apparently did not become aware of a pivotal piece of information regarding Wendt's rights until the filing of Wendt's Motion to Suppress five months after he was indicted. The City could have—and *should* have—produced the October 3 letter when it responded to the grand jury subpoena. Doing so would have helped protect Wendt because it would have notified prosecutors that he had been promised immunity, thus potentially discouraging those prosecutors from reviewing evidence of Wendt's statements during City Council meetings. Doing so also would have been fully consistent with the text of section 80F.1(20), which requires a government employer to keep an employee's statements and other investigative records confidential "unless otherwise provided by law." When the Government serves a grand jury subpoena on a governmental entity, the entity is required "by law" to provide responsive materials—including materials deemed "confidential" under Iowa Code § 80F.1. *See Dunn v. Does 1-20*, 596 F. Supp. 1197, 1201–02 (S.D. Iowa 2022); *see also In re Grand Jury Investigation*, No. 17-2587(BAH), 2017 WL 11140345 (D.D.C. Oct. 23, 2017).

## III.   LEGAL BACKGROUND AND ANALYSIS – WENDT'S AND WILLIAMS'S MOTIONS TO SUPPRESS PURSUANT TO THE FOURTH AMENDMENT.

### A.  Background.

The Fourth Amendment establishes that warrants may be issued upon a showing of probable cause, "supported by Oath or affirmation, and particularly describing the place to be searched." U.S. Const. amend. IV. "The Fourth Amendment's particularity requirement is a standard of practical accuracy rather than a hypertechnical one." *United States v. Maccani*, 49 F.4th 1126, 1131 (8th Cir. 2022) (cleaned up) (quoting *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007)). In deciding whether a warrant satisfies the particularity requirement, courts must "consider 'the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case.'" *United States v. Schave*, 55 F.4th 671, 675 (8th Cir. 2022) (quoting *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011)).

B. *The Search Warrants Are Not Limited to Subscriber Information.*

Williams argues, first, that the December 7 warrants to Yahoo and Meta Platforms, Inc. ("Meta")[6] are improper because they authorized the Government to obtain information about the contents of electronic communications even though the search warrant application only cited 18 U.S.C. § 2703(c)(1)(A), which merely refers to disclosure of subscriber information. Wendt joins Williams's argument, except his argument relates to the May 18 warrants to Hotmail and Meta pertaining to his accounts. In what will become a recurring theme, Williams cites no authority to support his position that the warrants' citation to section 2703(c)(1)(A) renders them invalid.

The Court has little difficulty rejecting Williams's and Wendt's position. When read in context, the reference to section 2703(c)(1)(A) was not meant to limit the scope of the warrant, but rather to explain why the United States District Court for the Southern District of Iowa had the authority to issue search warrants for electronic communications stored in the Northern District of California and Western District of Washington. Which is to say, section 2703(c)(1)(A) allows any "court of competent jurisdiction" to issue a search warrant under the Stored Communications Act for subscriber records even when the records are housed in a different judicial district. This special venue provision appears to be designed to save judges in districts where electronic communications providers are headquartered—including, especially, the Northern District of California (Meta and Yahoo) and Western District of Washington (Microsoft)—from being overwhelmed with search warrant applications. Section 2703(b)(1)(A) contains a virtually identical special venue provision for warrants seeking the contents of electronic communications.

It is clear from the remainder of the warrant application and resulting warrants that the Government sought, and the Court ordered, disclosure of the contents of communications, not merely subscriber information. For example, Attachment B to the Meta warrant dated December 7, 2022, specifically identifies "contents of communications and messages made or received by the user" in the list of "Information to be disclosed by [Meta]." (ECF 171-2, pp. 6–7.) Similar language appears in Attachment B to the Yahoo warrant of the same date (ECF 171-1, pp. 6–7 ("contents of all emails")), Attachment B to the Meta warrant dated May 18, 2022 (ECF 171-4, pp. 12–13 ("contents of communications and messages")), and Attachment B to the Hotmail

