IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: 4:22-cr-199 |
| Plaintiff, | |
| vs. | **BRIEF IN SUPPORT OF** |
| | **DEFENDANT WENDT'S MOTION** |
| BRADLEY EUGENE WENDT, | **TO DISMISS** |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   BACKGROUND ........................................................................................... 1

III.  FEDERAL LAW ON MACHINE GUNS ................................................... 1

        A. The Statute .................................................................................... 1

        B. The Regulation ............................................................................. 2

IV.  THE CHARGES AGAINST WENDT ....................................................... 3

        A. Count 1: Conspiracy To Make False Statements To Defraud The ATF.......... 3

    B.     Counts 2-3: False Statements To The ATF – Purchase Law Letters (Wendt) ...................................................................................... 4

    C.     Counts 4-16: False Statements To The ATF – Demonstration Law Letters (Wendt) .............................................................. 4

    D.    Counts 17-19: False Statements To The ATF – Demonstration Law Letters (Wendt And Williams)................................. 5

    E.     Count 20: Illegal Possession Of Machine Gun (Wendt)........................................ 5

V.   ARGUMENT ............................................................................................... 6

    A.     The Regulation Impermissibly Restricts The City's Authority Under The Statute And Violates The Second Amendment .................... 6

        1.     The Regulation Impermissibly Restricts The City's Authority Under The Statute ........................................... 6

        2.     The Regulation Violates The Second Amendment................................. 10

    B.     Even If The Court Upholds The Regulation As Applied To Wendt, The Charges Against Him Should Still Be Dismissed................. 17

        1.     The Indictment Misstates The Law....................................... 17

        2.     The Law Is Ambiguous.......................................................... 18

VI.  CONCLUSION............................................................................................ 20

I.      **INTRODUCTION**

Defendant Bradley Eugene Wendt ("Wendt") submits this brief in support of his motion to dismiss.

II.     **BACKGROUND**

Wendt has been and continues to be the Police Chief for the City of Adair ("Adair" or the "City"). Unlike other cases the Government has brought around the country, Wendt was actually purchasing machine guns for the use of the Adair Police Department. In fact, the Government seized machine guns from the Adair Police Department as part of this case. Further, unlike the other cases, Wendt did not receive any sort of bribe or kickback for authorizing dealers to purchase machine guns. Lastly, unlike the other cases, Wendt was both the Police Chief and a dealer with an FFL-SOT – something Wendt made clear to the ATF and that the ATF knew and understood from the very beginning. Now, the Government seeks to do what the ATF did not do as part of its regulatory oversight via federal criminal charges.

III.    **FEDERAL LAW ON MACHINE GUNS**

   A.      **The Statute**

In 1986, Congress enacted 18 U.S.C. §922(o) (the "Statute") which states:

> Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machine gun. (2) This subsection does not apply with respect to—(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or (B) any lawful transfer or lawful possession of a machine gun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o).

B.        The Regulation

The regulation at issue in this case is 27 C.F.R. § 479.105(a) (the "Regulation") which

states:

(a) General. As provided by 26 U.S.C. 5812 and 26 U.S.C. 5822, an application to make or transfer a firearm shall be denied if the making, transfer, receipt, or possession of the firearm would place the maker or transferee in violation of law. Section 922(o), Title 18, U.S.C., makes it unlawful for any person to transfer or possess a machine gun, except a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or any lawful transfer or lawful possession of a machine gun that was lawfully possessed before May 19, 1986. Therefore, notwithstanding any other provision of this part, no application to make, transfer, or import a machine gun will be approved except as provided by this section.

(b) Machine guns lawfully possessed prior to May 19, 1986. A machine gun possessed in compliance with the provisions of this part prior to May 19, 1986, may continue to be lawfully possessed by the person to whom the machine gun is registered and may, upon compliance with the provisions of this part, be lawfully transferred to and possessed by the transferee.

