# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 4:22-cr-00199-SHL-HCA-1 |
| Plaintiff, | |
| vs. | **ORDER FOLLOWING** *KASTIGAR* **HEARING** |
| BRADLEY EUGENE WENDT, | |
| Defendant. | |

When the prosecution team in a federal criminal case hears or learns about statements made by a defendant under promise of immunity, the Government must prove either that it did not use those statements in the prosecution or that any such use was harmless beyond a reasonable doubt. The Government has satisfied its burden of proof here. The Court therefore DENIES Wendt's request to dismiss the indictment or disqualify members of the prosecution team.

## I.    FINDINGS OF FACT.

### A.   Investigation Prior to October 26, 2022.

Wendt serves as Police Chief for the City of Adair, Iowa. (Tr.[1] 91.) He also owns gun businesses. (Tr. 13.) In March 2022, law enforcement agents began investigating Wendt for possible violations of federal law revolving around his submission of "law letters" to the Bureau of Alcohol, Tobacco, and Firearms (ATF) to obtain highly regulated machine guns. (Tr. 10; ECF 2, ¶ 19.) The Indictment alleges, *inter alia*, that Wendt falsely claimed the machine guns would be used by the Adair Police Department but was actually acquiring them for his personal use and benefit through his gun businesses. (ECF 2, ¶ 4.) The lead agents in the investigation are Special Agent Kevin Kohler of the Federal Bureau of Investigation (FBI) and ATF Special Agent Kelly Etnier. (Tr. 47, 135.)

As of May 2022, the investigation had advanced to a sufficient degree that the Government sought and obtained search warrants for Facebook and Hotmail accounts associated with Wendt. (ECF 171-4; ECF 171-5.) By late August 2022, the Government had developed enough

---

[1] "Tr." refers to the transcript of the *Kastigar* hearing, which spanned two days and was filed in two parts. (ECF 242 (volume I, containing pp. 1–132); ECF 251 (volume II, containing pp. 133–232).) Since pagination was continued between volumes I and II, the Court refers to the transcript by page number only.

information to apply for warrants for five properties, including, *inter alia*, Wendt's residence, businesses, and the Adair Police Department. (ECF 171-7; ECF 171-8; ECF 171-9.) Special Agent Etnier submitted an Affidavit in support of these applications that spanned seventy-two pages and 164 paragraphs (not counting subparagraphs). (ECF 171-10.) Etnier's Affidavit stated, among many other things, that Wendt used his position as Police Chief to acquire machine guns but did not intend to acquire those guns for the Adair Police Department, but rather for his own profit. (E.g., id., ¶¶ 39, 95–96, 114.) The Affidavit identifies at least three machine guns purportedly obtained for the Adair Police Department but sold by Wendt personally. (Id., ¶¶ 92, 95.)

Agents executed the search warrants on August 31, 2022, as part of a coordinated operation in Adair, which is a small town in west central Iowa with a population of approximately 800 people. *United States v. Wendt*, --- F. Supp. 3d. ----, 2023 WL 4248754, at *1 (S.D. Iowa June 9, 2023). Special Agents Kohler and Etnier interviewed Wendt and other city officials on that date or subsequent days. (Tr. 153, 158; Govt. Exs. 11, 18–21[2].) Their interview with Wendt on August 31 was extensive enough that Kohler's interview report—i.e., the FBI 302—is six, single-spaced pages in length. (Govt. Ex. 11.) The interview revolved largely around Wendt's sale of firearms registered to the Adair Police Department, as well as whether Wendt profited from those sales. (Id., pp. 3, 5.) Agents also asked Wendt whether the City Council ever approved his acquisition of machine guns, with Wendt saying at one point that "many" Council members would know about the law letters and machine guns but later admitting that "most would not." (Id., p. 2.)

During interviews with other City officials on August 31 or ensuing days, Agents Kohler and Etnier asked whether each official recalled the City Council ever approving Wendt's use of law letters or acquisition of machine guns. Former Council member Richard Hays said no. (Govt. Ex. 18.) Former Council member Craig Wedemeyer said no. (Govt. Ex. 19.) Former Council member Jeremy Gettler said no. (Govt. Ex. 20.) Council member Kyle Irlmeier said no. (Govt. Ex. 21.)

Unsurprisingly, the activity in Adair on August 31, 2022, created concerns for City officials, as it was clear that there was a criminal investigation targeting Wendt in connection with actions taken by him in his role as Police Chief. *Wendt*, 2023 WL 4248754, at *1–2. Adair City

---

[2] The Court admitted twenty-five Government Exhibits during the *Kastigar* hearing, which are found at various places on the electronic docket. (*See* ECF 215-1–215-10 (Exhibits 1–10); ECF 226-1 (Exhibit 11); ECF 248 (Exhibits 12–24); ECF 233-1 (Exhibit 25).) For ease of reference, the Court refers to each Government Exhibit by its number only.

Attorney Clint Fichter talked to Wendt that day to try to understand what had led to the execution of the search warrants. *Id*. at *2. Other City officials also asked Wendt questions either that day or in the ensuing days or weeks. *Id*. Wendt was placed on paid leave by the Mayor and City Administrator. *Id*.

At some point, the City Council directed City Attorney Fichter to perform an investigation. *Id*. Fichter's testimony was unreliable as to when this occurred, but the timeline is clear from surrounding evidence, including, especially, the recording from City Council meetings on September 14 and October 26, 2022. *Id*. Prior to September 14, Fichter had taken preliminary steps to try to obtain information about Wendt's situation, including communicating with the U.S. Attorney's Office. *Id*. Fichter had not, however, begun any formal investigation because he needed to confirm with the City Council what they wanted him to do. *Id*. The fledgling investigation was discussed during a closed-session City Council meeting on September 14. *Id*. During the meeting, Council members discussed whether Wendt had done anything illegal, with most saying they did not know one way or the other. *Id*. One Council member (apparently Rick Stanley) said, however, that he was told by an FBI agent that Wendt "had broken no laws." *Id*. Someone (possibly also Stanley) said Wendt had "paid for everything," defended Wendt's right to use City letterhead for "law letters," and said, "Everything [Wendt] did, had to be approved by the ATF." *Id*. This member was highly supportive of Wendt and, in context, it seems clear that the original source of much of his information was Wendt himself. *Id*. Later, a Council member explicitly said he talked about the situation with Wendt, who claimed to have done nothing wrong. *Id*. A different Council member then said one of his concerns was that Wendt "sat here" and admitted selling the guns for substantially more than he paid for them, which, in the member's view, was troubling because Wendt was only able to buy the guns in the first place by purporting to do so on behalf of the City. *Id*. More discussion ensued, in part revolving around things Wendt said, but also involving statements made by law enforcement agents, with some Council members defending Wendt and others expressing concerns. *Id*. Ultimately, the members agreed to "leave the status quo the way it is" and authorized Fichter to "continue gathering this information." *Id*. Wendt himself was not present for the September 14 meeting; instead, he was on a pre-scheduled vacation. *Id*.; (*see also* ECF 228, p. 24.)

The City of Adair is a "close-knit community" with "all different levels of personal relationships," and thus City officials could have received information from Wendt in a variety of

settings. *Wendt*, 2023 WL 4248754, at *3. City officials have a fiduciary duty to the City to gather facts and information, although investigatory powers are "usually exercised through the City Attorney." *Id*. On October 3, 2022, Fichter sent a letter to Wendt from the City, signed by Mayor Joanne Byars, notifying Wendt of "an investigation being conducted into violations of personnel standards . . . in compliance with Iowa Code 80F." *Id*. The letter informed Wendt that "any information obtained in this investigation cannot be used against you in any criminal proceedings and will be considered a confidential employee record." *Id*. The letter summarized the City's understanding of the substance of the FBI and ATF investigation into Wendt's purchases of firearms, then stated:

> We are offering you an opportunity to respond to questions regarding these purchases in writing or through an in-person interview. You may have an attorney provide your responses or attend such in-person interview.

> The questions the City needs to resolve are the following:

> 1.    How many Law Letters were sent by you on behalf of the City of Adair for the purchase or demonstration of automatic weapons?

> 2.    How many weapons were purchased on behalf of the City of Adair because of these Law Letters? If automatic weapons were purchased, were any sold by you and how many were in your possession or in the City's possession on August 31, 2022.

> 3.    Did you communicate to the ATF or FBI that any automatic weapons purchased were to be bought with City funds and for City use?

> 4.    Did you communicate that the City of Adair had three or more full-time officers in the Police Department in any of the Law Letters?

