**From:** Howell, David
**To:** Howard, Rob
**Subject:** FW: 201988016
**Date:** Monday, February 4, 2019 7:46:00 AM
**Attachments:** Bradley Wendt - USCOURTS-iand-5_16-cv-04130-0.pd.pdf
FORM53203-SUBMITTED_IN PROCESS-REF 19VX007 SO66589.pdf
SO66589 - Marcum MFG LLC Dlr + LE Ltr.pdf

Hi Rob,

Can you please fwd this to the agents? We also need to know whether to take action or just sit on these new applications as it's an open investigation.

**From:** Huff, Heather <Heather.Huff@atf.gov>
**Sent:** Sunday, February 3, 2019 7:40 AM
**To:** Howell, David <David.Howell@atf.gov>
**Cc:** Costello, Suzanne L. <Suzanne.Costello@atf.gov>
**Subject:** Fwd: 201988016

Good Morning David,

Suzanne is asking that we reach out to the PD on this one. You will notice the FFL is Marcum who was referred during the last detail.

She is not comfortable putting her name on it as it stands.

**Heather N. Huff**

**Firearms and Explosives Services Specialist**

**NFA Division- Government Support Branch**

**(304) 616-4500 NFAD Main Line**

**Martinsburg, WV**

Begin forwarded message:

> **From:** "Costello, Suzanne L." <Suzanne.Costello@atf.gov>
> **Date:** February 2, 2019 at 1:57:09 PM EST
> **To:** "Huff, Heather" <Heather.Huff@atf.gov>
> **Subject:** 201988016
>
> Hey Heather,
> It appears this guy has everything he needs for this request but I checked his inventory and he has a lot of MGs. At least a lot to me. I researched the police department and it stated there are 2 officers, serving 863 people but the letter states there are 6 officers? This is all new to me so, I might be over thinking this one but can you take a look prior to me approving it and let me know if it is ok. Plus, I found this on the internet but it appears Bradley Wendt is still the Chief of Police. There are so, many more articles but I don't want to spend any more time then I already have.
> Thanks,



EXHIBIT

B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

BRADLEY WENDT,

              Plaintiff,

vs.

CITY OF DENISON, IOWA,

              Defendants.

No. C16-4130-LTS

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

---

## I.    INTRODUCTION

This case is before me on plaintiff Bradley Wendt's motion (Doc. No. 19) for preliminary injunction.   Defendant, the City of Denison, Iowa (the City), filed a resistance (Doc. No. 27).   Wendt filed a reply (Doc. No. 30) and the City filed a reply to Wendt's reply (Doc. No. 32).   On May 3 and 4, 2017, I held an evidentiary hearing. The motion is now fully submitted and ready for decision.

## II.    PROCEDURAL HISTORY

Wendt commenced this action on November 7, 2016, by filing a two-count petition in the Iowa District Court for Crawford County.   Doc. No. 4.   Wendt alleges (1) retaliation in violation of Iowa Code § 70A.29 (the Whistleblower Act) and (2) retaliation in violation of the First Amendment to the United States Constitution.[1]   On November 23, 2016, the City removed the action to this court on the basis of federal question jurisdiction.   Doc. No. 3.   Wendt filed his motion for preliminary injunction on February 15, 2017.

---

[1] The petition names a second defendant, John Emswiler.   Wendt has dismissed Emswiler from this action without prejudice.   Doc. No. 23.



## III.   FACTUAL BACKGROUND

Wendt, a former police officer for the City, contends that he was retaliated against for actions protected by the Whistleblower Act and for exercising his First Amendment rights.

**The Cast**.   Wendt was a police officer for the City from December 29, 2008, until his discharge on February 14, 2017.   Emswiler was the City's Deputy Chief of Police prior to becoming Chief of Police in April 2015.   He served as Chief until June 23, 2016, when he resigned.   Dan Schaffer became Chief of Police in September 2016.

Brad Bonner was the City's Mayor from January 2014 until December 2015 and continued to serve on the City Council after his term as Mayor ended.   Dan Leinen succeeded Bonner as Mayor effective January 1, 2016.

Ray Ohl worked as a police officer for the City but was discharged before Wendt. Tony Trejo and Douglas Peters are both Sergeants with the City's police department.

**The Claims**.   Count 1 alleges retaliation for (1) Wendt's report to the Iowa Ombudsman's Office about Emswiler allegedly illegally entering a home (the Entry) and (2) Wendt's disclosures to the City Council and Mayor about a directory of inappropriate images (the Directory) that Emswiler maintained on a police department computer. Count 2 alleges retaliation for Wendt's exercise of his First Amendment rights.

**The Evidentiary Hearing.**   During the evidentiary hearing, Wendt, Leinen, Schaffer, Bradley, Emswiler, Bonner, Trejo and Peters testified.   Wendt submitted Exhibits 1 through 65, including a recording of a Denison Police Department meeting that was played during the hearing.   The City submitted Exhibits A through TT.   I will discuss relevant testimony and exhibits as it pertains to the analysis below.

**The Entry**.   In September 2015, Emswiler and Ohl were executing an arrest warrant at a residence in Denison.   After no one answered the door, Emswiler used a knife to pry open a window and unlock the door in order to enter the apartment.   Ohl

2

informed Wendt about the incident and sent him a video of the event.   The video was sent over Snapchat, which deletes the video after it is viewed.   Ohl told Wendt that Emswiler had stated:   "It's not breaking and entering if you don't break anything."   Wendt, allegedly believing that the Entry was illegal, reported it to the Iowa Ombudsman's Office.