---

[6] Williams often refers to the Meta warrant as the "Facebook warrant" because it sought information about his Facebook account. In the interest of consistency with the warrant itself, which was served on the entity that owns and operates Facebook, the Court will use "Meta" instead.

warrant dated May 18, 2022 (ECF 171-5, pp. 11–12 ("contents of all emails")). Thus, while the Government could have—and perhaps, in the interest of clarity, *should* have—cited to section 2703(b)(1)(A) as well as (c)(1)(A), the warrant is nonetheless valid as to contents and subscriber information alike once it is considered in conjunction with the attachments, as it must be. *See, e.g.*, *United States v. Hager*, 710 F.3d 830, 835 (8th Cir. 2013) (rejecting Fourth Amendment challenge after reading warrant and addendum in conjunction with one another to determine warrant's scope); *see also Fiorito*, 640 F.3d at 347 ("The broad language of the warrant must be given a practical, rather than a hypertechnical, interpretation that is cabined by the purpose for which it issued."). The Court rejects Williams's and Wendt's arguments to the contrary.

   C.  *The Search Warrants Were Not Overbroad and Did Not Violate the Particularity Requirement.*

      1.  <u>The December 7 Warrants Satisfied the Particularity Requirement of the Fourth Amendment and Were Not Overly Broad.</u>

   Williams next argues that the December 7 warrants to Yahoo and Meta violated the Fourth Amendment's particularity requirement because the warrants sought "information associated" with his accounts rather than referring to more specific types or categories of information. Williams acknowledges, correctly, that his position runs into problems once Attachment B to the search warrant applications is taken into account, as Attachment B identifies specific categories of "[i]nformation to be disclosed by [Meta or Yahoo]," including, *inter alia*, "contents" of emails or other communications. (ECF 171-1, pp. 6–8; ECF 171-2, pp. 6–8.)[7] Williams argues, however, that Attachment B "was not a judicial order when attached to the government's application, and did not become one when it was attached to the warrant and referenced loosely as it was." (ECF 135-1, p. 4.)

   Again, Williams cites no authority to support his position. This is likely because Eighth Circuit case law weighs against him. His argument that Attachment B is "not a judicial order," for example, is incorrect under binding Eighth Circuit precedent. The Eighth Circuit has repeatedly held that a "warrant may cross-reference other documents when it uses appropriate words of incorporation and if the supporting document accompanies the warrant." *United States v. Sigillito*,

---

[7] Attachment B to the two warrants is not identical. Attachment B to the Yahoo warrant (ECF 171-1) focuses on subscriber information and email communications, whereas Attachment B to the Meta warrant (ECF 171-2) identifies a broader range of categories of information, consistent with Meta (i.e., Facebook) being a multi-faceted platform that allows users to communicate and interact in more ways than a mere email platform like Yahoo.

759 F.3d 913, 925 (8th Cir. 2014); *see also United States v. Campbell*, 6 F.4th 764, 770 (8th Cir. 2014) (similar). Thus, for example, a warrant stating "Attachment 1" in the space designated for "items to be searched" was sufficient to incorporate the Attachment into the warrant. *United States v. Riesselman*, 646 F.3d 1072, 1077–78 (8th Cir. 2011) (affirming denial of motion to suppress). Similarly, a warrant identifying the items to be seized as "property more particularly described on the attached 'Exhibit A'" satisfied the Fourth Amendment. *See United States v. Gamboa*, 439 F.3d 796, 807 (8th Cir. 2006).