(c) Importation and manufacture. Subject to compliance with the provisions of this part, importers and manufacturers qualified under this part may import and manufacture machine guns on or after May 19, 1986, for sale or distribution to any department or agency of the United States or any State or political subdivision thereof, or for use by dealers qualified under this part as sales samples as provided in paragraph (d) of this section. The registration of such machine guns under this part and their subsequent transfer shall be conditioned upon and restricted to the sale or distribution of such weapons for the official use of Federal, State or local governmental entities. Subject to compliance with the provisions of this part, manufacturers qualified under this part may manufacture machine guns on or after May 19, 1986, for exportation in compliance with the Arms Export Control Act (22 U.S.C. 2778) and regulations prescribed thereunder by the Department of State.

(d) Dealer sales samples. Subject to compliance with the provisions of this part, applications to transfer and register a machine gun manufactured or imported on or after May 19, 1986, to dealers qualified under this part will be approved if it is established by specific information the expected governmental customers who would require a demonstration of the weapon, information as to the availability of the machine gun to fill subsequent orders, and letters from governmental entities expressing a need for a particular model or interest in seeing a demonstration of a particular weapon. Applications to transfer more than one machine gun of a

2

particular model to a dealer must also establish the dealer's need for the quantity of samples sought to be transferred.

(e) The making of machine guns on or after May 19, 1986. Subject to compliance with the provisions of this part, applications to make and register machine guns on or after May 19, 1986, for the benefit of a Federal, State or local governmental entity (e.g., an invention for possible future use of a governmental entity or the making of a weapon in connection with research and development on behalf of such an entity) will be approved if it is established by specific information that the machine gun is particularly suitable for use by Federal, State or local governmental entities and that the making of the weapon is at the request and on behalf of such an entity.

(f) Discontinuance of business. Since section 922(o), Title 18, U.S.C., makes it unlawful to transfer or possess a machine gun except as provided in the law, any qualified manufacturer, importer, or dealer intending to discontinue business shall, prior to going out of business, transfer in compliance with the provisions of this part any machine gun manufactured or imported after May 19, 1986, to a Federal, State or local governmental entity, qualified manufacturer, qualified importer, or, subject to the provisions of paragraph (d) of this section, dealer qualified to possess such, machine gun.

27 CFR § 479.105.

## IV.     THE CHARGES AGAINST WENDT

The Government has charged Wendt with one count of conspiracy to unlawfully acquire machine guns, in violation of 18 U.S.C. § 371; eighteen counts of false statements concerning the acquisition or transfer of machine guns, in violation of 18 U.S.C. § 1001(a)(2); and one count of aiding and abetting the illegal possession of a machine gun, in violation of 18 U.S.C. § 922(o).

### A.     Count 1: Conspiracy To Make False Statements To Defraud The ATF

The Government alleges Wendt and Williams conspired to unlawfully acquire machine guns. To accomplish this conspiracy, the Government alleges that Wendt made materially false statements to the ATF in law letters that were required for the acquisition of machine guns. The Government alleges Adair only has a population of 791, that it typically only has one officer on duty, and that during Wendt's tenure as Police Chief, at most, the Adair Police Department only

had three-full time officers. The Government also makes allegations about the number of machine guns that were purchased or transferred, the suitability of the particular machine guns for law enforcement use, as well as other ways in which the machine guns were used, including a machine shoot. The Government alleges the purpose of the conspiracy was to (1) unlawfully obtain and acquire machine guns for Defendants' personal enjoyment; (2) sell or transfer the machine guns for the Defendants' personal profit; (3) rent the machine guns to private citizens in exchange for money; (4) allow private citizens to possess and shoot machine guns; and, (5) with respect to Wendt, to transfer machine guns to other FFL-SOTs.

### B.      Counts 2-3: False Statements To The ATF – Purchase Law Letters (Wendt)

In the Indictment, the Government states that a "purchase law letter" is required for a law enforcement agency to purchase machine guns. It alleges that Wendt made materially false statements to the ATF in those "purchase law letters" that the machine guns would be used to carry out the duties of the Adair Police Department and that they were not being acquired for resale or transfer, when in fact Wendt was acquiring them for his personal gain and profit.