> You may also provide any other information that you feel is pertinent to this situation.

> If you wish to respond in writing, please do so by October 7, 2022. If you request an in-person interview to be held at a date and time prior to 4:00 PM on October 7, 2022.

> Please be advised that this investigation may result in reprimand or termination of your employment.

*Id*. In Fichter's view, Wendt had an obligation "under the personnel manual[3]" to answer these inquiries, with disciplinary action possible for failure to comply, including termination. *Id*. Wendt

---

[3] Witnesses sometimes referred to the same document as the "employee handbook." This Order uses the phrases "employee handbook" and "personnel manual" interchangeably.

interpreted the letter to mean that if he did not respond, he would be terminated. *Id*. He acknowledged, however, that the letter does not say this expressly. *Id*.

Wendt responded to the October 3 letter via letter from his counsel, Timothy Rudd, dated October 26, 2022 (the "Rudd Letter"). *Id*.; (ECF 129-2.) The Court previously ruled that the Rudd Letter is protected by the City's promise of immunity. *See Wendt*, 2023 WL 4248754, at *8–9. In light of this ruling, the Court will not summarize the substance of the Letter. It will, however, quote an important sentence from the non-substantive opening paragraph: "We are writing in response to a recent inquiry regarding the City of Adair's investigation into 'violations of personal standards' and this response is being provided under the protections of Iowa Code 80F." (ECF 129-2, p. 1.)

The City Council held a closed session meeting the same day (October 26) the Rudd Letter was delivered. *Wendt*, 2023 WL 4248754, at *3. Wendt attended. *Id*. Mayor Byars started the meeting by passing out materials to Council members, including the Rudd Letter. (ECF 74-7, 0:38–1:15.) After giving Council members an opportunity to read the materials, Byars asked Wendt if he had any comments or "[do] you just want to sit and listen?" (Id., 11:00–11:15.) Wendt responded, "[i]f you have any questions, I can answer the ones that I can, I guess." (Id.) Byars and other Council members then began discussing Wendt's situation.

At a relatively early point in the discussion, Byars referenced the Rudd Letter, saying: "If you look at page, the second page, the--page three of the letter from the lawyer answering question two, the last line says, '███████████████████████████████████████████████████ ██████.'" (Id., 12:26–12:42.) Byars then said she was unaware of ██████████████████, prompting several minutes of discussion on that topic among the Council members. (Id., 12:42–16:40.) Wendt participated in this discussion at various times. (E.g., id., 15:12–16:09.) After several minutes of discussion, the Mayor and Council members began directing other questions toward Wendt, which he answered. (Id., 17:20–21:30, 35:46–37:55.) Most of Wendt's statements revolved around how a police department can obtain machine guns and his understanding of the status of the criminal investigation. (E.g., id.) Wendt said nothing close to an admission of criminal wrongdoing, although he did answer questions about the number of machine guns he sold that were registered to the City of Adair, as well as whether he profited from his acquisition and sale of machine guns. (Id.)

At the conclusion of the meeting, the City Council voted to reinstate Wendt. *Wendt*, 2023 WL 4248754, at *3. In its prior ruling, the Court concluded Wendt's statements during the October 26 closed session meeting were not "compelled" for purposes of *Garrity v. New Jersey*, 385 U.S. 493 (1967). *See id.* at *10. Conversely, however, the Court held the statements <u>were</u> made under promise of immunity for purposes of *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52 (1964), and thus could not be used against Wendt. *See id.* The Court now must decide whether and to what extent the Government used the immunized statements and if, as a result, the Indictment must be dismissed or members of the prosecution team must be disqualified.

B.    *Pre-Indictment Use of Immunized Statements.*

On November 1, 2022, Special Agent Kohler interviewed Mayor Byars regarding Wendt's reinstatement and the October 26 closed session meeting. (Govt. Ex. 5.) Byars shared information about Wendt's statements during the meeting, as well as statements made by City Council members Stanley and Irlmeier, both of whom supported Wendt. (Id.) Kohler's report noted that Stanley, in particular, "claim[ed] that the council approved Wendt to purchase machine guns." (Id.) Byars also discussed statements made by Wendt after the formal meeting ended. (Id.) Kohler likely discussed his interview with Byars with Special Agent Etnier, although the record is unclear whether this discussion involved the substance of the interview or simply the fact that the Government intended to issue grand jury subpoenas to City Council members. (Tr. 172–74.)

Regardless, Kohler prepared a 302 report of his interview with Byars and emailed it to AUSAs Leemkuil and Mikaela Shotwell on November 1, 2022. (ECF 215-11, ¶ 1; Govt. Ex. 25.) AUSA Shotwell did not read the report, but AUSA Leemkuil did. (ECF 233, ¶ 3; Govt. Ex. 25.) In an email response the same day, Leemkuil suggested having Stanley and Irlmeier testify before the grand jury. (Govt. Ex. 25.) Leemkuil has not reviewed Kohler's report since February 1, 2023, and thus was unable in the *Kastigar* hearing in early July 2023 to recall what prompted his email response. (ECF 233, ¶ 4.) With the benefit of having reviewed Kohler's report, as well as the eventual grand jury testimony, it is clear to the Court, in context, that Leemkuil was interested in forcing Stanley and/or Irlmeier to testify under oath as to whether the City Council truly approved Wendt's acquisition of machine guns. Like Mayor Byars, Leemkuil and other members of the prosecution team were skeptical of Stanley's claim that such approval occurred.

Sometime after Wendt's reinstatement on October 26, the grand jury issued a subpoena to the City asking for records relating to Wendt. *Wendt*, 2023 WL 4248754, at *4. This led to dialogue

between City Attorney Fichter and AUSA Leemkuil about attorney-client privilege issues and Iowa Code Chapter 80F, which, as relevant here, provides protections to law enforcement officers in the context of internal investigations. *Id.* Fichter was concerned about producing information that might be protected under Iowa Code § 80F.1, but Leemkuil provided Fichter with a copy of a recent Eighth Circuit case, *In re Grand Jury Subpoena Dated August 14, 2019*, 964 F.3d 768 (8th Cir. 2020), that addressed the interplay between federal grand jury subpoenas and internal investigations of government officials in the State of Iowa. *Id.* The City ultimately withheld its October 3 letter and Wendt's October 26 written response from its production but produced recordings of the closed-session City Council meetings dated September 14 and October 26, among other materials. *Id.*

Stanley testified before the grand jury on November 15, 2022. (Govt. Ex. 1.) AUSA Leemkuil questioned him extensively about whether the Adair City Council ever approved Wendt's acquisition of machine guns. (Id., pp. 9–18.) Leemkuil also asked Stanley a handful of questions about recent City Council meetings, but Stanley had trouble remembering the dates or substance of those meetings beyond the fact that Wendt was reinstated as Police Chief at one of them. (Id., pp. 19–23.) Stanley said he did not believe Wendt said anything at the most recent meeting but could not remember for sure. (Id., p. 21.) Accordingly, Stanley did not provide any testimony about anything Wendt said. (Id.) For his part, Irlmeier testified before the grand jury on December 13, 2022. (Govt. Ex. 2.) As with Stanley, AUSA Leemkuil asked questions of Irlmeier about whether the Adair City Council ever approved Wendt's acquisition of machine guns. (Id., pp. 10–14.) Leemkuil also asked questions at a general level about the October 26 closed session City Council meeting, although Irlmeier did not provide any testimony about statements made by Wendt during that meeting because he didn't recall Wendt being there. (Id., pp. 14–15.)

Special Agent Etnier testified before the grand jury on December 14, 2022. (Govt. Ex. 3.) His testimony largely tracked the allegations in the Indictment, but, at one point, he deviated from the Indictment to discuss the October 26 closed session City Council meeting. (Id., pp. 24–25.) Etnier has never listened to the recording of the October 26 meeting, but AUSA Leemkuil listened to it for the first time the morning of Etnier's grand jury testimony on December 14. (Tr. 139–40; ECF 215-11, ¶ 2.) Leemkuil found some of Wendt's statements significant enough that he brought them to Etnier's attention shortly before Etnier began testifying. (Id.) Wendt's statements did not,

however, impact the substance of the Indictment or the Government's decision to present the Indictment to the grand jury, which was already scheduled for that afternoon. (Id.; Tr. 141.)