**Charges Against Wendt**.   On December 8, 2015, Wendt was cited by the Iowa Department of Natural Resources (DNR) with several infractions, the most serious being an aggravated misdemeanor charge of intentionally discharging a firearm in a reckless manner causing property damage in violation of Iowa Code § 724.30(3).   Initially, Wendt was placed on paid administrative leave pending the outcome of the charges and pending an internal investigation conducted by Emswiler.   Exhibit 32.   However, after Emswiler reviewed the matter and determined that the charges were not baseless, Wendt was placed on *unpaid* administrative leave.

The City now maintains that the decision to place Wendt on unpaid leave was based on the fact that he was facing a weapons-related charge.   However, the first email message concerning that decision did not mention this as the reason.   In a message from Emswiler to then-Mayor Bonner, Emswiler stated that he could not "have [Wendt] arresting people on Simple and Serious Misdemeanors and throwing them in jail while he is under indictment for an aggravated misdemeanor."   Exhibit 32.   Similarly, Wendt contends he was told that he was placed on unpaid status because he was charged with an aggravated misdemeanor, not because the charge involved a firearm.   However, Bonner testified that Wendt's unpaid status was due to the fact that he faced a firearms charge. Leinen testified that when he became Mayor, Bonner told him Wendt was on unpaid administrative leave because he had a firearms charge pending.

**The Directory**.   In late 2015, one or more police department employees located the Directory on the police department's shared computer server.   The Directory was

3

015732

accessible by all police department employees and contained various images and photographs with text (memes), with some being of an offensive racial or sexual nature. A review of the Directory revealed that it was maintained by Emswiler.   Indeed, it turns out that the Directory was stored on Emswiler's own work computer, accessible only to him, but had somehow been copied to the shared server as well.   Once the Directory was discovered on the shared server, it was copied by someone who then provided at least some portions of it to Wendt while Wendt was on administrative leave.

On December 18, 2015, Emswiler directed an email message to all police department staff in which he stated that he knew his Directory had been accessed and copied.   Emswiler further stated that he knew who had accessed the Directory but would give those employees an opportunity to "come clean."   Further, Emswiler stated that if they did not come forward, it would show "who has morals and ethics and who probably needs to go elsewhere."   He stated that if they came to see him no action would be taken, but failing to do so "would only hurt [their] career."   Exhibit FF.

On January 5, 2016, Wendt contacted Bonner, who was acting as Mayor pro tem while Leinen was out of town, to report that he had information about images Emswiler stored on police department computer equipment.   After Bonner asked to see the images at issue, Wendt provided Bonner's assistant with a USB drive containing a PowerPoint presentation that included approximately 50 images from the Directory.   In response, Bonner asked Wendt to provide him with whatever additional information he had. Bonner was concerned that the Directory might contain confidential information regarding police department investigations.   While Wendt told Bonner that he would attempt to obtain the rest of the Directory, he was unable to do so.

**Emswiler's Fate**.   Emswiler ultimately admitted that the Directory was his and received a letter of reprimand from Leinen based on his use of police department computers to store inappropriate materials.   Exhibit QQ.   Wendt, however, believed

that Emswiler should be fired.   After various communications with Bonner and the City Council did not achieve that result, Wendt went to the media.   For example, on March 4, 2016, Wendt sent an email message to a reporter for the *Des Moines Register* in which he addressed issues relating to both the Entry and the Directory.   Exhibit HH.   Wendt's efforts resulted in media coverage of the Directory which, in turn, sparked public protests against Emswiler.   *See, e.g.*, Exhibit 65.

In addition, Wendt was openly involved in a petition drive seeking Emswiler's removal from office.   Among other things, Wendt displayed a copy of the petition at his place of business.[2]   Ultimately, about 420 individuals signed the petition (Denison's population is approximately 8,000).   Moreover, public disclosure of the Directory led to greater attendance at City Council meetings.

On March 23, 2016, Emswiler sent an email message to Leinen requesting copies of text messages and "the other document" exchanged between Wendt and Bonner "so we can go to the county attorney and pursue criminal charges."   Exhibit 38.   Leinen then emailed that information from his City account to his personal email account before forwarding it to Emswiler.   Exhibit 39.   Leinen provided the information to Emswiler about an hour after receiving Emswiler's request.

On March 25, 2016, the Iowa Department of Public Safety, Division of Criminal Investigation (DCI) determined there was no basis for pressing charges against Emswiler based on the Entry.   Exhibit 47.   Emswiler was not placed on suspension during the DCI investigation.   Leinen testified that Emswiler was not suspended because the City believed the investigation would reveal that his Entry was lawful.

The City Council conducted an evaluation of Emswiler's job performance during a closed session on May 3, 2016.   Emswiler received overall ratings of average or above

---

[2]  Wendt operates a business in Denison called BW Outfitters.

average from each Council member.   Exhibit 22.   In June 2016, however, multiple members of the Council advised Leinen that they no longer had confidence in Emswiler and asked Leinen to tell Emswiler that he could resign or would be fired.   Leinen testified that this development arose from Emswiler's practice of responding to public criticism via social media despite being directed not to.   On June 23, 2016, Emswiler submitted his letter of resignation.   Exhibit 23.   Emswiler testified that his resignation was tendered at Leinen's request and that he understood he would be fired if he did not resign.

**Dismissal of the Charges Against Wendt**.   On September 12, 2016, the charge against Wendt for reckless use of a weapon was amended from an aggravated misdemeanor to a simple misdemeanor.   Shortly thereafter, Wendt contacted Rod Bradley, who was serving as the City's interim Director of Public Safety, to inform him that the charge had been reduced.   Wendt advised Bradley that he had been told his unpaid leave status was due to the aggravated nature of the initial charge and requested information about his employment status as soon as possible.   Exhibit 29.   Bradley responded by telling Wendt he would confer with other City officials and get back to him.   Two days later, Bradley informed Wendt that the City had decided not to change his employment status.   Exhibit 30.   Bradley stated that Wendt was on unpaid leave because he faced a weapons charge, not because the charge had been an aggravated misdemeanor.