Here, the warrants signed on December 7, 2022, by Chief Judge Adams included the words "See Attachment A" in the space below the words "An application presented by an attorney for the government requests the search of the following person or property located in the Northern District of California." (ECF 171-1, p. 2; ECF 171-2, p. 2.) Similarly, each warrant stated "See Attachment B" in the space below the section confirming the existence of probable cause and identifying what the search will reveal. (ECF 171-1, p. 2; ECF 171-2, p. 2.) Attachment A then stated that the "warrant applies to information associated with [Williams's Facebook and Yahoo accounts, respectively]." (ECF 171-1, p. 5; ECF 171-2, p. 5.) Attachment B went on to identify the specific "information" that had to be disclosed by Meta and Yahoo, respectively, in response to the warrants, as well as the information the Government was entitled to "seize," which was limited in the Yahoo warrant to "evidence and instrumentalities of violations of [specified provisions] of the federal criminal code" (ECF 171-1, p. 8) and in the Meta warrant to "fruits, evidence and instrumentalities" of those same federal code provisions (ECF 171-2, p. 9). This is sufficient under binding Eighth Circuit precedent to satisfy the particularity requirement of the Fourth Amendment. *See Riesselman*, 646 F.3d at 1077–78; *Sigillito*, 759 F.3d at 925; *Gamboa*, 439 F.3d at 807.

In arguing otherwise, Williams focuses on technical deficiencies in individual pieces of the warrants and attachments. The Eighth Circuit has consistently and repeatedly held, however, that "[w]hether a warrant fails the particularity requirement cannot be decided in a vacuum" and is a question of "practical accuracy rather than of hypertechnicality." *United States v. Shrum*, 59 F.4th 968, 973 (8th Cir. 2023) (quoting *Fiorito*, 640 F.3d at 346, and *Sigillito*, 759 F.3d at 923). In other words, the proper approach is to review the warrants and attachments in their entirety to see whether they are "sufficiently definite to enable the searching officers to identify the property authorized to be seized." *Summage*, 481 F.3d at 1079 (quoting *United States v. Horn*, 187 F.3d

23

781, 788 (8th Cir. 1999)). When viewed through the proper lens, the warrants here clearly satisfy this test.

The Court also rejects Williams's argument that the December 7 warrants are overly broad in seeking communications dating to January 2018. Williams argues that the "earliest date range that conceivably should have been under consideration was September 2020," when he apparently became a federal firearms licensee, or "FFL." (ECF 135-1, pp. 7–8.) His argument fails to acknowledge that the affidavits[8] submitted in support of the warrants stated, *inter alia*, that: (a) Wendt became the City of Adair Police Chief sometime in 2018 (ECF 171-3, p. 25); (b) Wendt's first execution of the alleged scheme occurred in July 2018 and included communications that month with someone in Indiana who was later prosecuted for a similar scheme (id., pp. 3, 33); (c) the alleged scheme was fairly complicated and required Wendt to submit "law letters" to FFLs and ATF to facilitate the transfer of highly-regulated machine guns (id., p. 3); and (d) Wendt and Williams had Facebook communications dating as far back as February 2019 regarding Wendt's acquisition of machine guns (id., p. 9). The remainder of the lengthy affidavits—over one hundred pages, collectively—went into considerable detail describing the evidence law enforcement officers accumulated against Wendt and Williams regarding their alleged conspiracy to obtain machine guns through false and fraudulent pretenses. (Id.)

When the affidavits are considered as a whole, there was probable cause for the seizure of Williams's communications dating to January 2018. The February 2019 messages included Williams asking whether Wendt had "[f]igur[ed] out how to get rich yet," and Wendt responding, "Oh ya just bought 2 more mp5sd . . . Goin be machine gun Joe lol." (Id., p. 9.) The substance of these messages makes clear that Wendt and Williams were not communicating about machine guns for the first time, but rather must have started talking or trading messages earlier. How much earlier is unclear, but the affidavits established that Wendt first used a "law letter" to acquire a machine gun in July 2018 after communicating with someone in Indiana engaged in similar conduct. Given the timing of this first transaction—and keeping in mind the relative complexity of what Wendt needed to do to use his status as Police Chief to obtain machine guns—it is likely that he began even before July 2018 to contemplate the acquisition of machine guns. It follows that the affidavits established probable cause for the Government to look at least as far back as

---

[8] There were two affidavits attached to the warrants, the second of which was expressly incorporated by reference into the first. (ECF 171-3, ¶ 8.)