### C.      Counts 4-16: False Statements To The ATF – Demonstration Law Letters (Wendt)

In the Indictment, the Government states that dealers with an FFL-SOT may purchase a machine gun with a "demonstration law letter" from a law enforcement agency. The Government alleges that Wendt made materially false statements to the ATF that the machine guns were requested for demonstration for future potential purchase by the Adair Police Department, when in fact Wendt was acquiring the machine guns for his personal gain and profit and to facilitate the transfer of the machine to other FFL-SOTs.

**D.     Counts 17-19: False Statements To The ATF – Demonstration Law Letters (Wendt And Williams)**

Regarding the demonstration law letters to Williams, the Government alleges that Wendt made materially false statements in the demonstration letters that the machine guns were requested for demonstration for future purchase by the Adair Police Department, when in fact the machine guns were being acquired for Williams's personal gain and profit.

**E.     Count 20: Illegal Possession Of Machine Gun (Wendt)**

Lastly, the Government alleges Wendt "knowingly possessed a machine gun" and aided and abetted the same. It identifies the machine gun, which Wendt purchased for the use of the Adair Police Department, and the date, which seems to refer to a machine gun shoot in Adair. However, it provides nothing more and the discovery does not elaborate on it either. The Government does not explain why or how the exceptions to the Statute, 18 U.S.C. § 922(o)(2), do not apply here. However, the Government will have to prove at trial both why Wendt did not have the legal authority to possess the machine gun and how and to whom Wendt allegedly aided and abetted the illegal possession of the machine gun. When Wendt requested additional information from the Government on this count regarding a bill of particulars, the Government pointed him to paragraphs 23, 31, and 32 of the Indictment and three ATF reports. Those paragraphs of the Indictment simply allege that the machine gun in question was purchased on a "purchase law letter" for official use and responsibilities of the Adair Police Department and yet Wendt charged members of the public to shoot it on a machine gun shoot on April 16, 2022. The Government has not provided Wendt with copies of the ATF reports.

## V.     ARGUMENT

The charges against Wendt should be dismissed. First, the Regulation impermissibly restricts the City's authority and is unconstitutional as applied to Wendt. Second, even if the Court upholds the Regulation, the charges should nonetheless still be dismissed because the Government misstates the law in the Indictment, and its interpretation of the law as applied here would be unconstitutional and otherwise invalid. In addition, Wendt joins Williams's motion to dismiss (Dkt. # 177 *et al.*) and hereby incorporates the arguments made in support of that motion.

### A.     The Regulation Impermissibly Restricts The City's Authority Under The Statute And Violates The Second Amendment

It is a violation of the Second Amendment to restrict the City's ability to purchase or authorize the purchase of machine guns. Congress enacted the Statute which restricts citizens' ability to acquire a certain type of firearms ("machine guns"). The Regulation then goes further to restrict the City's ability to acquire, transfer, or authorize the acquisition or transfer to those purposes deemed appropriate by the ATF. This Court should strike the Regulation as it seeks to restrict what the Statute authorizes and violates the Second Amendment. Importantly, this applies to both the direct possession or transfer as well as the authorization of a dealer, because the latter is tied up in and a critical part of the former.

### 1.     The Regulation Impermissibly Restricts The City's Authority Under The Statute

The Statute explicitly carves out and provides that a city has the authority to transfer, possess, or authorize the transfer or possession of a machine gun – and does not limit that authority in any way. 18 U.S.C. § 922(o). And the following is undisputed: (1) the authority of the City of Adair was vested in the Adair Police Department; (2) throughout the entire time in

question, Wendt was the Police Chief of Adair; and (3) Wendt, as the Police Chief, had the authority to exercise that authority under § 922(o).