During his grand jury testimony, Etnier stated that, based on his investigation, Wendt "always acquired these machine guns for the resale and for the profit--profitability of selling them to another person. It was never his intent to have the Adair Police Department utilize these, to train with them, test them out, become familiar with them, but rather hold on to them and have them, quote/unquote, new in the box, which would greatly enhance their value out on the open market." (Govt. Ex. 3, p. 24.) AUSA Shotwell and Etnier then engaged in the following colloquy:

> Q. Are you aware of a closed session of a city council meeting that occurred on October 26th, 2022?
>
> A. Yes.
>
> Q. And during that closed session, the Adair City Council considered whether they would reinstate Brad Wendt as the chief of police following a paid administrative leave?
>
> A. Yes.
>
> Q. During the course of that closed session, did the current mayor ask Brad Wendt if he had sold any machine guns that were registered to the Adair Police Department?
>
> A. Yes.
>
> Q. What was his response?
>
> A. He said that he had sold them.
>
> Q. And he specifically admitted to having sold four?
>
> A. Correct.
>
> Q. And your evidence is that he, in fact, sold six; is that right?
>
> A. That's correct.
>
> Q. But two of those machine guns had not yet been transferred?
>
> A. Correct.
>
> Q. Did the mayor further ask Brad Wendt whether he personally profited from the sale of those machine guns?
>
> A. Yes.
>
> Q. What did he say to that?
>
> A. He said he did not profit from the sale.

(Id., pp. 24–25.)[4]

Although Etnier's testimony lasted approximately 100 pages, there was no other discussion of the October 26 closed session meeting. (*See generally* Govt. Ex. 3.) The Government used fifty-nine exhibits during Etnier's testimony, none of which pertained to Wendt's statements during the October 26 meeting. (ECF 215-11, ¶ 3.) Etnier testified extensively about evidence that Wendt acquired the machine guns for his personal benefit and not for the Adair Police Department. (E.g., Govt. Ex. 3, pp. 14, 18–19, 50, 71, 90–98.) Except for the portion of his testimony excerpted above, Etnier's testimony was based on evidence separate from statements made by Wendt during the October 26 closed session City Council meeting, including financial records, Facebook messages, and emails. (E.g., id., pp. 93–98.) At the conclusion of AUSA Shotwell's questioning of Special Agent Etnier, grand jurors asked questions of their own. (Id., pp. 98–102.) None of these questions involved Wendt's statements at the October 26 closed session City Council meeting. (Id.)

The grand jury returned an Indictment on December 14, 2022. (ECF 2.) The Indictment was made public the same day. (Id.) The Indictment repeatedly alleges, *inter alia*, that Wendt "sold several machine guns registered to the Adair Police Department at a profit" or words to similar effect. (E.g. id., ¶¶ 4, 20.) Count 1 charges Wendt with participating in a conspiracy that included "unlawfully obtain[ing] and acquir[ing] machine guns for the purpose of selling or transferring the machine guns for the defendants' personal profit." (Id., ¶ 17.b.) The Indictment alleges that Wendt sold six machine guns that were purportedly for the official use of the Adair Police Department and identifies the four that were transferred. (Id., ¶¶ 26–28.) These allegations were already in the draft Indictment before AUSA Leemkuil discussed with other members of the prosecution team Wendt's statements at the October 26 closed session meeting. (Tr. 141.)

    C.    *Post-Indictment Use of Wendt's Immunized Statements.*

After the Indictment was returned in December 2022, Special Agent Kohler listened to the recording of the October 26 closed session as part of his review of several years of Adair City

---

[4] Etnier's testimony is arguably misleading. In the closed session City Council meeting, Wendt was artful in how he responded to the question about whether he profited from his conduct, talking about the high cost of machine guns and saying he would only earn a profit "in the end when I retire, if I sell the machine guns that I bought. So currently, no, I have not made personal gain yet, in the whole situation." (ECF 74-7, 35:45–36:26.) In other words, in context, Wendt appears to have been referring to *all* the machine guns he purchased when talking about profits, not merely the four (or six) that he bought and re-sold. Less than a minute later, when asked directly if he profited from the sale of the four machine guns he already transferred, he admitted he made money on those transactions but said he "turned around and reinvested [it] in more guns." Someone else then added, "for the city." (Id., 37:29–37:50.)

9

Council meetings. (ECF 215-11, ¶ 3, fn. 1.) On December 28, 2022, Kohler prepared a summary of these meetings, including the October 26 meeting. (Id.; *see also* Govt. Ex. 10, pp. 9–10.) Kohler's report included, *inter alia*, a statement that the October 26 meeting included the Council's review of "a letter from Wendt's attorney." (Govt. Ex. 10, p. 10.) The report described many of Wendt's statements during the October 26 meeting, as well as the Council's discussion about whether Wendt had Council approval to purchase guns. (Id.) Kohler emailed the report to AUSAs Shotwell and Leemkuil on January 25, 2023, but neither of them reviewed it due to concerns about whether it contained protected statements. (ECF 215-11, ¶ 3, fn. 1.)

AUSAs Shotwell and Leemkuil had those concerns because of what transpired during an open court hearing on January 10, 2023, regarding the conditions of Wendt's pretrial release. (ECF 97.) During the hearing, AUSA Leemkuil said he had listened to a recording of the October 26 meeting and that it included what the Government interpreted as a false statement made by Wendt. (Id., pp. 32–33.) In response, Wendt's counsel said:

> I think we have a *Garrity* issue because Mr. Wendt is a Government employee. He is required to answer questions as part of his employment to keep his job. The Government has just said that it has accessed those communications between Mr. Wendt and the City where he is answering questions about the subject matter of this case for purposes of his job. That's protected under his *Garrity* rights, and that should be not only not admissible, but typically any prosecutor who has had access to that information would be conflicted out of the case.

(Id., p. 61.)

### D.    *Post-Indictment City Council Meetings.*

Following the Indictment against Wendt, the Adair City Council addressed Wendt's employment status at two closed session City Council meetings on December 19, 2022, and January 11, 2023, respectively. The first meeting occurred five days after the Indictment was returned and made public, which prompted the Mayor to place Wendt on unpaid leave pending City Council review. (Def. Ex. G[5].) Wendt was present for the December 19 meeting along with his attorney, Nick Klinefeldt. (Govt. Ex. 15.) The meeting commenced in open session, but Wendt asked to go into closed session during discussion of his employment. (Def. Ex. G, 3:15–3:52.)

---

[5] With leave of Court, electronic recordings of the December 19, 2022, meeting were submitted *ex parte*. (Tr. 222, 224 (discussing admission of Def. Exs. A, G.) Exhibit A (submitted in parts A-1 and A-2) was incomplete and did not appear to record the entire meeting. The Court therefore is relying exclusively on Exhibit G, which appears to be a complete and uninterrupted recording of the meeting.

Unlike the October 26 meeting, which was precipitated by a letter from the City announcing an investigation governed by Iowa Code Chapter 80F and promising Wendt immunity, there is no evidence that anyone sent anything in writing to Wendt in advance of the December 19 meeting containing similar statements or promises. Nor, during the meeting itself, did any City official describe it as an "interview" or otherwise suggest it might be governed by the protections of Iowa Code Chapter 80F.1. (*See generally* Def. Ex. G.) Similarly, no City official told Wendt he had to answer questions or else would be terminated. (Id.) For their part, neither Wendt nor Attorney Klinefeldt said anything to suggest they believed Wendt was entitled to immunity or would be terminated for failure to answer questions. (Id.) To the contrary, Klinefeldt often took the lead in answering questions and describing Wendt's position (e.g., id., 11:32–20:00), thus implicitly confirming that Wendt himself was not obligated to speak.

Some of Klinefeldt's and Wendt's statements during the meeting were explanatory and involved, for example, how machine guns may be transferred and the typical timeframe for federal criminal cases. (*See generally* Def. Ex. G.) For the most part, however, Klinefeldt's and Wendt's statements were clearly designed to try to convince Council members that Wendt had been wrongfully accused and did not commit a criminal offense or otherwise misuse his position as Police Chief. (Id.) Wendt claimed, for example, that for "forty years people have been doing this exact same thing [as him] and then two years ago they [presumably referring to ATF] started changing their ways because they reorganized." (Id., 48:33–48:41.) Similarly, Klinefeldt and Wendt insisted that Wendt purchased every gun for the Adair Police Department, not himself personally. (E.g., id., 28:45–29:14.) Klinefeldt said Adair benefited from Wendt's sale of the four firearms because Wendt "replaced four of them with a newer model." (Id.) Mayor Byars and others pushed back on various occasions, with many of their questions focused on whether and to what extent Wendt hoped to profit from the sale of firearms registered to the City of Adair. (E.g., id., 36:55–38:05; 40:11–40:35.) At one point relatively early in the discussion, Mayor Byars made an apparent reference to one of Wendt's statements from the October 26 meeting about whether he profited from the sale of machine guns. (Id., 6:43–8:46.) Byars claimed that Wendt said on that earlier occasion that he had not profited from the transactions but now was admitting he had. (Id.) Wendt suggested that Byars misunderstood his earlier statement. (Id.) The discussion then pivoted to who would have been liable if someone was injured during public machine gun shoots involving guns purchased by Wendt but registered to the City of Adair. (Id.)