On October 14, 2016, Wendt requested permission for secondary employment, per City policy, when he was offered a part-time position with the Adair Police Department.   The City denied this request and Wendt filed a grievance, which was also denied.

On November 22, 2016, the firearms charge against Wendt was dismissed, leaving only two simple misdemeanor charges for trial – neither of which involved a firearm. Wendt sent an email message to Dan Schaffer, the City's new Chief of Police, to advise

015735

him of this development.   Exhibit 41.   Schaffer forwarded the message to Leinen and to the City Attorney.   Wendt's job status was not changed.

Wendt's remaining charges were scheduled for trial on November 28, 2016. Leinen testified that the City had not devised any plan for addressing Wendt's employment status once the charges against him were resolved.   On November 29, 2016, all of the remaining charges were dismissed.   Based on this development, Wendt requested immediate reinstatement.   However, he was not reinstated at that time.   No reason was provided as to why his unpaid leave status was being maintained.

**Post-Dismissal Events**.   On November 29, 2016, Lisa Koch, the City Clerk/City Manager, sent an email message to Leinen and the City Council stating that a special council meeting was needed "to discuss Brad Wendt's pending lawsuit."[3]   Exhibit 51. The message did not make reference to any need to discuss Wendt's employment status, nor did it address the fact that all charges against Wendt had been dismissed.   Koch sent another email message the next day stating that she "[j]ust wanted to let everyone know, in case you are hearing 'rumors,' all the charges from the DNR against Brad Wendt were dropped yesterday."   Exhibit 52.   Koch then wrote: "That is the reason for the closed session at Tuesday night's council meeting and the special meeting on Thursday next week [December 6, 2016]."   *Id.*   However, Leinen testified that the reason for the special meeting on December 6, 2016, was to discuss Wendt's lawsuit.   Moreover, on December 5, 2016, Koch sent another email message to Leinen and the City Council in which she asked that they review the lawsuits filed by Ohl[4] and Wendt prior to the following day's closed session, and another closed session that would take place the

---

[3] As noted above, Wendt filed this action on November 7, 2016.

[4] Like Wendt, Ohl filed a lawsuit against the City on November 7, 2016.   That action has been removed to this court.

7

following week, because those matters would be discussed.   Exhibit 42.

On December 5, 2016, Schaffer sent Leinen a letter concerning both (1) a Facebook post created by Wendt and (2) a complaint by two Denison residents, Tim and Brandon Johnston, that Wendt had harassed them.   Exhibit 6.   Schaffer explained that he had received the information about the Facebook post from an anonymous individual who dropped off a USB drive at the police department on December 5, 2016.   Schaffer also stated that that he received the complaint about alleged harassment on December 4, 2016.   Exhibit 6.   Schaffer recommended keeping Wendt on unpaid administrative leave pending investigation into both matters.   *Id.*   On December 6, 2016, Shaffer requested that the DCI investigate the Johnstons' harassment complaint.

The City discussed the lawsuits filed by Wendt and Ohl in a closed session on December 6, 2016.   Leinen testified that the City kept Wendt on unpaid administrative leave pending the investigations of Wendt's Facebook posts and the alleged harassment because he was already on that status and the City wanted to wait for the results of the DCI investigation before making any decisions.   Ultimately, the DCI issued a report in which it concluded that there was not sufficient evidence to support criminal charges against Wendt arising from the Johnstons' harassment complaint.   Exhibit 60.

**Wendt's Fate**.   On February 14, 2017, the City issued an Order of Removal terminating Wendt's employment as a police officer.   Exhibit B.   The Order made reference to both (a) Wendt's Facebook posts, including one in which he criticized the DNR officer who had initiated the criminal charges against him, and (b) the Johnstons' harassment complaint.   The Order stated that Wendt's conduct was in violation of "numerous rules of the Denison Police Department" and itemized those rules.   *Id*.

8

### IV.   ANALYSIS

Wendt seeks entry of "a preliminary injunction requiring Defendant City of Denison to immediately restore Plaintiff Bradley Wendt to active status with the Denison Police Department, and enjoining and restraining Defendants from terminating Plaintiff's employment, placing Plaintiff on unpaid administrative leave, or otherwise interfering with his ability to work as a Denison Police Officer, without the advance approval of this Court."   Doc. No. 19 at 4.

### A.   Preliminary Injunction Standards

The Eighth Circuit Court of Appeals has stated:

> When evaluating whether to issue a preliminary injunction, a district court should consider four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest.

*Roudachevski v. All–American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).   In this circuit, these are often referred to as the *"Dataphase"* factors.   In applying these factors, the court must keep in mind that a preliminary injunction is "an extraordinary remedy never awarded as of right."   *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).   As such, the party seeking injunctive relief bears the burden of proving that it is appropriate.   *Roudachevski*, 648 F.3d at 705.

### B.   Application of the <u>Dataphase</u> Factors

### 1.   Success on the Merits

For the reasons set forth in the following section, I find that Wendt's request for a preliminary injunction turns on the issue of irreparable harm.   Thus, I will not address

the probability of success on the merits in detail.   In short, based on the evidence summarized above I cannot say that Wendt has failed to demonstrate a probability of success.   This is particularly true with regard to his First Amendment retaliation claim as it relates to his disclosure of the Directory.   I find that this *Dataphase* factor weighs in favor of injunctive relief.