January 2018 to see if there was evidence of relevant communications between him and Williams. *See United States v. Lasley*, No. 17-CR-04045-BCW, 2020 WL 5502309, at *3 (W.D. Mo. Sept. 11, 2020) (denying motion to suppress where warrant authorized seizure of electronic communications from approximately six months before the conduct underlying the charges); *see also United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986) (holding that search warrant must be "as specific as the circumstances and nature of activity under investigation permit" (quoting *United States v. Wuagneaux*, 683 F.2d 1343, 1349 (11th Cir. 1982))).

In reaching this conclusion, it is important to keep in mind that relevant evidence in conspiracy cases often includes not just what the co-conspirators did after the conspiracy came into existence, but also how it was formed in the first place. In other words, the Government is allowed to present evidence regarding "the establishment and structure of the conspiracy." *United States v. Garrison*, 168 F.3d 1089, 1094 (8th Cir. 1999); *see also United States v. Rodrequez*, 859 F.2d 1321, 1327 (8th Cir. 1988) (affirming admission of evidence showing "how the conspiracy began and functioned"). It follows, during the investigation phase, that probable cause often will exist for the search and seizure of evidence pre-dating the first allegedly unlawful transaction. Such is the case here.

Finally, and in any event, Williams is incorrect in suggesting that the remedy for an overbroad warrant is to throw out every piece of evidence seized thereto. "[W]here the warrant is invalid only in part, the warrant is 'severable,' and items seized pursuant to valid portions of the warrant need not be suppressed." *United States v. Timley*, 443 F.3d 615, 622 (8th Cir. 2006). Here, even if the December 7 warrants were overbroad, the proper remedy would be exclusion of evidence falling within the invalid portion. *See id.* Williams has not, however, delineated the evidence pre-dating September 2020, which he characterizes as the "earliest date range that conceivably should have been under consideration." Until and unless he does, he would not be entitled to relief even if the warrant was overbroad.

2. The May 18, 2022, August 25, 2022, and January 11, 2023 Warrants Satisfied the Particularity Requirement of the Fourth Amendment and Were Not Overly Broad.

Wendt challenges four warrants—two involving search and seizure of his cell phone (dated August 25, 2022, and January 11, 2023, respectively), one to Hotmail dated May 18, 2022, seeking Wendt's emails, and one to Meta dated May 18, 2022, seeking information from Wendt's Facebook account. (ECF 127.) It appears that his only challenge to the Hotmail and Meta warrants

is that the reference to 18 U.S.C. § 2703(c)(1)(A) rendered the warrants invalid as to searches and seizures of the contents of communications. As explained above, the Court has already rejected this challenge for the same reasons it rejected the identical challenge made by Williams; namely, that the reference to section 2703(c)(1)(A) on the face of each warrant does not limit its scope once the warrant (including attachments) is viewed in its entirety. To the extent Wendt is also challenging the Hotmail and Meta warrants based on lack of probable cause or lack of particularity, the Court rejects those challenges for the same reasons it rejected similar challenges made by Williams.

As to the August 25, 2022, and January 11, 2023 warrants, Wendt argues they are overbroad because they fail to contain a date limit. He also argues, vaguely, that they lack particularity as to the items to be searched and seized. He does <u>not</u> argue that the warrants were unsupported by probable cause, nor would any such argument have merit given the incredible level of detail provided, for example, in the 163-paragraph affidavit attached to the August 25 warrant application. (ECF 171-10.)