The City is a political subdivision. Iowa Code § 23A.1 ("'*Political subdivision*' means a city, county, or school corporation."). Further, a city can only act through its officials. *Kramer v. Logan Cnty. Sch. Dist. No. R-1*, 157 F.3d 620, 623 (8th Cir. 1998) ("a political subdivision . . . acts through its agents and employees"). Thus, the City, through its agents and employees, is authorized to transfer or possess machine guns under 18 U.S.C. § 922(o). Here, Wendt is the Police Chief of Adair. A police chief is generally authorized to make decisions to fulfill the police department's responsibilities to its citizens. *See, e.g., Bernini v. City of St. Paul*, 665 F.3d 997, 1008 (8th Cir. 2012) ("The chief of police, for example, has 'general authority and control over all departmental staff and shall oversee the proper fulfillment of all tasks and duties assigned to the department.'") (citing city ordinance); *Bramblett v. City of Columbia*, 831 F.3d 999, 1001 (8th Cir. 2016) ("*chief of police* shall have general supervision and control of the department, including the enforcement of discipline among the members thereof, and the instruction of the members in their duties") (citing city ordinance). It follows that one of those duties is to make sure the police department is properly armed. Under the Statute, Wendt is authorized to transfer or possess machine guns under the authority of the City.

### i.     The Statute Is An Unambiguous Criminal Statute Therefore *Chevron* Deference Does Not Apply

*Chevron* deference does not apply in this case, and even if it did, the Regulation is still impermissible. Under the doctrine known as *Chevron* deference:

> [A] court review[ing] an agency's construction of the statute which it administers . . . is confronted with two questions." *Chevron, USA, Inc. v. NRDC*, 467 U.S. 837, 842 (1984): First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

> unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Hardin v. ATF*, 65 F.4th 895 (6th Cir. 2023); *see also Cargill v. Garland*, 57 F.4th 447, 458 (5th Cir. 2023); *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 455 (6th Cir. 2021).

The Eighth Circuit has recognized Congress's clear intent in passing the Statute. *U.S. v. Pearson*, 8 F.3d 631, 633 (8th Cir. 1993) ("Congress adequately addressed the relationship between the proliferation of machine guns, violent crime, and narcotics trafficking. Congress reasonably concluded that mere possession of firearms threatens the lives and safety of law enforcement officials and the public at large.") (internal citation omitted) (discussing the Statute).

Congress intended to ban machine guns for the general public, while specifically making an exception for political subdivisions, including police departments. This conclusion is bolstered by the Eighth Circuit's recognition that the "mere possession of firearms threatens the lives and safety of law enforcement officials." *Id.* Thus, the protection of law enforcement officials clearly served as a basis for enacting the Statute. Congress also specifically created an exception for law enforcement officials, signaling the important right for law enforcement to have machine guns to protect the general public. If Congress wished to ban machine guns entirely, they could have done so, but they did not.

Moreover, deference to an agency's interpretation of criminal laws is highly disfavored. The Circuit Courts have expressly held that the ATF's interpretation of the Statute is not entitled to deference:

The critical point is that criminal laws are for courts, not for the Government, to construe. We think ATF's old position no more relevant than its current one—which is to say, not relevant at all. Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly (as the ATF used to [regarding this provision]), a court has an obligation to correct its error. Here, nothing suggests that Congress—the entity whose voice does matter—limited [the provision's] prohibition ... in the way [the petitioner] proposes. Thus, the Court was clear, unequivocal, and absolute in saying that it has "never held that the Government's reading of a criminal statute is entitled to any deference."

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

And we have never held that Chevron deference applies to an agency's interpretation of a purely criminal statute, such as the ban on possessing a machine gun in 18 U.S.C. § 922(o). . . . Instead, we have found that a court's deferring to an agency's interpretation of a criminal statute would be problematic, if not prohibited. *See United States v. Dodson*, 519 F. App'x 344, 349 (6th Cir. 2013) ("The ATF does not have the ability to redefine or create exceptions to Congressional statutes.")

*Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 455, 459 (6th Cir. 2021).

While *Chevron* deference is often based on the expertise of an administrative agency, the courts have also found the ATF is not considered a relevant expert:

Notwithstanding the ATF's frequent reversals on major policy issues, we understand that the Court would consider the bureaucrats at the ATF as experts in firearms technology. But that technical knowledge is inapposite to the question of what should be criminally punished and what should not. Criminal statutes reflect the value-laden, moral judgments of the community as evidenced by their elected representatives' policy decisions.