Two days after the closed session meeting on December 19, Special Agent Etnier interviewed Mayor Byars and learned about many of Wendt's statements. (Govt. Ex. 15.) Etnier texted AUSA Leemkuil and Special Agent Kohler the same day with information about what Byars reported. (Id.) Later, Etnier prepared a detailed Report of Investigation summarizing, *inter alia*, Wendt's statements during the closed session meeting. (Govt. Ex. 6.) Neither Etnier's report nor Wendt's statements have been used to develop leads, identify witnesses, obtain search warrants, or in any other way. (ECF 215-11, ¶ 9.) Etnier has not reviewed the report since he wrote it and does not independently recall what Wendt is reported to have said during the December 19 meeting. (Tr. 144.)

The second closed session meeting occurred on January 11, 2023. (Def. Ex. B.) The beginning of the meeting appears not to have been recorded, as the recording picks up with comments by Attorney Klinefeldt in mid-sentence. (Id., 0:00–0:30.) As with the December 19 meeting, there is no evidence that anyone from the City submitted anything in writing to Wendt in advance of the January 11 meeting promising him immunity or making reference to the protections of Iowa Code Chapter 80F. (*See generally* Def. Ex. B.) Similarly, the recording does not capture any City official verbally making such a promise or otherwise suggesting Wendt's statements might be protected, nor did any City official tell him he would be fired for refusing to answer questions. (Id.)

The relevant portion of the January 11 meeting was much shorter than the relevant portion of the December 19 meeting. (Id., 0:00–18:00.) Nonetheless, the two meetings are similar in that Klinefeldt and Wendt again attempted to defend Wendt's conduct by arguing, *inter alia*, that he did not make improper use of his official position for personal gain. Wendt argued, for example, that using City of Adair letterhead to acquire machine guns that he later sold personally is no different than serving as a firearms instructor for the State of Iowa and being compensated for private trainings in other jurisdictions. (Id., 8:00–8:45.) Klinefeldt and Wendt also answered a handful of questions regarding topics such as who "owns" the guns registered to the City of Adair, how criminal forfeiture works, and whether the City might be liable to a third party to whom Wendt sold guns that he now could not deliver due to the criminal case. (Id., 3:00–7:10.) Later, Wendt insisted that "everybody" on the City Council knew he was buying machine guns. (Id., 11:20–11:51, 14:55–16:00.) The discussion of Wendt's situation ended after approximately eighteen minutes, following which the City Council went into a separate closed session meeting without

Wendt or Klinefeldt present. (Id., 18:00–29:46.) This separate session covered privileged matters that should not be shared with the prosecution team. (Id.)

The City Council went back into open session approximately thirty minutes into the recording. (Id., 29:47.) By a 2-1 margin, the Council voted to reinstate Wendt to his position as Police Chief. (Id., 30:40–32:00.) The Council then discussed other matters until the conclusion of the meeting. The prosecution team has never obtained the closed session recording from the January 11 meeting and has no knowledge of any statements made by Wendt during that meeting. (ECF 215-11, ¶ 10.)

## II.   LEGAL ANALYSIS.

### A.  Wendt's Statements During the December 2022 and January 2023 Meetings Are Not Protected.

The Court will first address whether Wendt's statements during closed session City Council meetings on December 19, 2022, and January 11, 2023, are protected. The Court could not previously rule on the issue because it had not yet received recordings of the meetings, although it temporarily prohibited the Government from reviewing or using those statements pending further analysis. *See Wendt*, 2023 WL 4248754, at *11.

Having now listened to the recordings, and with the benefit of additional context, the Court concludes that Wendt's statements during the December 2022 and January 2023 meetings are not protected. There is no evidence that anyone promised Wendt immunity at any point during those meetings or in the weeks leading up to them, nor did Wendt or his counsel (who attended both meetings with him) ask for such an assurance or say anything to suggest they believed Wendt's statements were protected. Similarly, there is no evidence that City officials told Wendt he was required to speak under threat of termination or that he felt compelled to do so.[6] To the contrary, although Wendt made statements and answered questions during the meetings, Attorney Klinefeldt did most of the talking for him without complaint or objection from City officials. This all but confirms that Wendt himself felt no compulsion to speak. *See Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) ("The Fifth Amendment is violated only by the combined risks of both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers."). Finally, the substance of the statements by Wendt and Klinefeldt

---

[6] In its prior ruling, the Court rejected Wendt's position that the employee handbook created such a threat in the context of the meeting on October 26, 2022. *See Wendt*, 2023 WL 4248754, at *6–8. The same logic applies to the December 2022 and January 2023 meetings.

make clear that they viewed the meeting as an opportunity to argue that the Indictment lacked merit and Wendt had not committed any crimes, as opposed to being a formal, fact-gathering "interview" of the type contemplated by Iowa Code § 80F.1. In these circumstances, Wendt's statements are not protected under *Garrity*, *Murphy*, or any other principle of federal or state law. *See United States v. Najarian*, 915 F. Supp. 1460, 1482 (D. Minn. 1996) (rejecting *Garrity* argument where defendant "openly and, by every appearance, freely submitted to intensive, public interrogation [and] willfully pledged his continuing cooperation"); *United States v. Hutley*, No. 1:10-CR-127-MSH/AJB, 2010 WL 4223741, at *10 (N.D. Ga. Aug. 27, 2010) ("Being afforded an opportunity to present one's side is not the equivalent of being compelled to speak.").

The Court recognizes, of course, that it previously held that Wendt's statements during the October 26 City Council meeting were protected by promise of immunity. *See Wendt*, 2023 WL 4248754, at *10. The Court reached this conclusion with some hesitation because the record was ambiguous as to whether the October 26 meeting was meant to serve as the formal "interview" referred to in the City's letter dated October 3 and for which immunity is required by Iowa Code § 80F.1. One would not typically think of a city council meeting as an "interview." Nonetheless, the Court resolved the ambiguity in Wendt's favor because of the meeting's close temporal proximity to the promise of immunity, the fact that pointed questions were directed at him during the closed session portion of the meeting, and the following additional facts: "(a) no one from the City ever said otherwise [i.e., that he was <u>not</u> entitled to immunity]; (b) the meeting occurred on the same date Wendt provided his written [and immunized] responses to the October 3 letter; and (c) there is nothing in the record to suggest a formal 'interview' happened on any other date." *Id*. In other words, the City gave Wendt enough reason to believe his oral answers would be immunized that it was appropriate to provide him that protection. *Id.*

The situation was very different by the time of the December 2022 and January 2023 meetings. There is no evidence that any City official made a verbal or written promise of immunity to Wendt in the days or weeks leading up to those meetings, nor did anyone from the City suggest the promise of immunity from October 3 remained in effect. In fact, given that the City Attorney had long since completed and delivered his investigation report to the City Council, the evidence indicated the opposite: that there was no longer any basis for immunity. After all, the promise of

immunity is largely intended under Iowa Code § 80F.1 to facilitate the preparation of a report into possible misconduct, and thus it typically ends when the report is finished and delivered.[7]

Moreover, both the October 3 letter and section 80F.1 promise immunity during an "interview" (singular). While this does not necessarily preclude an "interview" from consisting of multiple sessions over multiple days, the use of the singular form makes it difficult to conclude that targets of an investigation are entitled to perpetual immunity spanning several months and multiple City Council meetings. If Wendt believed otherwise, he and his counsel should have asked for clarification before he started making statements during the December 2022 and January 2023 meetings. By failing to do so, Wendt implicitly acknowledged that he did not believe his statements were protected by the October 3 promise of immunity. The Court likewise concludes that they were not protected.