### 2.   *Irreparable Harm*

A party seeking a preliminary injunction must establish that he or she will suffer irreparable harm absent such relief.   *See, e.g.*, *Dataphase*, 640 F.2d at 114.   "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."   *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing *Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996); *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987)); *see also Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) (irreparable harm is "threshold inquiry" in granting or denying preliminary injunction). "In order to demonstrate such harm, the moving party must show 'that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'"   *Zhou v. International Business Machines Corporation*, No. 15-CV-1027-LRR, 2015 WL 7756152, at *3 (N.D. Iowa 2015) (citing *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (internal quotation marks omitted) (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).   When there is an adequate remedy at law, a preliminary injunction is not appropriate.   *Watkins*, 346 F.3d at 844 (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir. 1989)).

The City argues that Wendt can be fully compensated by a monetary judgment and therefore cannot establish irreparable harm.   Wendt argues that because he is likely to

succeed on the merits of his constitutional retaliation claim, he has established irreparable harm.   I find that even if Wendt establishes a likelihood of success on the merits, he has failed to establish that irreparable harm will occur if he is not immediately reinstated as a Denison Police Officer.

### a.      The Whistleblower Claim

With regard to Wendt's claims under Iowa's Whistleblower Act, he can be fully compensated for any injuries with monetary damages.   Federal law is very clear on this issue – lost earnings do not constitute irreparable harm.   *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90-92 (1974); *Sharp v. Parents in Community Action, Inc.*, 172 F.3d 1034, 1040 (8th Cir. 1999); *Roberts v. Van Buren Pub. Schs.*, 731 F.2d 523, 526 (8th Cir. 1984).   As such, I find that Wendt has failed to demonstrate irreparable harm with regard to his Whistleblower Act claims.

### b.      The First Amendment Claims

Wendt argues that his First Amendment claims are different.   He notes that federal courts have recognized that irreparable harm is presumed with regard to First Amendment violations, as "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."   *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).   While this theory of automatic irreparable harm in First Amendment cases has some superficial appeal, it does not stand up to scrutiny under the circumstances present here.

"To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."   *S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d

11

771, 778 (8th Cir. 2012) (quotation marks and citations omitted)).   Moreover, "[t]he irreparable harm factor weighs against issuing a preliminary injunction when a harm has already occurred and can be remedied through damages." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009).   Applying these principles, the Southern District of Iowa recently found proof of irreparable harm lacking in a First Amendment case involving the alleged censorship of a student newspaper.   *See Gomez v. Allbee*, 134 F. Supp. 3d 1159, 1180-81 (S.D. Iowa 2015).   Among other things, the court noted the lack of evidence concerning a threat of *future* harm in the absence of injunctive relief.   *Id.*

I find the analysis set forth in *Gomez* to be persuasive and, as applied to the record here, fatal to Wendt's request for a preliminary injunction.   The evidence does not suggest that the City either (a) interfered with his past efforts to exercise his First Amendment rights or, more importantly, (b) is threatening to restrain his future efforts to exercise those rights.   With regard to the past, Wendt exercised his free speech rights prodigiously, making his views about Emswiler and the Directory known to seemingly anyone who would listen – both within the City government and to the public and the press.   Indeed, Wendt even openly supported a petition drive to remove Emswiler as Chief of Police while still a member of the police force.   There is simply no evidence that the City restrained, or attempted to restrain, Wendt's exercise of First Amendment rights.   Instead, Wendt claims that the City punished him in various ways, after the fact, for exercising those rights.

As for the future, Wendt has identified no specific First Amendment activity with which the City is actively interfering on an ongoing basis.   At best, he testified that now he has experienced the City's alleged retaliation, he might think twice before engaging in similar First Amendment conduct in the future.   However, he identified no specific free speech activities in which he would like to engage but is being prevented by the City

12

from doing so.   "A mere 'theoretical possibility' of future harm is not sufficient to warrant injunctive relief; Plaintiff must show it is a 'demonstrated probability.'"   *Gomez v. Allbee*, 134 F. Supp. 3d 1159, 1181 (S.D. Iowa 2015) (quoting *McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1211 (8th Cir. 1992) (citations omitted); *S.J.W.*, 696 F.3d at 778; *CDI Energy Servs.*, 567 F.3d at 403)).   The record here reflects no such "demonstrated probability."

Cases in which irreparable harm has been presumed with regard to First Amendment violations involve the ongoing restraint of free speech activities.   *See, e.g.*, *Elrod*, 427 U.S. at 373 (injunctive relief affirmed due to ongoing threat that county employees would be discharged if they failed to provide support for the Democratic Party); *Child Evangelism Fellowship of Minnesota v. Minneapolis Special School Dist. No. 1*, 690 F.3d 996, (8th Cir. 2012) (granting injunctive relief to prevent the ongoing, viewpoint-based exclusion of an organization from an after-school program); *Marcus v. Iowa Public Television*, 97 F.3d 1137, 1140-41 (8th Cir. 1996) (irreparable harm established with regard to the exclusion of two political candidates from upcoming television forums).

I had occasion to address the presumption of irreparable harm in *Xcentric Ventures, L.L.C. v. Smith*, No. C15-4008-MWB, 2015 WL 4940812 (N.D. Iowa Aug. 19, 2015).[5]   In that case, a website hosting company and its owner claimed that an elected county attorney was engaged in ongoing First Amendment retaliation by issuing subpoenas, disclosing confidential information and threatening criminal charges in response to criticism of the county attorney that was being posted on the website.   After conducting an evidentiary hearing, I found that the plaintiffs had established a likelihood

---

[5] My analysis in *Xcentric* was in the form of a Report and Recommendation issued while I was a United States Magistrate Judge.   The District Judge accepted the Report and Recommendation without modification.   *See Xcentric Ventures, L.L.C. v. Smith*, No. C15-4008-MWB, 2015 WL 5184114 (N.D. Iowa Sept. 4, 2015).