The Court rejects Wendt's overbreadth and particularity arguments. The August 25 warrant authorized seizure of "[e]vidence and fruits of violations" of five specified federal statutes, including 18 U.S.C. §§ 371 (conspiracy), 924(a)(1)(A) (false statements in records maintained by FFL), 922(o) (unlawful possession or transfer of a machine gun), 1001 (false statements to the government), and 31 U.S.C. § 5324 (structuring). (ECF 171-9, p. 5.) "This is a specific limitation." *United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008) (rejecting overbreadth challenge to warrant allowing seizure of property "which are evidence of the illegal possession, use, possession with intent to deliver, or delivery of controlled substances"). Moreover, the August 25 warrant went on to identify subcategories of information that constitute "[e]vidence and fruits," including specified types of documentation, financial records, vehicles, indicia of occupancy, large amounts of cash, and computers or storage media (defined broadly enough to include "mobile phones"). (ECF 171-9, pp. 5–8.) The Eighth Circuit has consistently held that warrants with language like this satisfy the particularity requirement of the Fourth Amendment. *See, e.g.*, *United States v. Coleman*, 909 F.3d 925, 931 (8th Cir. 2018) (affirming validity of warrant authorizing search and seizure of "books, records, receipts, ledgers, and other papers related to . . . controlled substances"); *Fiorito*, 640 F.3d at 346–47 (affirming denial of motion to suppress despite language authorizing

seizure of "[e]ntire files" because the broad language was cabined by specific categories of information to be searched and seized); *Nieman*, 520 F.3d at 839.

The January 11 warrant is even narrower. It limits the list of items to be seized to "[e]vidence and fruits" of violations of 18 U.S.C. §§ 1512 (witness tampering) and 1621 (perjury), including records or other information reflecting the identification of the user of the phone, that person's state of mind, and materials relating to the "Adair City Council's authorization of Bradley Wendt acquiring machine guns for purchase or demonstration" and "[a]ny witness's appearance before or testimony to the grand jury." (ECF 133-2, p. 4.) Again, Eighth Circuit precedent makes clear that this language sufficiently cabins the scope of the warrant to satisfy the particularity requirement of the Fourth Amendment. *See Coleman*, 909 F.3d at 931; *Fiorito*, 640 F.3d at 346–47; *Nieman*, 520 F.3d at 839.

The fact that neither warrant contains an express temporal limitation does not change this conclusion. When considered in context, both warrants contain obvious limits as to timeframe. *See Milliman v. Minnesota*, 774 F.2d 247, 250 (8th Cir. 1985) (requiring courts to consider "the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case"). For example, given that Wendt only began acquiring machine guns through his status as Adair Police Chief in July 2018, and witnesses presumably only testified to the grand jury in 2022, it is clear in context that the January 11 warrant limited the seizure of evidence to that timeframe. Similarly, although the August 25 warrant contained a longer list of items to be seized (ECF 171-9, pp. 5–8), those items nonetheless had to be tied to the five criminal statutes identified therein. Meaning: there was, in practical effect, a limit on the scope of the warrant to the period when Wendt was using his status as Police Chief to obtain machine guns. *See Maccani*, 49 F.4th at 1131 ("The Fourth Amendment's particularity requirement is a standard of practical accuracy rather than a hypertechnical one." (cleaned up)). The warrants did not violate the Fourth Amendment.

Finally, and as is the case with Williams, Wendt has not explained why any overbreadth problem with the warrants would warrant suppression of every item of seized evidence. *See Timley*, 443 F.3d at 622. Instead, at most, he would be entitled to suppression only of evidence from the overbroad portion of the warrant. *See id.* Until and unless he identifies some piece of evidence that fits this description, suppression is not appropriate.

3.   The Two-Step Warrant Process Is Not *Per Se* Invalid.

Most of Wendt's and Williams's remaining arguments revolve around attorney-client privilege issues and the two-step process contemplated by the Meta, Hotmail, and Yahoo warrants, with step one involving the seizure of electronic communications and information and step two involving the separation of responsive and non-responsive information. Wendt and Williams complain that the Government has not appropriately followed the two-step process, but the relief they seek is unclear. Williams appears to want the Court to order the Government to "return" non-responsive items. (ECF 135-1, p. 10.) Wendt, for his part, makes no request for relief at all beyond including the absence of an appropriate "responsiveness review" process in his list of reasons for the Court to invalidate the warrant. (ECF 127-1, pp. 15–16.)