\*\*\*

The ATF is not an expert on community morality, so the rationale of deferring to "agency expertise" on this question fails. And there is great risk if the responsibility of making moral condemnations is assigned to bureaucrats in the nation's capital who are physically, and often culturally, distant from the rest of the country. Federal criminal laws are not administrative edicts handed down upon the masses as if the administrators were God delivering the Ten Commandments to Moses on Mount Sinai.

*Id.* at 461-62. The ATF is not an expert in interpreting criminal statutes. Congress was clear in the Statute, and it is up to the courts, not the ATF, to interpret the Statute.

The Government contends that Wendt could not authorize an FFL to purchase a machine gun so that Wendt could decide if he wanted it for the Adair Police Department. It cannot follow that Wendt is both able under the Statute, and at the same time, unable under the Regulation to transfer and possess machine guns. This is exactly the result that the Sixth Circuit held is "problematic, if not prohibited." *Garland*, 992 F.3d at 459.

Additionally, "the Supreme Court has long recognized that an agency interpretation that 'conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.' The concern is only magnified where, as here, the Government's interpretation of the underlying statute carries implications for criminal liability." *Garland*, 57 F.4th at 469 (internal citations omitted). The Circuit Courts have recognized the inherent concerns in the inconsistency of the ATF's regulations. *Id.*; *see also Aposhian v. Wilkinson*, 989 F.3d 890, 900 (10th Cir. 2021) ("When an agency plays pinball with a statute's interpretation, as the ATF has here, fair notice cannot be said to exist.") (Tymkovich, C.J., dissenting); *Guedes v. ATF*, 920 F.3d 1, 41 (D.C. Cir. 2019) ("[t]he ATF's interpretation of 'machinegun' gives anything but fair warning") (Henderson, J., concurring in part and dissenting in part).

## 2.    The Regulation Violates The Second Amendment

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022) ("*Bruen*"), the Supreme Court articulated a framework for determining if firearms regulations are constitutional. That framework requires the Court to begin with the Second Amendment's text. If the plaintiff's proposed course of conduct falls within that text, then that conduct is presumptively protected. *Id.* at 2126.

Therefore, the first step is to determine if a defendant's conduct is covered by the plain text of the Second Amendment. The Second Amendment not only protects a particular weapon that was in common use at the time of the Amendment's enactment, but it also extends to all instruments that constitute bearable arms—even those that were not in existence at the time of the Founding. *Caetano v. Massachusetts*, 577 U.S. 411, 415 (2016); *see Bruen*, 142 S. Ct. at 2132 (reference to "arms" does not apply "only to those arms in existence in the 18th century"). As the Supreme Court in *Heller* explained, the term "arms" includes any "[w]eapo[n] of offence" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] ... for the purpose of offensive or defensive action." *Dist. Of Columbia v. Heller*, 554 U.S. 570, 584 (2008).

Moreover, "[t]he people" presumptively means "all Americans," and to "bear" simply means to "carry." *Id.* at 580–82, 584. Additionally, the Second Amendment right to possess firearms necessarily includes the right to acquire firearms, including purchase and transfer. See *Ill. Ass'n of Firearm Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) (explaining that the Second Amendment "right must also include the right to acquire a firearm").

"When the Second Amendment's plain text covers an individual's conduct, the Constitution *presumptively protects* that conduct." *Bruen,* 142 S. Ct. at 2126 (emphasis added). After this prima facie textual showing has been made, the second step is that "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). In *Bruen*, the Court notes

that there is a historical precedent for statutes that prohibit the carrying of "dangerous and unusual weapons" that spread "fear" or "terror" among the people.

### i.   The Second Amendment Protects The Right To Possess Machine Guns In The Circumstances Of This Case

Circuit Courts have held that the text of the Second Amendment does not protect the right of an **individual** to possess a machine gun. *See United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for **individual** use.") (emphasis added); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) ("[W]hatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed **individual** to possess unregistered machine guns for **personal use**.") (emphasis added); *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) ("*Heller* deemed a ban on **private possession** of machine guns to be obviously valid.") (emphasis added).