B. *Kastigar* Standards and Harmless Error.

Having now concluded, over the course of two rulings, that Wendt's oral and written statements at the October 26 City Council meeting are protected but those at later meetings are not, the Court must decide whether the use of the protected statements requires dismissal of the Indictment or disqualification of the members of the prosecution team. "The prosecuting government bears a very heavy burden in proving, once a witness has been given immunity, that subsequent evidence against that individual is not 'tainted' by the immunized testimony." *Appeal of Starkey*, 600 F.2d 1043, 1047 (8th Cir. 1979). In other words, "the government must show that any evidence used or derived has a 'legitimate source wholly independent of the compelled testimony.'" *United States v. McGuire*, 45 F.3d 1177, 1182 (8th Cir. 1995) (quoting *Kastigar v. United States*, 406 U.S. 441, 460 (1972)). "The crucial inquiry is whether the immunized testimony was in any way *used*, not whether it was related [to the prosecution]." *Id.*

In *United States v. McDaniel*, the Eighth Circuit took a broad view of what it means to "use" immunized testimony, concluding that a prosecutor's mere reading of transcripts was enough to invalidate a prosecution despite "voluminous reports" showing independent sources for the same evidence. 482 F.2d 305, 311–12 (8th Cir. 1973). *McDaniel* held that the government faced

---

[7] Now having the benefit of the December 19 and January 11 recordings, and having carefully re-reviewed the October 26 recording, it has become clear to the Court that City Attorney Fichter's investigation report was already completed by the time the October 26 meeting started. This makes the Court even less confident than it was before that the City Council meeting should be considered an "interview" under Iowa Code § 80F.1 for which Wendt was protected by immunity. Nonetheless, the Court stands by its prior ruling on that issue.

an "insurmountable task" to satisfy *Kastigar* in such circumstances, as the immunized testimony might have played a subtle role "in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *Id.* at 311. Any of these, the Eighth Circuit concluded, would be enough to require dismissal of the indictment. *See id.* at 312.

The Eighth Circuit's approach in *McDaniel* has been repeatedly rejected and criticized by other circuits. *See United States v. Velasco*, 953 F.2d 1467, 1474 (7th Cir. 1992) ("Assuming for the sake of argument only that the prosecutor used [the immunized statements] to shape his trial strategy, we join three of our sister circuits and reject the reasoning of *McDaniel*."); *United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991) ("[W]e have expressly rejected the *McDaniel* holding as being too restrictive."); *United States v. Serrano*, 870 F.2d 1, 17 (1st Cir. 1989) ("We disagree with the Eighth Circuit's statement in *McDaniel* . . . ."); *United States v. Byrd*, 765 F.2d 1524, 1531 (11th Cir. 1985) (declining to follow *McDaniel*); *see also United States v. Slough*, 641 F.3d 544, 553–54 (D.C. Cir. 2011) (concluding, without mentioning *McDaniel* by name, that a rule prohibiting all non-evidentiary use of immunized testimony is too restrictive); *United States v. Daniels*, 281 F.3d 168, 182 (5th Cir. 2002) (distinguishing *McDaniel* and holding that, "[t]o satisfy *Kastigar*, use immunity must leave the witness in substantially the same position as if he had asserted his Fifth Amendment privilege not to testify"); *Gwillim v. City of San Jose*, 929 F.2d 465, 468 (9th Cir. 1991) ("The law of this circuit is clear that a prosecutor's access to immunized testimony is not a violation of the privilege."); *United States v. Jones*, 542 F.2d 186, 201 (4th Cir. 1976) (distinguishing *McDaniel*).

The Eighth Circuit itself has backed away from *McDaniel*, stating in *United States v. McGuire* that "*McDaniel* is a case limited to its 'unusual circumstances.'" 45 F.3d at 1183 (quoting *McDaniel*, 482 F.2d at 312). Similarly, in *United States v. Barker*, the Eighth Circuit attached significance to the fact that prosecutors in *McDaniel* obtained access to the immunized testimony "at a very early stage in the investigatory process." 542 F.2d 479, 484 n.9 (8th Cir. 1976). "Whether the balance should be struck differently when the access is afforded substantially later in the investigatory process is a question we leave open." *Id.* "The determination of a *McDaniel* violation necessarily turns on the facts of each case and again focusses on whether the immunized testimony was used by the prosecutor exposed to it." *McGuire*, 45 F.3d at 1183.

A related question is whether the Government's use of protected statements is subject to harmless error review. The Court is unable to locate any Eighth Circuit cases expressly applying harmless error review in this context, although *McGuire* came close to doing so when it affirmed the district court's conclusion that "no **prejudicial** misconduct occurred" when a grand jury indicted the defendant in a murder-for-hire case despite having earlier heard immunized testimony from him on a somewhat related matter. 45 F.3d at 1184 (emphasis added); *see also United States v. Garrett*, 849 F.2d 1141, 1142 (8th Cir. 1988) (affirming denial of motion to quash indictment despite grand jury having heard immunized testimony from defendant before later indicting him). The Eighth Circuit came close to reaching such a holding again in *United States v. Kiser*, when it reviewed the district court's refusal to suppress a witness's testimony that allegedly had been derived from the defendant's immunized statements. 948 F.2d 418, 422–23 (8th Cir. 1991). *Kiser* held that the prosecution team "would have inevitably discovered [the witness's testimony] by lawful means," and thus the district court correctly denied the motion to suppress. *Id.* at 423. Finally, the Eighth Circuit has expressly applied harmless error review in analogous contexts, including the Government's alleged use of statements protected by a proffer agreement, *see United States v. Yielding*, 657 F.3d 688, 706 (8th Cir. 2011) (holding that any error in failing to hold an evidentiary hearing was harmless), and a prosecutor's access to information protected by the attorney-client privilege, *see United States v. Rossbach*, 701 F.2d 713, 717–18 (8th Cir. 1983) (concluding the defendant failed to show prejudice).

Other Circuits—including, at minimum, the First, Second, Third, Ninth, Tenth, Eleventh, and District of Columbia—unanimously agree that harmless error review is appropriate to determining whether an indictment or conviction should be dismissed or overturned based on the use of immunized statements. *See United States v. Ponds*, 454 F.3d 313, 329 (D.C. Cir. 2006); *United States v. Schmidgall*, 25 F.3d 1523, 1529 (11th Cir. 1994); *Serrano*, 870 F.2d at 16; *United States v. Gallo*, 859 F.2d 1078, 1083 (2d Cir. 1988); *United States v. Crowson*, 828 F.2d 1427, 1432 (9th Cir. 1987); *Byrd*, 765 F.2d at 1532; *United States v. Semkiw*, 712 F.2d 891, 894–95 (3d Cir. 1983); *United States v. Beery*, 678 F.2d 856, 863 (10th Cir. 1982). In the words of the Second Circuit, dismissal is not required if "the immunized testimony presented was so minimal or of such inconsequential nature in light of the other evidence before the grand jury as to constitute harmless error." *United States v. Pelletier*, 898 F.2d 297, 303 (2d Cir. 1990). These cases are consistent with the Supreme Court's admonition that "it is the duty of a reviewing court to consider the trial record

as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hasting*, 461 U.S. 499, 509 (1983). Based on the overwhelming weight of authority outside the Eighth Circuit, as well as the Eighth Circuit's application of harmless error review in analogous circumstances, the Court concludes the Government's use of Wendt's protected statements is subject to harmless error review.

C. *The Court Must Clarify and Expand its Prior Ruling on the Scope and Use of Wendt's Immunized Written Statements from the Rudd Letter.*

Before the Court can go further in analyzing the impact of the Government's use of Wendt's protected statements, the Court must revisit which statements are at issue. In its prior ruling, the Court held, *inter alia*, that the October 26 Rudd Letter was written "in direct response to the City's promise of immunity, and thus the Government may not use those written answers [in the Rudd Letter] in this case." *Wendt*, 2023 WL 4248754, at *9. The Court explained, however, that the impact of this holding was "minimal" because "the Government has never seen those written answers because the City withheld [the Rudd Letter] from its response to the grand jury subpoena." *Id.* After further review of the record, the Court realizes this analysis needs additional attention. The Court stands by its conclusion that the statements in the Rudd Letter are protected, but it feels compelled to reconsider whether the impact of that conclusion is "minimal."

In re-reviewing the recording of the October 26 meeting, the Court discovered that Mayor Byars directly quoted one line from the Rudd Letter as to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (ECF 74-7, 12:26–12:42.) Her quotation triggered several minutes of discussion among Council members, including Rick Stanley's claim that the Council approved Wendt's acquisition of machine guns at some unspecified time. (Id., 12:42–16:20.) A few days later, Special Agent Kohler included Stanley's statements in the interview report he prepared following his interview with Mayor Byars. (Govt. Ex. 5, p. 1 (noting that Stanley "claim[ed] that the council approved Wendt to purchase machine guns").) Kohler then emailed his report to the other members of the prosecution team (ECF 215-11, ¶ 1; Govt. Ex. 25), prompting AUSA Leemkuil to respond by proposing that they have Stanley and Kyle Irlmeier testify before the grand jury (Govt. Ex. 25). In context, Leemkuil clearly wanted to test Stanley and Irlmeier to see if they would say, under oath, that the City Council approved Wendt's acquisition of machine guns. Other current or former City Council members also ended up testifying before the grand jury. (Govt. Exs. 22–24.)