13

of success on the merits of their First Amendment retaliation claim.    *Id.* at *20.    With regard to irreparable harm, I wrote:

> A party seeking a preliminary injunction typically must establish that it will suffer irreparable harm absent such relief.    *See, e.g., Dataphase*, 640 F.2d at 114.    However, such harm is presumed with regard to First Amendment violations, as "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."    *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).    Even without this presumption, I find that irreparable harm would continue to occur if Smith is not enjoined from continuing with his seemingly-retaliatory conduct.    In particular, the continued receipt, review and disclosure by Smith of privileged communications and confidential financial information would likely cause harm that could not be cured or remedied by a mere award of money damages.    Based on the legal presumption of irreparable harm and the evidentiary record, I find that this factor weighs in favor of injunctive relief.

*Id.* at *21.    Thus, *Xcentric* presented a situation in which both (a) the plaintiffs were engaged in ongoing First Amendment conduct and (b) the defendant was engaged in ongoing adverse conduct of a "seemingly-retaliatory" nature.    I found that injunctive relief was appropriate to prevent further injury to the plaintiffs' First Amendment rights pending trial.

Wendt's situation is different.    He complains of past adverse action that was allegedly motivated by past free speech activities.    If he prevails, his damages will arise from the loss of his employment and, perhaps, other economic harm that resulted from past retaliatory conduct.[6]    He has not shown that he faces the risk of future, irreparable

---

[6] Wendt alleges that his continued absence from the police department damages his reputation. Reputational damage can pose a threat of irreparable harm.    *See Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 707 (8th Cir. 2011) (citing *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003)).    However, Wendt did not present evidence supporting a finding that he is likely to suffer irreparable damage to his reputation absent injunctive relief.

14

harm absent the injunctive relief he requests.   As such, his request for a preliminary injunction must be denied.   *See, e.g.*, *Watkins*, 346 F.3d at 844.

### c.     *Remaining Dataphase factors*

Because Wendt did not meet his burden of demonstrating irreparable harm, I need not address the remaining *Dataphase* factors in detail.   For the record, I find that based on the record before me, (1) forcing the City to reinstate Wendt as a police officer would not be in the public interest and (2) the balance of the respective harms is roughly equal.

## V.     CONCLUSION

For the reasons set forth herein, plaintiff Bradley Wendt's motion (Doc. No. 19) for preliminary injunction is **denied.**

**IT IS SO ORDERED.**

**DATED** this 8th day of June, 2017.

_____
Leonard T. Strand, Chief Judge

15

OMB No. 1140-0013 (01/31/2011)

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Application for Tax-Exempt Transfer of Firearm
and Registration to Special Occupational Taxpayer
(National Firearms Act)**

ATF Control Number    201988016

| | |
|---|---|
| 1.   Transferee's Name and Address  *(as they appear on the Federal Firearms License, including trade name, if any)*<br><br>MARCUM MFG LLC<br>18224 MARCUM LN<br>LAUREL, IN 47024, UNITED STATES | To be submitted in duplicate by transferor of firearm<br><br>To: National Firearms Act Branch<br>  Bureau of Alcohol, Tobacco, Firearms<br>  and Explosives<br>  244 Needy Road, Martinsburg, WV  25405 |

☐ Sole Proprietor   ☐ Partnership   ☐ Corporation

2b. Tranferor's Telephone Number and Area Code
  803-736-0522x415

2a. Transferor's Name And Address  *(as they appear on the Federal Firearms License, including trade name, if any)*

FNH AMERICA LLC
FNH USA/FN
14 HAZEL PARK LN
FREDERICKSBURG, VA 22405, UNITED STATES

☐ Sole Proprietor   ☐ Partnership   ☐ Corporation

The above-named and undersigned transferor and special (occupational) taxpayer hereby makes application as required by Section 5812 of the National Firearms Act to transfer, without payment of tax, and register the firearm described below to the special *(occupational)* taxpayer identified as the transferee in this application.

3.  Description of Firearm   *(Complete items a through h, if applicable)*

| a.   Name and Address of Manufacturer and/or Importer of Firearm | b.   Type of Firearm *(See instruction 1c)* | c.   Caliber, Gauge or Size *(Specify)* | d.   Model | | |
|---|---|---|---|---|---|
| SEE ADDITIONAL SHEETS | | | Length *(Inches)* | E. Of Barrel | F. Overall |
| | | | g.   Serial Number | | |

h.   Additional Description or Data Appearing on Firearm   *(Attach additional sheet if necessary)*

| 4.   Transferee's Federal Firearms License | 5.   Transferee's Special (Occupational) Tax Status | |
|---|---|---|
| *(Give complete 15-digit number) (See instruction 2b)* | a.   Employer Identification Number | b.   Class |

| First 6 digits | 2 digits | 2 digits | 5 digits | 825403160 | CLASS 2 - MANUFACTURER OF FIREARMS |
|---|---|---|---|---|---|
| 435047 | 07 | 1J | 08087 | | |

| 6.   Transferor's Federal Firearms License | 7.   Transferor's Special (Occupational) Tax Status | |
|---|---|---|
| *(Give complete 15-digit number) (See instruction 2b)* | a.   Employer Identification Number | b.   Class |

| First 6 digits | 2 digits | 2 digits | 5 digits | 202006285 | CLASS 1 - IMPORTER OF FIREARMS |
|---|---|---|---|---|---|
| 154179 | 11 | 0D | 13766 | | |

8.   Consent to Disclosure of Information to Transferee  *(See instruction 8)* .  I  **do** or **do not**  *(circle one)*  authorize ATF to provide information relating to this application to the above-named transferee.