On the issue of privilege, Chief Judge Adams recently approved a protocol for the Government's use of a "taint team" to review and segregate materials covered, or potentially covered, by the attorney-client privilege as to Williams. (ECF 191.) A similar ruling is forthcoming on privilege issues as to Wendt. (Id., p. 1.) The Court therefore denies as moot Wendt's and Williams's arguments about alleged deficiencies in the Government's handling of privileged materials. If, in the future, Wendt and/or Williams develop good faith reasons to believe the Government has violated the privilege protocol or otherwise invaded the attorney-client privilege, they may file a renewed motion seeking relief; provided, however, that any such motion must be filed within the deadline for motions to suppress.

The Court also denies Wendt's and Williams's Motions to Suppress to the extent they are based on complaints about the two-step review process. The Court simply does not understand what relief they are seeking, nor have Wendt or Williams cited persuasive authority supporting any such relief. Moreover, their complaints about the two-step process are intertwined with the privilege issues in the sense that the Government cannot complete the responsiveness review until it first segregates the privileged material. (ECF 143, pp. 11–12.)  Again, Wendt and Williams may renew their motions within the appropriate deadline if they have good faith reason to believe their rights have been violated.

4.   No Evidentiary Hearing Is Required on the Fourth Amendment Challenges.

Because the Court is able to determine from the face of the relevant warrants that they are supported by probable cause and satisfy the particularity requirement of the Fourth Amendment, there is no need for an evidentiary hearing. *See United States v. Yielding*, 657 F.3d 688, 705 (8th

Cir. 2011) ("[A] hearing is unnecessary if the district court can determine that suppression is unwarranted as a matter of law."). The Court could not, in any event, divine from Williams's or Wendt's briefs what relevant facts they sought to develop on the Fourth Amendment issues anyway. *See United States v. Stevenson*, 727 F.3d 826, 830 (8th Cir. 2013) ("A district court must hold an evidentiary hearing only when the moving papers are sufficiently definite, specific, and detailed to establish a contested issue of fact."). Williams, for example, acknowledges (correctly) in one place in his brief that the warrant "needs to stand or fall on its own and be read within its four corners (ECF 135-1, p. 4) but suggests elsewhere that he would call federal prosecutors or even Chief Judge Adams herself to the witness stand to talk through the historical "practice engaged in by the Government and the Magistrate Judge who issued this warrant" (id., p. 3). (*See also* ECF 183, p. 10 (describing "evidence from Government counsel and perhaps the Clerk of Court").) The Court does not need evidence of historical search warrant practices to decide whether this warrant, on its face, satisfies the Fourth Amendment. The Court therefore denies Williams's and Wendt's requests for an evidentiary hearing on the Fourth Amendment issues. The Court will reconsider if Williams and/or Wendt raise issues about the Government's adherence to the privilege protocol or two-step review process for which an evidentiary hearing is legitimately necessary. Any such motion practice must be based on specific, good faith concerns and supported by legal authority.

## IV.   LEGAL ANALYSIS – WILLIAMS'S APPEAL FROM MAGISTRATE JUDGE RULING.

The final disputed issue is Williams's appeal from Chief Judge Adams's ruling denying both sides' motions for protective order. (ECF 143.) The appeal arises from a months-long standoff between the parties as to how to handle discovery, which started when the Government proposed the standard Stipulated Discovery and Protective Order it uses in virtually all criminal cases in this District. (ECF 73, ¶ 2.) Wendt and Williams declined to enter such an order because they believe, *inter alia*, that it includes provisions inconsistent with Fed. R. Crim. P. 16(a), *Brady*, *Giglio*, and other governing authority. (Id., ¶¶ 2, 3; ECF 82, pp. 5–11; ECF 83, pp. 6–13.) In the meantime, the Government represents that it made all discovery materials in its possession available for inspection at the U.S. Attorney's Office, as well as an index for those materials and a commitment to provide copies of Rule 16 materials upon request. (ECF 73, ¶ 4.) The Government also provided,

via its cloud-based sharing system, a copy of Wendt's and Williams's criminal histories and recorded statements to law enforcement. (Id., ¶ 5.)