While the Eighth Circuit has held the Second Amendment's text does not cover the possession of machine guns for *private, individual* use, the analysis cannot be the same for the possession of machine guns by law enforcement. The text of the Second Amendment expressly recognizes "[a] well regulated Militia" as "necessary to the security of a free State." In the Founding era, preserving the "free State" by arming the local governments and militias was one of the biggest perceived threats to freedom. James Madison wrote of the importance of the arming of local governments in the Federalist Papers:

> Notwithstanding the military establishments in the several kingdoms of Europe …
> which are carried as far as the public resources will bear, the governments are
> afraid to trust the people with arms. And it is not certain, that with this aid alone
> they would not be able to shake off their yokes. **But were the people to possess
> the additional advantages of local governments chosen by themselves, who
> could collect the national will and direct the national force, and of officers
> appointed out of the militia, by these governments, and attached both to
> them and to the militia**, it may be affirmed with the greatest assurance, that the
> throne of every tyranny in Europe would be speedily overturned in spite of the
> legions which surround it.

THE FEDERALIST No. 46 (James Madison) (emphasis added).

The Federalist Papers are recognized as one of the best indicators of historical practice

and intent. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 360-61 (1995) ("The

essays in the Federalist Papers . . . are only the most famous example of the outpouring of

anonymous political writing that occurred during the ratification of the Constitution. . . . the

historical evidence indicates that Founding-era Americans opposed attempts to require that

anonymous authors reveal their identities on the ground that forced disclosure violated the

'freedom of the press.'").

The Federalist Papers expressly state the very intent the Founders had in drafting the

Second Amendment: for local governments and armed militias to have the right to bear arms to

deter against the threat of an authoritarian federal government. THE FEDERALIST No. 46 (James

Madison); *see also United States v. Jackson*, No. 22-2870, 2023 WL 3769242 (8th Cir. June 2,

2023) ("legislatures traditionally possessed discretion to disqualify categories of people from

possessing firearms to address a threat purportedly posed by these people 'to an orderly society

and compliance with its legal norms'").

With those principles in mind, the analysis regarding whether the Second Amendment

protects machine guns changes. For example, the Eighth Circuit held that "[m]achine guns are

not in common use by law-abiding citizens for lawful purposes and therefore fall within the

13

category of dangerous and unusual weapons that the government can prohibit for individual use." *Fincher*, 538 F.3d at 874. No part of that analysis is true when viewing the use of machine guns in the context of a police department or local government.

First, machine guns are in common use for lawful purposes by the individuals who serve in law enforcement. The Supreme Court reaffirmed *Heller*'s reasoning that the Second Amendment protects weapons that are in common use in *Caetano v. Massachusetts*, 577 U.S. 411 (2016). There, the Court reiterated that "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes today." *Id.* at 420 (Alito, J., concurring). In analyzing whether a state's law banning stun guns ran afoul of the Second Amendment, the Court considered how many private citizens had purchased stun guns, and how many states permitted their possession. *Id.* The Court concluded that "stun guns are widely owned and accepted" and, as a result, a state's "categorical ban of such weapons . . . violates the Second Amendment." *Id.* Applying that reasoning here, machine guns are registered for lawful use **in all fifty states**. Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States ANNUAL STATISTICAL UPDATE 2021 15-16 (2021). According to the ATF, of the 7,512,175 guns in the United States, 741,146, or 10.14% are machine guns. *Id.*

Second, the firearms possessed by law enforcement are not inherently more "dangerous" than any other type of modern firearm. Rather than being more dangerous, they enable law enforcement to protect citizens from the threat of external dangers. Third, the firearms possessed by law enforcement do not spread any more "fear" or "terror" among the people than any other commercially available firearm. Again, the purpose of the use of machine guns by law enforcement is to protect the citizens.

Therefore, "arms" under the Second Amendment includes machine guns when viewed in the context that the machine gun is an arm commonly used by law-abiding citizens in police departments, the National Guard, and the military. These groups are analogous today to the well-regulated Militia that the Founders intended to protect. Therefore, the purchase, possession, and transfer of machine guns for law enforcement purposes falls within the text of the Second Amendment.

> ### ii.     The Founders Intended To Protect The Rights Of Local Governments And State Militias To Keep And Bear Arms

Once a plaintiff can show its conduct falls within the text of the Second Amendment, the burden falls on the Government to "affirmatively prove" that the restrictions in 18 U.S.C. § 922(o) are "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. The Government may do so by identifying analogous restrictions from history, but these restrictions must arise from the relevant historical time period. Because the scope of the Second Amendment was set in 1791, the Founding era is the only appropriate period for this Court's historical analysis. *See generally* Mark W. Smith, '*Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, (Oct. 1, 2022), available at https://ssrn.com/abstract=4248297. That is because this Court is bound by two lines of Supreme Court precedent. The first mandates that the scope of the Second Amendment concerning the Federal Government is based on the public understanding in 1791. *See, e.g., Heller*, 554 U.S. at 634–35. The second establishes that incorporated Bill of Rights provisions mean the same thing when applied to the States and the Federal Government. *See, e.g., McDonald v. City of Chicago*, 561 U.S. 742, 765–66 (2010). *Bruen* itself was another entry in a long tradition of these precedents because it too—notwithstanding dicta about an "ongoing

scholarly debate"—treated evidence surrounding the Founding as generally dispositive of the contours of the incorporated Second Amendment. 142 S. Ct. at 2137–38 (noting Reconstruction era evidence has only been used as "confirmation" of what "had already been established" by Founding era evidence); *see also Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136.

"[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. Since the "Founders themselves could have adopted" restrictions similar to those in the Regulation —but did not do so—that is dispositive evidence that the restrictions the State seeks to impose in this case are unconstitutional. *Id.*; *see also United States v. Price*, 2022 WL 6968457 at *5–*6 (S.D. W. Va. Oct. 12, 2022) (discussing lack of historical tradition of banning personal possession of firearms without serialization).

Here, as outlined above, the Founders intended the local governments and state militias to receive protection. Today, those protections include those for the City and its police department. If this court were to hold the rights of the City, a political subdivision, can be restricted, it would necessarily mean that the law could begin restricting the Second Amendment

rights of law enforcement agencies, the National Guard, and the military. This is undoubtedly the type of restriction the Founders intended the Second Amendment to protect against.

Finally, the issue of fundamental fairness under the Constitution is implicated here. There is an abundance of legal machine guns in America. Every machine gun produced before January 1, 1986, is legal, so long as the registration requirement is met. However, this presents an issue of inequality in access to the rights guaranteed by the Second Amendment. For instance, if an individual were to purchase and register a machine gun on December 31, 1985, there would be no issue with their purchase, registration, or ownership of that firearm. Contrastingly, if a similarly situated individual attempted the same conduct, just one day later on January 1, 1986, they would not be able to legally engage in any of the activities that another could have engaged in the day before.

## B.   Even If The Court Upholds The Regulation As Applied To Wendt, The Charges Against Him Should Still Be Dismissed

### 1.   The Indictment Misstates The Law

Wendt joins William's motion to dismiss (Dkt. # 177 *et al.*) and hereby incorporates the arguments made in support of that motion. In addition, Wendt adds the following:

First, the Regulation does not cover the purchase of machine guns by a law enforcement agency. There is no law letter requirement like there is with dealer purchases. The Indictment's attempt to equate law enforcement purchases (via a so-called "purchase law letter" requirement) with dealer purchases is a misstatement of the law. And it is important for two reasons. First, it imposes a requirement that does not exist under the law. Second, it devalues and understates the authority of law enforcement agencies generally. A local law enforcement agency can purchase whatever type of machine gun it wishes and the ATF does not conduct a determination as to

whether it will be for official use, whether it is appropriate for law enforcement use, or anything

else. Nor could it for the reasons set forth above with respect to the Second Amendment.

Second, the Indictment does not allege that the requirements Wendt allegedly violated

were its practices or what was important to it in exercising its discretion. Rather, the Indictment

asserts they were material because they were against the law in a section of the Indictment

labeled, "Federal Law on Machine Guns." Indictment, at 3. And because they are not part of the

law and the Statute and Regulation provide no discretion to deny, the alleged misstatements

cannot be material. Nor does it appear that an ATF NFA representative provided any testimony

regarding the materiality of the alleged misstatements. Because that is not accurate, this Court

should conduct a review of the grand jury instructions.

## 2.      The Law Is Ambiguous

Any attempted criminal enforcement against Wendt based on the Regulation or the

Government's interpretation of it would violate his right to due process. *See Johnson v. United

States*, 576 U.S. 591, 595 (2015). Not only does the Government misstate the law, but the

requirements it now seeks to retroactively impose are ambiguous. For example, even if the law

required a dealer purchase to require the interest of a law enforcement agency "for potential

purchase," it is not clear what that means. Presumably, this would mean anything that could help

inform the purchase of not just that machine gun, a similar machine gun, or no machine gun at

all. The ATF has previously conceded that the make and model are not important. Nor is it clear

how an interest in a demonstration would be different than an interest in a purchase under the

Regulation. Neither the purchase nor the demonstration has to actually occur. And when a law

enforcement agency does make a purchase, it typically does not purchase the machine gun

acquired by the dealer for demonstration. It further does not make sense how the ATF could

restrict the type of machine gun acquired by the dealer for purposes of purchase or demonstration while, at the same time, acknowledging the law enforcement agency can purchase any type of machine gun it wishes and as many as it wishes. At a minimum, these requirements cannot be enforced in a criminal case against a police chief.

The Indictment does not allege that Wendt was acting outside the scope of his authority as Police Chief. It does not allege some sort of honest services fraud wherein Wendt took advantage of his position because that would require a bribe or kickback. *See Skilling v. United States*, 561 U.S. 358, 363 (2010). The City is the ultimate arbiter of what it wants to authorize and/or acquire when it comes to machine guns. Regardless of anything else, unless the Government can prove Wendt acted outside the authority given to him by the City, it cannot prosecute him. Even if the Court upholds the Regulation, if Wendt was within his scope of authority, any purchase was de facto for "official use." And because Wendt had the authority as Police Chief to purchase any type of machine gun he wanted to purchase, any authorization was per se connected to a potential purchase.

Lastly, Wendt should be immune for any actions he took under his authority as Police Chief unless the Government can demonstrate that Wendt acted outside his authority and/or took actions in violation of well-established legal precedent. Neither of which the Government can show. "Generally, government officials performing discretionary functions have qualified immunity, shielding them from civil liability. " *Daniels v. Iowa*, No. 4:04-CV-40420, 2005 WL 1398498, at *16 (S.D. Iowa May 23, 2005), *aff'd*, 170 F. App'x 446 (8th Cir. 2006). "Public officials are entitled to immunity from claims brought against them in their individual capacities if their actions did not violate clearly established law of which a reasonable person in the

officials' position would be aware. " *Gerlich v. Leath*, 152 F. Supp. 3d 1152 (S.D. Iowa 2016),

*aff'd*, 847 F.3d 1005 (8th Cir. 2017), and *aff'd*, 861 F.3d 697 (8th Cir. 2017).

## VI.  CONCLUSION

In conclusion, the charges alleged against Wendt in the Indictment should be dismissed

with prejudice.


Dated: June 15, 2023                    **FAEGRE DRINKER BIDDLE & REATH LLP**

                                        /s/ Nick Klinefeldt
                                        Nicholas A. Klinefeldt, AT0008771
                                        Rachel A. Yaggi, AT0014994
                                        801 Grand Avenue, 33rd Floor
                                        Des Moines, Iowa 50309
                                        Telephone: (515) 248-9000
                                        Fax: (515) 248-9010
                                        Email: *nick.klinefeldt@faegredrinker.com*
                                        Email: *rachel.yaggi@faegredrinker.com*

                                        ***ATTORNEYS FOR DEFENDANT WENDT***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of June, 2023, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

*/s/ Jessica Ibsen*