These facts show an unmistakable link between (i) Byars's quotation of the (protected) Rudd Letter during the October 26 City Council meeting, (ii) the subsequent statements by Stanley, and (iii) the Government's decision to have Stanley and others testify before the grand jury. It therefore might not be accurate to say, as the Court did in its prior ruling, that the protected status of the Rudd Letter is of only "minimal" significance. Instead, the Court must decide whether a *Kastigar* problem arises when the Government alters the course of an investigation based on a witness's response to an immunized statement.

In addressing that issue, it is important to recognize that the Government already knew prior to October 26 that Wendt might claim to have had City Council approval for his acquisition of machine guns. Special Agents Kohler and Etnier addressed that very issue with Wendt during their interview on August 31, then addressed the same topic shortly thereafter during interviews with other current or former City officials, including Irlmeier. (Govt. Ex. 21.) Nonetheless, the City Council meeting on October 26 altered the course of the Government's investigation because there is no evidence that the Government intended to issue grand jury subpoenas to City Council members until learning about what Stanley said on October 26. Prior to that, the Government presumably believed grand jury testimony was unnecessary because at least four current or former City Council members said during interviews that Wendt had never received Council approval to purchase machine guns. (Govt. Exs. 18–21.) It was only after learning about Stanley's comments that the grand jury subpoenas were issued. *Kastigar* might be implicated in these circumstances because the Government cannot use immunized testimony to "develop investigatory leads, to focus an investigation on a witness, or to motivate another witness to give incriminating testimony." *Slough*, 641 F.3d at 549 (internal citation omitted).

   D.  *The Government Did Not Make Impermissible Use of the Rudd Letter.*

The question turns, then, to whether there was impermissible use of the protected statements from the Rudd Letter when the Government used Stanley's *responses* to those protected statements as an impetus to issue grand jury subpoenas. The Court concludes that this does not constitute impermissible use of the protected statements themselves, and thus *Kastigar* does not require dismissal of the Indictment or disqualification of any members of the prosecution team.

No one from the prosecution team was present during the City Council meeting on October 26, nor did any Government official do anything to prompt Mayor Byars to quote from the Rudd Letter. She made that decision on her own. Indeed, no one from the Government has even *seen* the

19

Rudd Letter, nor does Agent Kohler's 302 report of his interview with Mayor Byars on November 1 mention the Letter's substance. Instead, Kohler's report focuses on the statements made by Stanley. (Govt. Ex. 5.) With the benefit of hindsight, we know those statements were made in response to Byars's quotation of the Rudd Letter, but there is no evidence that Kohler or any other member of the prosecution team knew this in early November when the interview occurred and the decision was made to issue the grand jury subpoenas. Instead, as noted above, the record shows that no member of the prosecution team listened to the recording of the October 26 City Council meeting until the morning of December 14, and thus the only information the team had when the subpoenas were issued to Stanley, Irlmeier, and others came from Kohler's interview with Mayor Byars on November 1 and his corresponding 302 report.

The Seventh Circuit has concluded in two relatively recent cases that *Kastigar* does not require dismissal when a third party says or does something to alter a criminal investigation after being exposed to immunized statements, but the statements themselves are not disclosed to the prosecution team. In *United States v. Cozzi*, the Superintendent of the Chicago Police Department made a criminal referral to the FBI after presumably reading the defendant's protected statements, which the Superintendent suggested were "falsified." 613 F.3d 725, 727 (7th Cir. 2010). Although the Superintendent did not disclose the substance of the statements themselves, the defendant argued that the criminal referral and characterization of evidence as "falsified" constituted impermissible "use" under *Kastigar* because without it there would have been no criminal investigation, period. *Id.* at 727–28. The Seventh Circuit disagreed, explaining that "*Kastigar* immunity is primarily concerned with **the prosecutor's** use of compelled testimony because it is the prosecutor who actually initiates and pursues criminal proceedings against a criminal defendant." *Id.* at 730 (emphasis added). A third party's mere referral of a criminal case—even if based on the substance of protected statements—is insufficient to violate *Kastigar*. *Id.* at 731–32.

The Seventh Circuit reached the same conclusion again a few years later in *United States v. Proano*, 912 F.3d 431 (7th Cir. 2019). In *Proano*, a police officer made protected statements during an interview with the Independent Police Review Authority (IPRA) regarding an officer-involved shooting. *Id.* at 435. An IPRA investigator later met with FBI agents to discuss the matter, and the officer eventually was criminally prosecuted. *Id.* The defendant argued that the meeting between the IPRA investigator and FBI constituted an impermissible "use" of his protected statements under *Kastigar*, and thus his conviction should have been overturned. *Id.* at 437–38.

The Seventh Circuit disagreed because: (a) the investigator never discussed the substance of the officer's protected statements with the prosecution team; (b) the prosecution team had independent bases for discovering the underlying facts; and (c) as in *Cozzi*, the mere fact that a third party met with the FBI after hearing protected statements does not mean the statements themselves were impermissibly "used" for purposes of *Kastigar*. *Id.* at 437–38; *see also United States v. Pendergrass*, 648 F. App'x 29, 32 (2d Cir. 2016) (concluding that no *Kastigar* violation occurred even though witness testified at trial after having heard the defendant make immunized statements during an internal investigation).

Although the fact pattern is slightly different, the logic of *Cozzi* and *Proano* applies with equal force here. Mayor Byars used Wendt's protected statements from the Rudd Letter to trigger discussion among City Council members regarding whether the Council ever approved Wendt's acquisition of machine guns. The prosecution team, however, did not use the protected statements at all; instead, the decision to issue subpoenas was based on *Stanley's* statements. As noted above, Special Agent Kohler's 302 report did not even mention the substance of the Rudd Letter and instead focused on Stanley. It follows that there is an acceptable degree of separation between the immunized statements and the Government's investigation. *See Cozzi*, 613 F.3d at 732 ("Whatever role the [immunized] statements might have had in motivating [the third party's] tip [to the FBI] is at least one step too far removed from the actual federal investigation and prosecution to justify overturning Cozzi's conviction.").

There are, to be sure, situations where a witness's exposure to immunized statements has been held to create *Kastigar* problems. In *United States v. North*, the D.C. Circuit held that *Kastigar* is violated "whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony, regardless of *how or by whom* he was exposed to that compelled testimony." 920 F.2d 940, 942 (D.C. Cir. 1990) (per curiam). The D.C. Circuit explained:

> [W]itnesses' exposure to immunized testimony can taint their trial testimony irrespective of the prosecution's role in the exposure and [] an inquiry is therefore necessary into whether the content of witnesses' testimony was derived from or motivated by the immunized testimony . . . And even where the witness testifies from personal knowledge, use within the meaning of *Kastigar* may occur . . . if the immunized testimony influenced the witness' decision to testify.

*Id.* The Second Circuit reached a similar conclusion in *United States v. Allen*, which ordered dismissal of an indictment where exposure to immunized testimony appeared to cause a material change in a witness's testimony. 864 F.3d 63, 93–94 (2d Cir. 2017). *North* and *Allen* are somewhat difficult to reconcile with *Cozzi* and *Proano* but arguably apply here because Stanley might not have said anything about prior City Council approval during the October 26 meeting without Byars first quoting from the Rudd Letter.[8]

The Eighth Circuit appears not to have squarely decided how *Kastigar* applies when a witness's response to a protected statement alters the course of a criminal investigation but the protected statement itself is not disclosed. The Eighth Circuit has, however, dropped important clues. In *McDaniel*, the Eighth Circuit tracked the logic of *Cozzi* and *Proano* by focusing entirely on how the **prosecutor** used the protected statements. 482 F.2d at 311–12. The same is true in *McGuire*, which framed the issue was "whether the immunized testimony was used **by the prosecutor exposed to it**." 45 F.3d at 1183 (emphasis added). Similarly, in *United States v. Moten*, the Eighth Circuit affirmed a conviction even though at least two (and possibly as many as four or five) prosecution witnesses either attended or were exposed to the defendant's protected statements. 551 F.3d 763, 766–67 (8th Cir. 2008). *Moten* did not analyze whether exposure to the protected statements had an impact on the witnesses' testimony, much less suggest this would have been a basis for reversal. *See id.* Finally, and most recently, the Eighth Circuit stated in *In re Grand Jury Subpoenas Dated August 14, 2019*, that *Garrity* and *Murphy* "do[] not prohibit a grand jury or government investigators from using compelled statements *of other officers* against the target of the investigation." 964 F.3d at 772. Based on this authority, the Court concludes that the Eighth Circuit would follow *Cozzi* and *Proano* and conclude that *Kastigar* is not violated simply because a third party witness responds to a protected statement in a way that later alters the Government's investigation, particularly when there is no evidence that the Government was involved in any way in exposing the witness to the protected statement.

---

[8] The Court cannot say with confidence that Stanley would not have raised the issue of City Council approval had Byars not quoted the Rudd Letter. The record shows that Wendt and Stanley communicated outside of City Council meetings regarding the criminal investigation. For example, when Stanley received a grand jury subpoena, he told Wendt about it. (Govt. Ex. 1, pp. 21–22.) The record leaves little doubt that these communications involved the merits of the investigation and how Wendt intended to defend himself. In City Council meetings on September 14 and October 26, for example, Stanley staunchly defended Wendt and referred, *inter alia*, to information of which he would not have had personal knowledge. It is therefore very plausible that Stanley would have raised the issue of City Council approval no matter what simply because he believed it would help Wendt's defense.

There is, in any event, also an important distinction between the facts in *North* and *Allen* and those present here. In *North* and *Allen*, the witnesses' testimony became more adverse to the defendant after the exposure to protected information than it had been before. In *Allen*, for example, the witness testified at trial about an incident that cast the defendant in a negative light. 864 F.3d at 93–94. As the witness had not mentioned the incident in pre-trial testimony—and, in fact, may not have even personally witnessed it—an inference arose that he learned about it for the first time from the immunized statements and used it to bolster his testimony. *Id*. For this reason, and because of doubts about the witness's claim that his exposure to immunized statements did not affect his testimony, the Court concluded the Government did not satisfy its "heavy burden" under *Kastigar*. *Id*. at 94–97.

Here, Stanley did not change his testimony to make it more incriminating after being exposed to immunized statements. To the contrary, his post-exposure testimony was **exculpatory** to Wendt. The Court does not interpret *North*, *Allen*, or similar cases to require dismissal of an indictment when a witness makes statements exculpatory to the defendant after hearing immunized testimony. Instead, as *North* itself recognizes, *Kastigar* requires the Government to "prove that witnesses who testified **against** the defendant did not draw upon the immunized testimony to use it **against** the defendant." 920 F.2d at 943 (emphasis added). Thus, even if the Eighth Circuit would follow the expansive approach of *North* and *Allen* in scenarios where exposure to immunized statements affects what a third party says or does, those cases would not compel dismissal in the circumstances present here. Instead, the Court concludes that the Government did not violate Wendt's *Kastigar* rights by deciding to subpoena Stanley and others after learning that Stanley made statements exculpatory to Wendt in the closed session City Council meeting on October 26.

Finally, and in abundance of caution, the Court notes that AUSA Leemkuil and Special Agent Kohler must have heard Mayor Byars's quotation of the one line from the Rudd Letter in December 2022 when each of them listened to the recording of the October 26 City Council meeting. The Court finds, however, that neither of them "used" this protected statement. AUSA Leemkuil instead focused on Wendt's **oral** statements in what Leemkuil communicated to AUSA Shotwell and Special Agent Etnier on the morning of December 14. Similarly, although the summary of the October 26 meeting in Kohler's December 28 302 report (Govt. Ex. 10, p. 10) makes indirect reference to the relevant line from the Rudd Letter, the report focuses on the ensuing discussion and has not, in any event, been used for any further purpose in the investigation or

prosecution. Thus, again, the Court concludes there has not been impermissible use of the statement in the Rudd Letter that would require dismissal of the Indictment.

E.  *The Government's Use of Wendt's Immunized Statements Is Harmless Error.*

In contrast to the written responses in the Rudd Letter, and regardless of how one interprets the word "use" for *Kastigar* purposes, the record unmistakably shows that the Government used Wendt's immunized oral statements before the grand jury. Several lines of Special Agent Etnier's grand jury testimony centered on things Wendt said during the closed session City Council meeting on October 26, 2022, including statements about the number of machine guns he sold that were registered to the Adair Police Department and whether he profited from those sales. (Govt. Ex. 3, pp. 24–25.) The record also unmistakably shows, however, that the prosecution team knew long before October 26, 2022, that Wendt had sold machine guns registered to the Adair Police Department. Indeed, Wendt's interview with Special Agents Kohler and Etnier on August 31 revolved around his acquisition and sale of firearms registered to the Adair Police Department. (Govt. Ex. 11.) Wendt made conflicting statements during the interview about whether he personally profited from those sales, admitting in the context of one transaction that he was selling two machine guns to a third party "for a profit" but claiming elsewhere that he "is not selling them for profit." (Id., pp. 3, 5.) The Government also had, in any event, independent evidence showing that Wendt sold firearms at a profit. (ECF 171-10, ¶¶ 92, 95.) This information was already in the draft Indictment before AUSA Leemkuil discussed Wendt's protected statements with other members of the prosecution team on the morning of December 14, 2022.

In urging the Court to deny Wendt's Motion to Suppress or Dismiss, the Government relies heavily on a First Circuit case, *United States v. Serrano*, in which the defendant's conviction was sustained despite the Government's presentation of immunized testimony to the grand jury. 870 F.2d at 16. *Serrano* held that the use of the immunized testimony was harmless beyond a reasonable doubt because: (a) the lead investigator had already completed ninety percent of his investigation before the immunized testimony even occurred; (b) the immunized testimony did not trigger any additional investigation; (c) the immunized testimony was "tangential" to the indictment; and (d) the Government presented "substantial untainted evidence" to the grand jury. *Id.* at 15–16. The Government urges the Court to reach the same conclusion here.

The Government has met its burden of proving harmless error with respect to Wendt's oral statements during the October 26 meeting. Most of Wendt's statements were never used by the

Government and involved subjects like how police departments may acquire machine guns, Wendt's then-understanding of the status of the criminal investigation into his conduct, and Wendt's desire to return to work as a police officer. The latter two are irrelevant to the substance of the charges. The former is relevant but was obviously already independently known by Special Agent Etnier given that his agency (ATF) is responsible for administering and enforcing laws relating to the acquisition and sale of machine guns. To that end, Etnier's search warrant Affidavit from late August 2022 went into considerable detail on how police departments may lawfully acquire and dispose of machine guns. (*See generally* ECF 171-10.) The Government's access to Wendt's statements from two months later about these topics is therefore not a basis for dismissing the Indictment. *See McGuire*, 45 F.3d at 1183 (refusing to reverse conviction where the immunized testimony "merely confirmed information previously obtained by the government through a court authorized wiretap"); *United States v. First W. State Bank of Minot*, 491 F.2d 780, 786 (8th Cir. 1974) ("The federal government, however, can use the same evidence testified to by defendants before the grand jury if it can demonstrate that the evidence to be used against defendants came from a legitimate source wholly independent of the compelled testimonies.").

The same is true for Wendt's statements about the number of machine guns he acquired and sold that were registered to the City of Adair. Etnier's Affidavit already identified machine guns acquired and sold by Wendt, and thus the Government clearly did not need Wendt's protected statements two months later to make them aware of the fact that such transactions occurred. Moreover, the draft Indictment—which was in final form before AUSA Leemkuil's discussion about the protected statements with other members of the prosecution team on the morning of December 14—identified each machine gun acquired and sold by Wendt, including the four completed and two pending sales. The record therefore shows that the Government had a legitimate, independent source for the evidence. The Government's access to and use of Wendt's immunized testimony on the subject was harmless beyond a reasonable doubt. *See Serrano*, 870 F.2d at 16.

This leaves one item: Wendt's oral statement during the October 26 closed session meeting about whether he profited from his acquisition and sale of machine guns. The Government viewed the statement as significant: AUSA Shotwell asked Special Agent Etnier about it during grand jury testimony, and AUSA Leemkuil brought it up again the following month in open court during a dispute about the conditions of Wendt's pretrial release. However, the statement has, at most, only

a tangential relationship to the charges. In context, the Government appears to view it as a false exculpatory statement.[9] The overarching question in the case, however, is whether Wendt made false statements to ATF when he sought permission to buy and sell machine guns, not whether he allegedly made a false statement about his profits to the Adair City Council after the fact. Moreover, Etnier's description of the protected statement comprised approximately four lines of his roughly 100 pages of grand jury testimony (i.e., less than one-half of one percent), was not the subject of any follow up questions from grand jurors, and was not mentioned directly or indirectly in the Indictment or any of the fifty-nine exhibits the Government introduced.

The Court concludes the Government's use of the protected statement about Wendt's profits (or lack thereof) was tangential and harmless and therefore does not require dismissal of the Indictment. The situation here is akin to *Serrano*, in which the First Circuited concluded that an improper reference to immunized testimony was harmless error "given the substantial untainted evidence presented to the grand jury and the tangential nature of the reference in relation to the indictment returned in this case." 870 F.2d at 16. Similarly, in *Gallo*, the Government's use of immunized testimony was harmless error because it involved facts of "negligible significance" that were also established through independent evidence. 859 F.2d at 1082; *see also United States v. Nanni*, 59 F.3d 1425, 1443 (2d Cir. 1995) (concluding the government's use of immunized testimony was harmless because it constituted only a "small fragment" of the information used to obtain a warrant).

The Eighth Circuit's decision in *McDaniel* does not compel otherwise. Unlike *McDaniel*, where prosecutors got access to immunized testimony "at a very early stage in the investigatory process," the prosecution team here did not obtain protected statements until the tail end of a nine-month investigation into Wendt's conduct that was inevitably going to result in the presentation of charges to the grand jury. *See Barker*, 542 F.2d at 484 n.9 (suggesting without deciding that the improper use of immunized testimony should be treated differently when it occurs late in the investigatory process). Moreover, the immunized statements in *McDaniel* consisted of "self-incriminating testimony filling three volumes of transcript" in which the defendant "fully

---

[9] Wendt has plausibly argued that the statement was not false. He told the City Council he had "not made personal gain yet, in the whole situation." (ECF 74-7, 35:45–36:26.) Although artfully phrased, the inclusion of the words "in the whole situation" arguably makes his statement accurate given the total number and cost of the machine guns Wendt purchased during his time as Police Chief, notwithstanding the fact that he made a profit on certain isolated transactions.

divulge[d] all his illegal actions." 482 F.2d at 307. Here, by contrast, Wendt's statements lasted only a few minutes and were either explanatory, irrelevant to possible criminal charges, or exculpatory. Wendt said nothing that comes even remotely close to the full-blown confession in *McDaniel*. It follows that the Eighth Circuit's conclusion in *McDaniel* that prosecutors faced an "insurmountable task" to prove they did not use the immunized testimony does not foreclose lower courts in the Eighth Circuit from concluding in cases like this one that the burden, although still "heavy," has been satisfied. *See McGuire*, 45 F.3d at 1183 (limiting *McDaniel* to its "unusual circumstances") (quoting *McDaniel*, 482 F.2d at 312); *see also United States v. Bartel*, 19 F.3d 1105, 1113–14 (6th Cir. 1994) (affirming denial of motion to dismiss indictment where immunized statements were exculpatory); *United States v. Vander Luitgaren*, 556 F. Supp. 2d 1313, 1318 (M.D. Fla. 2008) (same).

Wendt's arguments to the contrary are unavailing. He focuses, *inter alia*, on the fact that Special Agent Kohler interviewed Mayor Byars on November 1 and learned about some of the statements made by Wendt during the closed session meeting. (E.g., ECF 227, pp. 5–6.) The evidence shows, however, that the prosecution team's interest in the November 1 interview revolved around Byars's description of what *other* people said during the closed session meeting, not Wendt. This is illustrated by AUSA Leemkuil's email response after reading Kohler's 302 report. Leemkuil said nothing about Wendt's statements, but rather proposed to subpoena City Council members Stanley and Irlmeier based on what *they* said. The Court has already explained, above, why this does not constitute improper "use" of Wendt's protected statements.

The Government has similarly proven that other aspects of the post-October 26 investigation were not influenced by Wendt's statements. Wendt argues that Special Agent Etnier and Mayor Byars begin communicating more frequently in the weeks after November 1, but those communications did not escalate because of anything Wendt said during the October 26 closed session meeting. Rather, the evidence shows that Byars was simply interested in whether Wendt would be criminally charged and, if so, when. Wendt further argues that the grand jury testimony of Stanley and Irlmeier shows derivative use of his protected statements, but any such use is harmless given that neither Stanley nor Irlmeier testified about anything Wendt said during the October 26 closed session.

The Court also rejects Wendt's argument that the Indictment is tainted because it revolves around the theme that he was using his position as Police Chief to obtain machine guns for personal

profit. (Id., pp. 8–9.) The Government's entire investigation—starting long before October 26—focused on the same theme, as demonstrated by the extensive portions of Etnier's Affidavit in late August 2022 describing Wendt's alleged intent to make money from the sale of machine guns through allegedly false statements to ATF regarding the Adair Police Department's interest in those weapons. (E.g. ECF 171-10, ¶¶ 39, 95–96, 114.) Indeed, the very essence of a prosecution for false statements under 18 U.S.C. § 1001 in a context like this one is that a person has lied to ATF about why machine guns are being acquired. It follows that the Government has conclusively shown that the prosecution team's access to Wendt's protected statements on October 26 did nothing to impact their already-well-established belief that he obtained the machine guns for personal profit, not Police Department use. In other words, the Government "would have inevitably discovered this information by lawful means." *Kiser*, 948 F.2d at 423.

Finally, the Court rejects Wendt's argument that each member of the prosecution team suffers from an ongoing and incurable taint by virtue of their access to Wendt's protected statements. For reasons explained above, the prosecution team was already aware from other sources of the vast majority of what Wendt said, and thus the prosecutors and agents are not subject to disqualification simply because they heard the same things again through access to protected statements. *See McGuire*, 45 F.3d at 1183; *First W. State Bank of Minot*, 491 F.2d at 786. "The government need not show that the prosecution team had no exposure to the immunized testimony at all." *Nanni*, 59 F.3d at 1432.

Moreover, the topic of whether Wendt profited from the sale of machine guns came up repeatedly in non-protected settings during the investigation, including, e.g., in Wendt's text messages obtained by the Government via valid search warrants in May 2022, in Special Agent Kohler's and Etnier's interview with Wendt in late August 2022, and in statements in City Council meetings in December 2022 and January 2023 for which Wendt was not promised immunity. Against this backdrop, Wendt's statement on the issue of profits on October 26 is so tangentially related to the charges—and, in context, is arguably not false anyway—that the Court cannot envision a scenario in which it would impact the Government's trial or plea negotiation strategy. Simply put, this situation is nothing like the Government's early access to a full-blown confession in *McDaniel*.

The Court will, however, impose the following safeguards to ensure no future exposure to, or use of, the protected statements:

(1) the Court has prepared two versions of this Order: one that is redacted and placed on the public docket, and a second that is filed under seal and *ex parte* so that it cannot be accessed by the prosecution team. The Government may obtain a copy of the sealed version by having a member of the taint team contact Chambers via email (copying Wendt's counsel);

(2) the prosecution team may not review or use the recording of the October 26, 2022 City Council meeting (or any transcript or summary thereof, including FBI 302 reports) unless a taint team first redacts the recording (and transcript/summary/report) to remove: (a) all of Wendt's statements; and (b) the small portion of the meeting where Mayor Byars quotes directly from the Rudd Letter;

(3) the prosecution team may not review or use Special Agent Kohler's summary of City Council meetings (Govt. Ex. 10) until the taint team redacts page ten of the report to remove the entirety of the second, third, fourth, and fifth paragraphs under the heading "October 26, 2022 council meeting";

(4) the prosecution team may not review or use any other document that quotes or summarizes the protected statements from the October 26 City Council meeting. In the event of inadvertent access to such a document, the member of the prosecution team must immediately notify the taint team and make no use of the offending document until the protected statements are redacted; and

(5) the prosecution team may not review or use the recording of the January 11, 2023 City Council meeting (or any transcript or summary thereof) until the taint team redacts the entire portion from 18:00 to 30:00.[10]

## III. CONCLUSION.

The Government has proven: (i) it did not use Wendt's protected written statements; (ii) it had an independent, legitimate source for almost all the information at issue in Wendt's protected oral statements; and (iii) the use of the one remaining oral statement was harmless beyond a reasonable doubt. The Court therefore DENIES Wendt's request to dismiss the Indictment and/or disqualify the members of the prosecution team.

**IT IS SO ORDERED.**

Dated: August 17, 2023

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE

---

[10] This redaction has nothing to do with *Kastigar* and instead reflects the fact that the City Council was in closed session (outside of Wendt's presence) having a privileged discussion with the City Attorney.