I believe I am entitled to exemption from payment of the transfer tax imposed by Section 5811, National Firearms Act (NFA), on the firearm described above because the transferee named herein is qualified under the NFA to manufacture, import or deal in that type of firearm.

UNDER PENALTIES OF PERJURY, I DECLARE that I have examined this application, and to the best of my knowledge and belief it is true, correct and complete.

| 9.   Original Signature of Transferor   *(Or authorized official)*<br><br>DIGITALLY SIGNED | 10.  Name and Title of Authorized Official *(Print or type)*<br><br>BOBBI J HAMELINCK, SN LICENSING ADMINISTRATOR | 11. Date<br><br>01/04/2019 |
|---|---|---|

**The Space Below is for the Use of the Bureau of Alcohol, Tobacco, Firearms and Explosives**

By Authority of the Director, this Application has been Examined, and the Transfer and Registration of the Firearm Described Herein and the Interstate Movement of that Firearm, When Applicable, to the Transferee Are:

☐ Approved *(with the following conditions, if any)*          ☐ Disapproved *(For the following reasons)*

| Authorized ATF Official | Date |
|---|---|

ATF Form 3 (5320.3)
Revised October 2004

Firearms *(Continued)*

Control Number    201988016

| Line Number | Name and Address of Manufacturer a | Type of Firearm b | Caliber Gauge or Size c | Model d | Length of Barrel e | Overall Length *(Inches)* f | Serial Number g |
|---|---|---|---|---|---|---|---|
| 1 | FN (HERSTAL) | MACHINEGUN | 5.7 | P90 USG | 10.39 | 19.88 | FN026470 |
| 2 | FN (HERSTAL) | MACHINEGUN | 7.62 | SCAR-17 | 16 | 38 | H012000 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

SUBMITTED

1. **Definitions**

   a. **National Firearms Act (NFA)** . Title 26, United States Code, Chapter 53. The implementing regulations are found in Title 27, CFR, Part 479.

   b. **Gun Control Act (GCA)** . Title 18, United States Code, Chapter 44. The implementing regulations are found in Title 27, CFR, Part 478.

   c. **Firearm** . The term "firearm" means:  (1)  a shotgun having a barrel or barrels of less than 18 inches in length; (2)  a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3)  a rifle having a barrel or barrels of less than 16 inches in length; (4)  a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon as defined in 18 U.S.C. § 5845(e); (6)  a machinegun; (7)  a muffler or silencer for any firearm whether or not such firearm is included within this definition; and (8)  a destructive device.

   d. **Person.** The term "person" means a partnership, company, association, trust, estate, or corporation, as well as a natural person.

   e. **Employer Identification Number (EIN).** Required of taxpayer filing special  (occupational) tax returns under 27 CFR § 479.35.

   f. **Special (Occupational) Tax.** Required by the NFA to be paid by a Federal  firearms licensee engaged in the business of manufacturing (Class 2), importing  (Class 1), or dealing  (Class 3) in NFA firearms.

   g. **Federal Firearms License.** A license issued under the provisions of the GCA to manufacture, import or deal in firearms.

   h. **ATF Officer.** An officer or employee of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) authorized to perform any function relating to the administration of the NFA.

   i. **Transfer.** Selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of a firearm.

   j. **Transferor.** The registered owner of a firearm who is applying to transfer it.

   k. **Transferee.** The person acquiring the firearm.

2. **Preparation of Application**

   a. **Authority.** As provided by 26 U.S.C. §§ 5812 and 5852, any person seeking to transfer a firearm exempt from payment of tax must complete, in duplicate, a separate application on this form.  The transferor must furnish all the information  called for on this application form.

   b. The entity identified in item 4 must be the same as the entity identified in item 5.  For example, **if item 4 identifies a sole proprietor, item 5 cannot identify a corporation** .  This also applies for the completion of items 6 and 7.

   c. **Signatures.** All signatures required on Form 3 must be original in ink on both copies.

   d. **Photocopies Or Computer Generated Versions.** The ATF Form  3 may be photocopied or a computer-generated version *(as long as it is in the same format and contains all required information)* may be used.  This form may also be downloaded from the ATF Internet  website: **www.atf.gov**

   e. **Serial Numbers.** When more than one firearm of the same description is being transferred and the serial numbers are in a consecutive series, the transferor may  enter the beginning and ending numbers of the range in item 3g.  If more than one firearm of the same description is being transferred, but the serial numbers are non-consecutive, the registrant may note item 3g to "see attached list of xxx serial numbers."  Any attachment must be referenced to ATF Form 3.

   f. **Estates.** If the firearm is being transferred from an estate, as provided in

27 CFR §§ 478.56 and 479.42, of a Federal firearms licensee who has paid the special (occupational) tax under the NFA, item 2a shall reflect: the executor's  name, title (executor  *(or executrix, administrator, administratrix) of the estate of  (name))* , and the executor's address. *(See the ATF Internet website at  **www.atf.gov** for additional information)* .

   g. **Submission.** All requested informtion must be entered in blue or black ink and must be legible.  Send both copies of the ATF Form 3 and attachments to the address located in the upper right hand corner on the face side of the ATF Form 3.  The return of the application or sending it to any other address will only delay the processing.

   h. **Submission By Facsimile Transmission.** ATF Form 3 may be submitted for approval via facsimile transmission ((304) 616-4501) provided the transferor filed an affidavit with the NFA Branch in accordance with ATF Industry Circular 89-6.

   i. **State Or Local Permit.** If a State or local permit or license is required for the transferee prior to acquisition of the firearm, a copy of the permit must be included with the application.

3. **Approval of Application.** Upon approval of an application, the NFA Branch will return an approved copy to the transferor for delivery with the firearm to the transferee.  Since the approval of the application effectuates registration of the firearm to the transferee, the physical transfer of the firearm must be completed immediately; however, the transferor must not transfer the firearm until the application has been approved and received.  If the physical transfer of the firearm cannot be completed immediately, the transferor must contact the NFA Branch with the specifics.

4. **Withdrawal of Application.** The transferor may withdraw an application prior to approval subsequent to a written request.

5. **Cancellation of Approved Application.** The transferor  may cancel an approved application only if the physical transfer of the firearm has not been completed.  The transferor must return the approved application with a written request for cancellation, citing the need and that the physical transfer of the firearm did not take place.

6. **Disapproval of Application.** If the application is disapproved, the NFA Branch will note the reason for disapproval on the application and return one copy of the ATF Form 3 to the transferor.

7. **Reasons for Disapproval.** 26 U.S.C. § 5812 provides that applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law.  If State or local law prohibits the receipt or possession of the firearm being transferred, the application will be disapproved.

8. **Status Inquiries and Questions.** Information relating to the NFA and other firearms  laws is available at the ATF Internet website at **www.atf.gov** Any inquiry relating to the status of an application to transfer an NFA firearm or about procedures in general should be directed to the NFA Branch at (304) 616-4500.  Please be aware that any dissemination by ATF of information relating to the application to register an NFA firearm must conform with the restrictions in 26 U.S.C. § 6103.  The opportunity provided in item 8 to authorize ATF to disclose information is intended to enable ATF to respond to inquiries by the transferee regarding the application.  The failure to complete item 8 will be considered a declination of authorization to release the information.

9. **Penalties.** Any person who violates or fails to comply with any of the requirements of the NFA shall, upon conviction, be fined not more than $10,001 or be imprisoned for not more than 10 years, or both.  Any firearm involved in a violation of the NFA shall be subject to seizure and forfeiture.  It is unlawful for any person to make or  cause the making of a false entry on any application or record required by the NFA knowing such entry to be false.

10. **Compliance With The Gun Control Act.** All provisions of the GCA must also be complied with, including the recordkeeping requirements for licensees.

**Important Information for Currently
Registered Firearms**

If this registration document evidences the current registration of the firearm(s) described on it, please note the following information.

**Estate Procedures:**   For procedures regarding the transfer of firearms in an estate resulting from the death of the registrant identified in item 1, the executor should contact the NFA Branch, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road  Martinsburg WV 25405.

**Change of Address:**   The registrant, if no longer a Federal firearms licensee, shall notify the NFA Branch, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the address in item 1.

**Interstate Movement:**  If the registrant is no longer a Federal firearms licensee and the firearm identified in item 3 is a machinegun, short-barreled rifle, short-barreled shotgun, or destructive device, the registrant is required by 18 U.S.C. § 922(a)(4) to obtain permission from ATF prior to any transportation in interstate or foreign commerce.

**Change of Description:**   The registrant shall notify the NFA Branch, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the description of the firearm(s) in item 3.

**Restrictions on Possession:**  Any restriction  *(see approval block on face of form)*   on the possession of the firearm(s) identified in item 3 continues with the further transfer of the firearm(s).  Any machinegun manufactured or imported on or after May 19, 1986, may not be retained when the registrant is no longer qualified to deal in NFA firearms.

**Persons Prohibited from Possessing Firearms:**   If the registrant becomes prohibited by 18 U.S.C. § 922 from possessing a firearm, the registrant shall notify the NFA Branch, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road,  Martinsburg, WV  25405, in writing, immediately upon becoming prohibited for guidance on the disposal of the firearm.

**Proof of Registration:**   This approved application is the registrant's proof of registration and it shall be made available to any ATF officer upon request.

**Paperwork Reduction Act Notice**

This form is in accordance with the Paperwork Reduction Act of 1995.  The information you provide will be used to apply to transfer firearms tax exempt from one Federal firearms licensee and special  *(occupational)*  taxpayer  qualified to deal in NFA firearms to another qualified special taxpayer.  The data is used to verify lawful transfer and registration of firearms.  The information being furnished is mandatory  *(26 U.S.C. § 5812)*   .

The estimated average burden associated with this collection of information is 30 minutes per respondent or recordkeeper, depending on individual circumstances.  Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be addressed to the Reports Management Officer, Document Services Branch, Bureau of Alcohol, Tobacco, Firearms and Explosives, Washington, DC  20226.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

**Privacy Act Information**

1.   **Authority.**  Solicitation of this information is made pursuant to the National Firearms Act (26 U.S.C. §§§ 5812 and 5851 and 5852).  Disclosure of this information by the applicant is mandatory for any person *(other than a manufacturer qualified under the National Firearms Act)*   making a firearm as defined in the National Firearms Act.

2.   **Purpose.**  To verify the tax exemption imposed by 26 U.S.C. § 5851; to determine that the transfer would not be in violation of law; and to effect registration of the firearm.

3.   **Routine Uses.**  The information will be used by ATF to make the determinations set forth in paragraph 2.  In addition, to effect registration of the firearm, information as to the identification of the firearm, date of registration, and the identification and address of person entitled to possess the firearm will be entered into the National Firearms Registration and Transfer Record.  No information obtained from an application, registration, or records required to be submitted by a natural person in order to comply with any provision of the National Firearms Act or regulations issued thereunder, shall, except in connection with prosecution or other action for furnishing false information, be used, directly or indirectly, as evidence against that person in any criminal proceeding with respect to a violation of law occuring prior to or concurrently with the filing of the application.  The information from this application may only be disclosed to Federal authorities for purpose of prosecution for violation of the National Firearms Act.

4.   **Effects of Not Supplying Information Requested.**  Failure to supply complete information will delay processing and may cause denial of the application.

65006689

# MARCUM MFG LLC
## Johnathan Marcum
MarcumFirearms.com
18224 Marcum Street
Laurel, IN 47024

Dat
e 12-26-2018

Marcum MFG LLC
18224 Marcum Lane
Laurel, IN 47024
FFL# 4-35-047-07-1J-08087

Dear FN America
Order list Reference number 0026

(1) P90 Tactical $713.00 3818901393

(1) P90 Standard Selective Fire $1,479.00 3818900093

(1) P90 TR Selective Fire $1,428.00 3818900493

(1) P90 USG Blk Sight $1,938.00 3818902220

(1) SCAR 17 7.62x51mm FDE 13-in CQC 20-Rnd LE $2,703.00 98741

(1) SCAR 17 7.62x51mm FDE 16-in 20-Rnd LE $2,703.00 98743

(1) (3118929010H) 5SCAR-5C 5.56x45mm Blk 7.5-in 30-Rnd    $2,599.00

(1) 9348199 FN M249 SAW 5.56mm MG $7,699.00

(1) 9348199-1   FN M249 Para 5.56mm MG $7,899.00

(1) 5CAR 16 5.56x45mm Blk 10-in CQC 30-Rnd LE $2,494.00 98721

(1) SCAR 16 5.56x45mm FDE 14-in 30-Rnd LE $2,494.00 98703

Total $23,185.00

Sold Marcum MFG LLC, 18224 Marcum Lane, Laurel IN 47024
POC Johnathan Marcum 513-315-7332
Ship to Marcum MFG LLC, 18224 Marcum Lane, Laurel IN 47024
POC Johnathan Marcum 513-315-7332
Billing Address
Marcum MFG LLC
18224 Marcum Lane
Laurel, IN 47024

Marcum MFG LLC LLC has agreed to FN America's Terms .



Marcum MFG LLC
18224 Marcum Lane
Laurel, IN 47024
FFL# 4-35-047-07-1J-08087
Dear FNH USA

Reference number 0026

This is an order of the following FN machine guns ,(1) *FN P90 Tactical 5.7x28mm* ,*(1) FN (1) P90 Standard Selective Fire 5.7x28mm*, (1) FN P90 TR Selective Fire 5.7x28mm , (1) FN P90 USG Blk Sight 5.7x28mm, (1) FN SCAR-SC 5.56X45mm,(1) FN SCAR 17 7.62X51MM FDE 16,in LE, (1) FN SCAR 17 CQC 7.62X51mm FDE 13,in LE, (1) FN SCAR 16 5.56x45mm FDE 10-in CQC 30-Rnd LE, (1) FN SCAR 16 5.56x45mm FDE 14-in 30-Rnd LE, (1) FN M249 SAW 5.56mm , (1) FN M249 PARA 5.56mm.( at the total price of ($23,185.00), plus shipping charges.

The firearm will be used by Marcum Firearms in a demonstration of the firearm to the Adair Police Department . Attached is the letter Adair Police Department , *dated 10-31-2018)*, requesting the demonstration.

Theses firearm is particularly suitable for use as a law enforcement weapon *(These weapons are often used by police in their daily dutys. Along with use for SWAT teams.)* The firearm is currently in production by *(FNH)*, so quantities of the firearm are readily available to fill any subsequent orders for the firearm Adair Police Department .

Sincerely yours,
Marcum MFG LLC

By _____

*(Johnathan Marcum-Owner)*

*NOTE: LETTERS MUST BE DATED NO OLDER THAN 4 MONTHS

1

015750

# CITY OF ADAIR

Chief of Police Bradley Wendt
*320 AUDUBON STREET - P O BOX 66 - ADAIR, IA 50002*
*TELEPHONE 641-742-3751 - FAX 641/742-5514*
*EMAIL: Adairpolice113@gmail.com*

**OFFICERS**

COUNCIL

Mayor – John Larsen
Craig Wedemeyer
City Clerk Randi Lehman

City Attorney   John Fisher
Jeremy Gettler

Rick Stanley

Kyle Irlmeier      Rick
Hayes

October 31, 2018

Re: Request for demonstration FNH USA

Mr. Johnathan Marcum
DBA: Marcum MFG LLC
18224 Marcum Lane
Laurel, In, 47024

Dear MR. Marcum

The Adair Police Department would like a demonstration of the following FN machine guns for possible purchase for our department, *FN P90 Tactical 5.7x28mm ,FN P90 Standard Selective Fire 5.7x28mm*, FN P90 TR Selective Fire 5.7x28mm ,   FN P90 USG Blk Sight 5.7x28mm, FN SCAR-SC 5.56X45mm, FN SCAR 17 7.62X51MM FDE 16,in LE,   FN SCAR 17 CQC 7.62X51mm FDE 13,in LE, FN SCAR 16 5.56x45mm FDE 10-in CQC 30-Rnd LE, FN SCAR 16 5.56x45mm FDE 14-in 30-Rnd LE, FN M249 SAW 5.56mm , FN M249 PARA 5.56mm.

The number of sworn full time officers in our department is 6.    These officers are authorized by law to make arrests and carry firearms in the performance of their official duties

The personnel representing the Adair Police Department are authorized by law to carry firearms in the performance of their official duties. The personnel representing the Adair Police Department during the demonstration are authorized to evaluate the firearms. The firearm requested for demonstration is particularly suitable for use for government agencies .   These weapons are useful for training law enforcement officers on unfamiliar weapon systems that may be encountered in the field. These weapons are useful for training law enforcement officers on unfamiliar weapon systems that may be encountered in the field .It is known that local law enforcement in certain circumstances assist the US military forces and a knowledge of these new systems is invaluable for our official duties .

If there are any questions, please contact our office.

Sincerely yours,

Adair Police Department
By: _____