On January 23, 2023, Wendt and Williams agreed to a Stipulated Protective Order that covered the copying of Rule 16 materials but intentionally did not require the Government to make copies of witness statements, grand jury transcripts, or investigative reports due to Wendt's and Williams's unwillingness to agree to the strings the Government wanted to attach to the copying of such materials. (ECF 65; ECF 69.) The Government thereafter provided copies of Rule 16 materials, although the parties dispute whether the Government has gone far enough to satisfy its obligations under Rule 16, *Brady*, *Giglio*, and related authority. (See, e.g.. ECF 73, ¶ 8; ECF 128-1, pp. 7–8.) The Government also represents, in any event, that the witness statements, grand jury transcripts, and investigative reports "remain available for review at the U.S. Attorney's Office, where they have been available since January 13, 2023." (ECF 173, p. 3.)

Against this backdrop, Williams's appeal from Chief Judge Adams's ruling boils down to his ongoing concerns about whether the Government's proposed Stipulated Discovery and Protective Order is faithful to the Government's obligations under Rule 16, *Brady*, and other governing law, or whether it instead gives the Government too much flexibility to avoid or manipulate those obligations. (ECF 169-1, pp. 4–5.) Williams's most recent filing asserts that he has "two" main concerns with the Government's proposal (id., p. 4), although he does not appear to be withdrawing the other objections that are discussed in extensive detail in his earlier brief (ECF 83, pp. 6–13 (objecting to paragraphs 1, 2, 3, 4, 5, and 9 of the proposed Stipulated Discovery and Protective Order)). According to the Government, the universe of materials at issue in Williams's appeal remains narrow: "investigative reports, witness statements, and grand jury testimony." (ECF 173, p. 2.)

The Court does not doubt the sincerity of Williams's concerns about the Government's proposed Stipulated Discovery and Protective Order, nor the sincerity of his desire to obtain copies of investigative reports, witness statements, and grand jury testimony. The problem, however, is that Williams has not cited any authority giving the Court the power to order the Government to go beyond what the Federal Rules of Criminal Procedure and federal statutes and caselaw require with respect to producing copies of those items. To the contrary, the Court must give effect to the unambiguous limitations of 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2 and 16(a)(2) and (3) regarding the timing and process for disclosing witness statements, investigative reports, and grand

jury transcripts. In other words, in the absence of a Government stipulation or other unique circumstances not present in Williams's case, the Court cannot force the Government to make copies of those materials on terms the Government is unwilling to accept. *See, e.g.*, *United States v. White*, 750 F.2d 726, 729 (8th Cir. 1984) ("Although in many cases the government freely discloses Jencks Act material to the defense in advance of trial, the government may not be required to do so."); *United States v. Billups*, No. 23-CR-18 (MJD/DJF), 2023 WL 2447430, at *3 (D. Minn. Mar. 10, 2023) (denying motion for early disclosure of Jencks Act material). Chief Judge Adams correctly recognized and applied these legal principles, and thus the Court DENIES Williams's Appeal of Magistrate Judge Ruling.

## V.    CONCLUSION

Wendt's Motion to Suppress (ECF 127) is GRANTED IN PART and DENIED IN PART. The Court will hold a *Kastigar* hearing as described above to determine whether the Indictment resulted wholly from evidence independent of the protected statements. Williams's Motion to Quash, to Return Seized Property, and to Suppress (ECF 135) and Wendt's Joinder (ECF 139) are DENIED. Williams's Appeal from Magistrate Judge Ruling (ECF 169) is DENIED.

IT IS SO ORDERED.

Dated: June 9, 2023 _____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE