IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>BRADLEY EUGENE WENDT,<br><br>      Defendant. | Case No: 4:22-cr-199<br><br>**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................... 1

II. BACKGROUND ...................................................................................... 1

 A. Legal Background............................................................................ 1

 B. Factual Background ........................................................................ 4

 C. The Indictment ............................................................................... 4

  1. "Federal Law on Machine Guns"........................................ 5

  2. Counts.................................................................................. 6

 D. Pretrial Issues ................................................................................. 8

  1. The Government Obtained and Executed General Search Warrants Against Wendt in Violation of the Fourth and Sixth Amendments................................................................. 8

  2. The Government Invaded Closed Sessions of Adair City Council Meetings Regarding Wendt's Employment in Violation of the Fifth Amendment Right ........................... 9

  3. The Government Violated its Discovery Obligations in Violation of the Fifth Amendment Right ........................... 10

III. LEGAL STANDARD............................................................................ 10

IV. THE LAW WAS WRONG..................................................................... 11

 A. The "Official Use" Requirement .................................................. 11

 B. The So-Called "Purchase Law Letter" Requirement ................... 18

 C. The Demonstration Law Letter Requirement ............................... 22

V. THE CHARGES WERE UNCONSTITUTIONALLY VAGUE.............. 26

VI. THE EVIDENCE WAS INSUFFICIENT............................................... 30

 A. The Government's Case................................................................. 30

 B. The Defense Case ......................................................................... 31

 C. The Verdict ................................................................................... 34

1. Conspiracy to Make False Statements (Count 1) .................................. 34

2. False Statements ("Purchase Law Letters") (Counts 2-3)...................... 35

3. False Statements ("Demonstration Law Letters") (Counts 4-14) .......... 36

4. Illegal Possession of a Machine Gun (Count 15).................................. 37

VII.   CONCLUSION ........................................................................................... 39

## I.       INTRODUCTION

Bradley Eugene Wendt ("Wendt") submits this brief in support of his motion for judgment of acquittal or new trial. As the Court is well aware, this case has been intensely litigated throughout its history. At first blush, that might seem strange since it appears to be nothing more than a straightforward conspiracy/false statement/gun possession case similar to hundreds, if not thousands, of other criminal prosecutions each year. Such, however, could not be further from the truth, either factually or legally. Factually, this matter involves a unique (and believed to be never-before-seen) set of circumstances involving the purchase and acquisition of machine guns by someone who is both a Chief of Police and a firearms dealer, as well as all of the nuances and details that arise from that joint status. Legally, this matter involves a highly technical and heavily regulated area of law that, when coupled with almost 40 years of ATF and industry history, explains why the Court spent countless hours wrestling with the law and how to instruct the jury about it.

After all of this, however, one thing remains clear. This case is nothing more than an improper attempt by the Government to regulate through criminal prosecution activity that it does not like but that is not illegal, and thus can only be stopped through the proper channels of statutory amendment or rulemaking. Neither, however, has occurred here, and the Government cannot be allowed to use this Court to "change the rules" by improperly interpreting the law and/or regulations based upon nothing more than its current whims.

## II.      BACKGROUND

### A.       Legal Background

Machine guns are highly regulated in the United States. Beginning with the National Firearms Act of 1934 ("NFA"), it became necessary to register machine guns, pay certain taxes on the transfer of machine guns, and obtain approval from ATF before such transfers occur.  In

general, the NFA is a tax, registration, and transfer statute, rather than a usage statute. That is, once someone lawfully acquires a machine gun, they can do whatever they want with it within the bounds of the law.  The NFA, and its corresponding regulations were generally the extent of machine gun law in the United States for over 50 years.

In 1986, however, Congress passed the Firearms Owners' Protection Act ("FOPA") which, among other things, banned new, post-1986 machine guns for anyone other than the government by a simple and straightforward amendment of the Gun Control Act of 1968:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machine gun.
>
> (2) This subsection does not apply with respect to—
>
> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>
> (B) any lawful transfer or lawful possession of a machine gun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o).

Shortly after the passage of § 922(o), however, it must have dawned on ATF what Congress had done, because unlike in China or other places where the government makes machine guns for itself using government-owned factories, in the United States, federal, state, and local governmental agencies must rely on the private sector to manufacturer/import and sell them machine guns. Section 922(o), of course, failed to take that into account, and it had no provisions that would allow governmental agencies to acquire the machine guns that they required.

As a result, ATF took it upon itself to promulgate an interim and then a final rule in order

to allow exactly what Congress had just specifically disallowed:

> (a)   **General**….[N]otwithstanding any other provision of this part, no application to make, transfer, or import a machine gun will be approved except as provided by this section.[1]
>
> * * * *
>
> (c)   **Importation And Manufacture**.  Subject to compliance with the provisions of this part, importers and manufacturers….may import and manufacture machine guns on or after May 19, 1986, for sale or distribution to any department or agency of the United States or any State or political subdivision thereof, or for use by dealers qualified under this part as sales samples as provided in paragraph (d) of this section.  The registration of such machine guns under this part and their subsequent transfer shall be conditioned upon and restricted to the sale or distribution of such weapons for the official use of Federal, State or local governmental entities….
>
> (d)   **Dealer Sales Samples**.  Subject to compliance with the provisions of this part, applications to transfer and register a machine gun manufactured or imported on or after May 19, 1986, to dealers qualified under this part will be approved if it is established by specific information the expected governmental customers who would require a demonstration of the weapon, information as to the availability of the machine gun to fill subsequent orders, and letters from governmental entities expressing a need for a particular model or interest in seeing a demonstration of a particular weapon. Applications to transfer more than one machine gun of a particular model to a dealer must also establish the dealer's need for the quantity of samples sought to be transferred.
>
> * * * *
>
> (f)   **Discontinuance Of Business**. Since section 922(o), Title 18, U.S.C., makes it unlawful to transfer or possess a machine gun except as provided in the law, any qualified manufacturer, importer, or dealer intending to discontinue business shall, prior to going out of business, transfer in compliance with the provisions of this part any machine gun manufactured or imported after May 19, 1986, to a Federal, State or local governmental entity, qualified manufacturer, qualified importer, or, subject to the provisions of paragraph (d) of this section, dealer qualified to possess such, machine gun.

*See,* 27 C.F.R. 479.105.

Then, after the implementation of Section 479.105, a market in post-1986 machine guns,

dealer sales samples, and out-of-business transfers arose and grew throughout the United States

---

[1] Just like the NFA itself under which this regulation was promulgated, Section 479.105 speaks only to the making/importing and transfer of machineguns, and not to their subsequent use by anyone who acquired them.

with the full knowledge, involvement, and approval of ATF, because no machine gun can be lawfully transferred without all of that.  In fact, as a result of ATF's full support of such transfers, the 38 year-old market in post-1986 machine guns (roughly 600,000 machine guns) has dwarfed the 52 year-old market in pre-1986 machine guns (roughly 175,000 machine guns).[2]

### B.    Factual Background

Wendt is the Chief of Police of the Adair, Iowa Police Department ("APD").  It is uncontroverted that as such, he has the authority to purchase whatever machine guns (in both kind and quantity) on behalf of the APD that he wished, and the APD purchased certain of the machine guns involved in the case pursuant to Section 922(o).

Wendt is also the owner of BW Outfitters ("BWO"). BWO is a federally licensed FFL/SOT firearms dealer, and it is uncontroverted that as such, BWO is authorized to deal in certain types of firearms including machine guns. These machine guns generally consist of "transferrable" pre-May 1986 machine guns and "restricted" post-May 1986 machine guns, and BWO acquired/attempted to acquire certain of the latter type of machine guns involved in this case pursuant to Section 479.105(d).

### C.    The Indictment

On December 14, 2022, the Government filed an Indictment charging Wendt and Co-Defendant Robert Allen Williams ("Williams"). The Government alleged the conspiracy count

---

[2] *See,* ATF Firearms Commerce in the United States (2021), Exhibit 8 (over 741,000 total machine guns registered in the United States….which does not include machine guns possessed by the federal government) and https://www.nfatca.org/pubs/MG_Count_FOIA_2016.pdf (in 2016 there were 175,000 pre-1986 machine guns in the United States). Obviously the number of pre-1986 machine guns only goes down as they are lost, broken, turned in, etc. while the number of post-1986 machine guns continues to go up at a staggering rate despite the purported ban on such guns in Section 922(o).  In fact, the number of post-1986 machine guns has roughly doubled in the last eight years from roughly 300,00 machine guns to roughly 600,000 machine guns – all after Congress supposedly banned post-1986 machine guns.

and some of the false statement counts against both Wendt and Williams, but later dismissed all counts against Williams. The Government subsequently dismissed five counts against Wendt.

### 1. "Federal Law on Machine Guns"[3]

The Government started this case by getting the law wrong in the Indictment. Starting on page 3 of the Indictment, the Government set forth its understanding of the law for the grand jury, entitled "Federal Law on Machine Guns." This was the basis for the grand jury to charge Wendt – and nearly everything the Government set forth in terms of the law was wrong.[4]

This section of the Indictment starts by overstating the prohibition and the ATF's role in determining what is lawful. The Indictment states "Federal law generally prohibits the possession, transfer, and importation of fully automatic machine guns manufactured after May 19, 1986 (machine guns)." Indictment, ¶ 6. As set forth above, that is not the case and overstates the restrictions. The Indictment then states "[t]he ATF administers and enforces federal machine gun laws." While the ATF enforces the law, it does not administer the machine gun laws – rather, it regulates machine guns (a process that had already be done here and not followed). *Id.* ¶ 7.

The Indictment continues by misstating the exceptions to the prohibition in a very critical way in collapsing the authority to authorize the possession with the authority to authorize a transfer. *Id.* ¶¶ 7-9. The Indictment then incorrectly states that "pursuant to ATF regulations, both exceptions require the law enforcement agency who is either purchasing the machine gun or requesting a demonstration of the machine gun to submit a 'law letter.'" *Id.* ¶ 10.

---

[3] Wendt filed a motion to dismiss regarding this issue and incorporates that by reference.
[4] This misunderstanding of the law then carried into the jury instructions. The Government's proposed jury instructions made this problem abundantly clear. In particular, the Government's proposed instruction No. 16 (National Firearms Act and Gun Control Act Additional Instructions) attempts to combine the law, the regulation, the ATF's purported practices, and the ATF's preferences.

The Indictment goes on to state "requesting either the purchase of a machine gun by the agency (purchase law letter)." There is no such thing as a purchase letter. *Id*. ¶ 11. Further, the law enforcement agency has the right to purchase and does not need to request it. The Indictment states: "The agency further represents the machine gun is being acquired for the agency's official use and not for the purpose of resale or transfer." There are several things wrong with this: First, it is not required and cannot be required. Second, it is based on H&K's requirements. Third, none of the letters Wendt submitted or was charged with state "for potential future purchase." And this is important because there is a significant difference between "potential" and "possible."

The Indictment then correctly states "the demonstration law letter must express a need for a particular machine gun or an interest in seeing a demonstration" but goes on to misstate the demonstration requirement. *Id*. ¶ 12.

The Indictment then states: "Transfers of machine guns between FFL-SOTs typically require a demonstration law letter from a law enforcement agency seeking a demonstration of the machine gun for future potential purchase." *Id*. ¶ 13.

Finally, the Indictment incorrectly states: "However, if an FFL-SOT surrenders its SOT – its authorization to possess and deal in machine guns – the FFL may sell and transfer machine guns to any licensed FFL-SOT without a law letter." *Id*. This is important because this case involves the alleged acquisition of machine guns under a theory that Wendt would then surrender his FFL-SOT.

### 2.     Counts

At trial, the remaining fifteen counts against Wendt are as follows:

**Count 1: Conspiracy to Make False Statements and to Defraud the ATF**

The Government alleged Wendt and Williams conspired to unlawfully acquire machine guns in violation of 18 U.S.C. § 371. To accomplish this conspiracy, the Government alleged

6

that Wendt made materially false statements to the ATF in law letters that were required for the

acquisition of machine guns. The Government alleged Adair only has a population of 791, that it

typically only has one officer on duty, and that during Wendt's tenure as Police Chief, at most,

the Adair Police Department only had three full-time officers. The Government also made

allegations about the number of machine guns that were purchased or transferred, the suitability

of the particular machine guns for law enforcement use, as well as other ways in which the

machine guns were used, including a machine shoot. The Government alleged the purpose of the

conspiracy was to (1) unlawfully obtain and acquire machine guns for Defendants' personal

enjoyment; (2) sell or transfer the machine guns for the defendants' personal profit; (3) rent the

machine guns to private citizens in exchange for money; (4) allow private citizens to possess and

shoot machine guns; and, (5) with respect to Wendt, to transfer machine guns to other FFL-

SOTs. In the Indictment, the Government alleged a broad swath of activities it claims to be overt

acts but has not identified which of those acts it tends to prove at trial.

### Counts 2-3: False Statements to the ATF – Purchase Law Letters

On the so-called "purchase law letters," the Government alleged that Wendt made two

materially false statements to the ATF:

1.  "that the machine guns would be used to carry out the official duties and
    responsibilities of the Adair Police Department;" and

2.  "that the machine guns were not being acquired for the purpose of resale or
    transfer"

Indictment, at 17. The Government alleges Wendt's real purpose was that "WENDT was

acquiring the machine guns for his personal gain and profit." *Id.*

**Counts 4-14: False Statements to the ATF – Demonstration Law Letters**

On the "demonstration law letters," the Government alleged that Wendt made only one

materially false statement to the ATF:

1.     "that the machine gun(s) were requested for demonstration for future potential
       purchase by the Adair Police Department"

The Government alleged Wendt's real purpose was that "WENDT was acquiring the machine

guns for his personal gain and profit and/or to facilitate the transfer of the machine to other FFL-

SOTs." *Id.*

**Count 15: Illegal Possession of Machine Gun**

In Count 15, the Government simply alleged that Wendt (a) illegally possessed a machine

gun and (b) aided and abetted another person in doing the same. The Government identified the

particulars as follows:

Machine gun:          U.S. Ordnance, Model M60, 7.62 caliber (Serial # 12413)

Date:                 April 16, 2022

Aided and abetted:    Omaha Police Officer Kenner Hatfield

*See* Indictment at 22; Wendt's Motion in Limine (ECF 296), at 7 n.2.

D.     **Pretrial Issues[5]**

1.     **The Government Obtained and Executed General Search Warrants Against
       Wendt in Violation of the Fourth and Sixth Amendments**

The Government began this prosecution with a complete disregard for Wendt's rights.

*See* ECF 127, 137, 139. It obtained and executed general search warrants for his cell phone, his

Facebook account, his Hotmail account, his home, and his business without any particularity or

restriction These warrants violated Wendt's Fourth Amendment right and as well as the Stored

---

[5] Wendt identifies and incorporates its previous filings on these issues for background to the extent the Court deems
they are not a valid legal basis for a motion for acquittal or new trial.

Communications Act. In addition, because these warrants did not provide any protocol regarding attorney-client privileged information and, in fact, no protocol was followed, the Government violated his Sixth Amendment right regarding the invasion of his attorney-client privilege. It was undisputed that the Government knew Wendt had counsel in matters that would be included in the confiscated materials. Yet the Government nonetheless reviewed the information anyway and only when Wendt was able to object did it, after the fact, have a taint team review the materials. Nor did the Government ever comply with the limited requirements of the warrants themselves in terms of only seizing relevant information. *See* ECF 303.

### 2. The Government Invaded Closed Sessions of Adair City Council Meetings Regarding Wendt's Employment in Violation of the Fifth Amendment Right

The Government then proceeded to invade the closed sessions of the Adair City Council meetings wherein the Adair City Council discussed Wendt's employment, in violation of Wendt's Fifth Amendment right. *Kastigar v. United States*, 406 U.S. 441, 461 (1972); Iowa Code 80F. *See* ECF 211, 227, 234. As set forth in Wendt's filings on this issue, the Government's unlawful intrusions included not just the City Council meetings but the constant communications between Special Agent Kelly Etnier (the ATF case agent in this case) and the Mayor leading up to and following those meetings. The Government did not attempt to put a stop to this or even appear to recognize this was a problem until counsel for Wendt called the Court's attention to it in the first hearing in this case. Nonetheless, the Government proceeded on with the same team in place (agents and prosecutors) without overcoming its substantial burden of proving that the tainted information was not used in this case. It is noteworthy that the Government took the unusual step of not calling case agent S/A Etnier in the trial.

3.      **The Government Violated its Discovery Obligations in Violation of the Fifth
Amendment Right**

The Government then proceeded to turn around and refuse to produce the documents and

information Wendt was entitled to in discovery, in violation of his Fifth Amendment right as

well as his rights under the Federal Rules of Criminal Procedures, the Jencks Act, and Supreme

Court precedent. *See* ECF 128, 136, 245, 271. Wendt relentlessly attempted to litigate these

issues prior to trial. The Government established a clear and consistent pattern of violating its

discovery obligations. In addition, the Government was allowed to hold discovery for in-office

review only under extreme conditions. Further, the Court refused to make a ruling on whether

the ATF NFA Division was part of the prosecution team. This effectively allowed the

Government to proceed without responsibility or obligation to produce that discovery which

would have been most relevant to this case – such as, internal ATF admissions regarding the

interpretation and application of the requirements at issue in this case.

## III.    LEGAL STANDARD

The Court should enter a judgment of acquittal or, in the alternative, grant him a new

trial. A district court must enter a judgment of acquittal if the evidence at trial was is insufficient

to sustain a conviction. Fed. R. Crim. 29(a); *United States v. Water*, 413 F.3d 812, 816 (8th Cir.

2005). The standard for a judgment of acquittal is whether, drawing all inferences in favor of the

verdict, there is no interpretation of the evidence that would allow a reasonable jury to find the

defendant guilty beyond a reasonable doubt. *United States v. Oberhauser*, 284 F.3d 827, 829 (8th

Cir. 2002); *United States v. Boesen*, 491 F.3d 852, 855-56 (8th Cir. 2007). Even if the district

court finds the evidence to have been sufficient, the district court should nonetheless grant the

defendant a new trial in the interest of justice if the evidence weighs against the verdict enough

to conclude a serious miscarriage of justice may have occurred. *United States v. Lincoln*, 630

F.2d 1313, 1319 (8th Cir. 1980).

## IV.     THE LAW WAS WRONG

The Government is attempting to regulate by criminal prosecution. The Government has

chosen to bring a novel theory in a highly-regulated area of the law in a first-of-its-kind case. It

then used two broad criminal statutes – conspiracy and false statements – and a statute that does

not apply to law enforcement officers at all (illegal possession of machine guns) to

simultaneously create and enforce standards that go beyond the statute and regulation governing

machine guns. Notably, there is a provision under the Gun Control Act that provides for false

statements – but the difference is that it must be a false statement in a record required by the law.

*See* 18 U.S.C. § § 5861. However, the Government is not charging Wendt with that nor alleging

he violated the regulation at all. The Government did not charge Wendt with the prohibited acts

contemplated by Congress regarding the Gun Control Act. Nor did the Government call a single

ATF witness who was involved in the review or consideration of machine gun transfers in this

case. Wendt has raised these issues in his motion to dismiss and then reraised them in his trial

brief and proposed jury instructions.[6]

All the charges against Wendt rely on inaccurate descriptions of the legal requirements at

issue in this case:

### A.     The "Official Use" Requirement

*First*, Section 922(o) does not contain any requirement of "official use." Section 922(o) is

short, simple, and easily understood on its face.  For present purposes, it banned Wendt's

---

[6] Wendt references Jury Instruction Nos. 16, 17, 18, 19, 20, 21, 22, 24, 26, and 29.

possession of a post-May 1986 machine gun registered to the APD unless such possession is by

or under the authority of the APD.  Nothing more:

> (1)     Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

> (2)     This subsection does not apply with respect to….possession by or under the authority of….a State, or a department, agency, or political subdivision thereof.

*See,* 18 U.S.C. 922(o).  There is, of course, no mention of "official use" anywhere within §

922(o).

*Second*, the term "official use" should not have been included in the Instruction Nos. 26

and 29. Instruction No. 26 was entitled, "Authority & Official Duties of the Adair Police

Department," and it instructed the jury - in direct contravention of Section 922(o) and over

Wendt's objection - that APD. could "lawfully acquire and possess NFA machine guns <u>for</u>

<u>official use</u> (emphasis added)."

Instruction 29 was entitled, "Count 15: Possession of a Machine Gun – Government

Authority Defense," and it similarly included - over Wendt's objection - multiple improper

references to the official use of the M60 in order for Wendt to come within the statutory defense:

> An employee or agent of a governmental entity is authorized by that entity to possess a machine gun so long as his or her possession within the scope of his or her <u>official duties.</u>
>
> * * * *
>
> To determine whether the defendant had the authority, or reasonably believed he had the authority, to possess the machine gun, you must consider whether his possession on the date in question was <u>within the scope of his official duties</u> as an officer of the [APD].

(emphasis added).  Thus, it was error for the Court to add requirements to the jury instructions that

are found nowhere in the controlling statute or applicable law.

*Third*, 27 C.F.R 479.105(c) cannot save the jury instructions. Throughout the Court's

consideration of the jury instructions, both the parties and the Court were primarily focused on

Section 922(o), a statutory section of the Gun Control Act, and 27 C.F.R. 479.105, a regulatory section under a completely different statute, the National Firearms Act.[7]  While Section 479.105(c) was the basis of the Court's "official use" instructions as it is the only place those words are even found, that section has no bearing on Wendt or the M60.

Section 479.105(c) is entitled, "Importation and Manufacture," so it unsurprisingly limits its application to just that, and not APD's or anyone's ongoing possession or use of a machinegun:

> ….[I]mporters and manufacturers qualified under this part may import and manufacturer machineguns on or after May 19, 1986 for sale or distribution [to the government] or for use….as sales samples as provided in paragraph (d)….The <u>registration</u> of such machineguns….<u>and their subsequent transfer</u> shall be conditioned upon and restricted to the sale or distribution of such weapons <u>for the official use</u> [of the government].

*See,* 27 C.F.R. 479.105(c) (emphasis added).  Thus, on its face, Section 479.105(c) is limited to the "registration" and the "transfer" of machine guns.  As a result, a police department may only have such guns transferred to it for its official use, but it has nothing whatsoever to do with their ongoing possession and use subsequent to such transfer/acquisition.

This, of course, makes sense since the National Firearms Act is a <u>taxation</u>, <u>registration</u>, and <u>transfer</u> statute. *See,* 26 U.S.C. 5861 (banning, for example, (b) possessing a firearm <u>transferred</u> in violation of the NFA, (d) possessing a firearm that is not <u>registered</u> to the possessor, (e) <u>transferring</u> a firearm in violation of the NFA, etc.).  As with any other firearm, once a machine gun is lawfully acquired by its transferee, they are free to do whatever they wish with it as long as such is lawful (for instance, a gun range can rent its registered machine guns to its patrons to use under its supervision), and the APD is no different than any other transferee in that regard.

---

[7]     The Government and the Court were using Section 479.105, but Wendt was objecting to its use.

Therefore, once the APD lawfully had the M60 transferred to it, consideration of the proper possession of the gun reverts right back to where the analysis began, Section 922(o), which permits possession by Wendt under the authority of the APD and nothing more.  The Court erred by including the additional requirement of "official use" in the instructions to the jury.

To be valid, regulations must be consistent with the statute under which they are promulgated. *See, U.S. v. Larionoff*, 431 U.S. 864, 873 (1977); *First Nat'l Bank v. National Ban of South Dakota,* 607 F.2d 708, 712 (8th Cir. 1981).  An agency's interpretation cannot supersede the language chosen by Congress or alter or amend a law of Congress.  *See, Mohasco Corp. v. Silver*, 447 U.S. 807, 825, (1980).  Regulations that are inconsistent with a statute must be set aside as contrary to law.  *Sikeston Production Credit Asso. v. Farm Credit Admin.,* 647 F.Supp. 1155, 1163-64 (E.D. Mo. 1986).[8]

The APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See, Second Amendment Found., Inc. v. BATFE*, 2023 U.S. Dist. LEXIS 202589 (N.D. Tx. 2023); quoting 5 U.S.C. § 706(2)(C).  "Even when acting within its authority, an agency is constrained by the language of the statute it must administer and may not rewrite or redefine terms in a way that contradicts the original statute." *Id.*, *citing; Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (*citing Massachusetts v. EPA*, 549 U.S. 497, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007)).

Here, Section 479.105 is essentially a complete rewriting and disregard of the clear and unambiguous statute passed by Congress (Section 922(o)), and it is void as a matter of law.

---

[8]     It should again be noted that Section 479.105 is a National Firearms Act regulation and not a Gun Control Act regulation.  Section 922(o) is, of course, found in the Gun Control Act.

Thus, it was error for the Court to include any of its language (including regarding dealer sales samples or demo letters) in ANY jury instructions, not just those regarding Count 15.

*Fourth*, an "official use" requirement cannot be added to the statute. During trial, the parties and the Court discussed the instructions for Count 15 on multiple occasions. The Government repeatedly insisted on an "official use" instruction, and Wendt repeatedly objected to such. The Court ultimately sided with the Government based on its belief there must be some kind of "official use" requirement. But the statute must be strictly construed:

> A criminal statute is to be construed strictly, not loosely. Such are the teachings of our cases from *United States v. Wildberger*, 5 Wheat. 76, down to this day. Chief Justice Marshall said in that case: "The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.

*See, United States v. Boston & M. R.R.,* 380 U.S. 157, 160 (1965). Thus, the term "official use" cannot be added as a requirement into Section 922(o).

*Fifth*, the post-1986 restriction stamped on transfer forms does not impose an "official use" requirement for possession. As previously noted, federal law regarding machine guns underwent a dramatic change in 1986 that created the distinction between fully transferrable pre-May 1986 machine guns and transfer-restricted post-May 1986 machine guns. Given the fact that the registration, transfer, and possession laws between the two differed in virtually every aspect, ATF needed to identify which machine guns were subject to which set of laws. Thus, it created a stamp to let the public know which machine guns were which:[9]

---

[9] This language was originally a rubber stamp. It is now placed electronically, but the language and point is the same – to let people know that the machine gun at issue is a post-May 1986 machine gun. Public Law 99-308 is FOPA, so this is merely a reference to Section 922(o) as created by FOPA.

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

Control Number:  2021676111

---

### RESTRICTIONS

| Line No. | |
|---|---|
| 1 | RESTRICTED REGISTRATION-Possession limited to continued compliance with provisions of Public Law 99-308. |

*See, e.g.,* GX 247.  The Government, however, argued, and the Court accepted, that this restriction somehow imposes an "official use" requirement on post-May 1986 machine guns that is found nowhere in the law.  While this argument makes no sense as it is circular (possession is limited to compliance with the law - but that goes without saying as to Public Law 99-308 and every other applicable law), it is also directly contrary to ATF's own guidance on the issue:

> A licensee can identify these machineguns [post-1986 machineguns] from the restriction stamped in the approval block of the registration form. The restriction reads:  RESTRICTED REGISTRATION – Possession limited to continued compliance with provisions of Public Law 99-308.
>
> * * * *
>
> Enacted in 1986, 18 U.S.C. 922(o) prohibits the possession, transfer, and importation of machineguns not lawfully registered as of May 19, 1986, with certain exceptions.  Machineguns (commonly termed as "post-1986" machineguns) may be possessed by Government agencies [with no mention whatsoever of official use] or by qualified FFLs for use as sales samples based on criteria in 27 CFR § 479.105.   This restriction is stamped on the forms as "RESTRICTED REGISTRATION – Possession limited to continued compliance with provisions of Public Law 99-308"   As noted, this restriction applies to any machinegun manufactured or imported subsequent to enactment of 18 U.S.C. 922(o).

*See,* ATF FFL Newsletter, August 1998, Page 3 and FFL Newsletter, February 2011, Page 8 (emphasis added).  Accordingly, a ministerial identification stamp that merely delineates between pre and post-1986 machineguns cannot possible provide any legal basis for including an "official use" requirement under Section 922(o) in the Count 15 jury instructions.

Accordingly, as a matter of law, Section 922(o) does not contain any requirement of "official use," and one cannot be imposed based on Section 479.105, the Court's feelings, or a literal "rubber stamp" that merely lets people know what machineguns are what.  Section

479.105 is also void as a matter of law, both as to Count 15 and all counts having anything

whatsoever to do with demo letters or Section 479.105(d) (Counts 4-14).

*Sixth*, as contemplated by the federal statute, Iowa state law authorizes the "possession"

of machine guns by police officers and dealers. The State of Iowa identifies a machine gun to be

among a category of weapons it labels "offensive" weapons. Iowa Code § 724.1. The State

authorizes certain individuals to possess such weapons:

> Any of the following persons or entities is authorized to possess an offensive
> weapon when the person's or entity's duties or lawful activities require or permit
> such possession:
> a.      Any peace officer
> . . . .
> e.      Any person who under the laws of this state and the United States, is
> lawfully engaged in the business of supplying those authorized to possess such
> devices.

Iowa Code § 724.2(1). Notably, the law does not limit the authority to possess only those

machine guns registered to you or your employer or make any other type of distinction. Nor does

it limit when or where within the State of Iowa. Rather, the only limitation is whether you are not

otherwise violating the law with it.

In addition, the State of Iowa provides for the ability to obtain a "permit" to carry

weapons.

> A person may be issued a permit to carry weapons when the person's employment
> in a private investigation business or private security business licensed under
> chapter 80A, or a person's employment as a peace officer, correctional officer,
> security guard, bank messenger or other person transporting property of a value
> requiring security, or in police work, reasonably justifies that person going armed.
> . . . .
> A permit so issued, other than to a peace officer, shall authorize the person to
> whom it is issued to go armed anywhere in the state, only while engaged in the
> employment, and while going to and from the place of employment.
>
> A permit issued to a certified peace officer shall authorize that peace officer to go
> armed anywhere in the state at all times, including on the grounds of a school.

Iowa Code § 724.6. Wendt was both a certified police officer (with a professional permit to carry weapons) and a licensed dealer. When read together, it is impossible to say Wendt did not have the authority to have the machine gun in question on April 16, 2022.

**B.      The So-Called "Purchase Law Letter" Requirement**

*First*, section 922(o) does not contain any requirement of "official use" or "not for resale." Just as with Count 15, Section 922(o) is short, simple, and easily understood on its face. For present purposes, it permits the APD to purchase post-1986 machineguns with no further requirements whatsoever, period. 18 U.S.C. 922(o).  There is, of course, no mention of "official use" or "not for resale" anywhere within § 922(o), and any instruction to the jury in that regard was error.

*First*, the Instruction Nos. 16 and 24 should not have included "official use" and "not for resale." Instruction No. 16 was entitled, "Making False Statements To The ATF Via Purchase Law Letters," and it instructed the jury - in direct contravention of Section 922(o) and over Wendt's objection - that Wendt made certain statements on "purchase law letters" with respect to the fact that the MP7s were for the official use of the APD and not for resale.

Instruction No. 24 was entitled, "Law Letters," and it similarly included - over Wendt's objection - multiple improper references to the so-called official use requirement for the APD to purchase the MP7s:

> The registration of such NFA machineguns and their subsequent transfer is conditioned upon and restricted to the sale or distribution of such weapons for the official use of Federal, State, or local governmental entities.

> This kind of transfer requires the applicant , among other things, to submit information to the ATF establishing that a law enforcement agency wants to purchase the NFA machinegun for the agency's official use.

> One of the ways the applicant may submit this information is through a letter that has sometimes been referred to in the case as a "purchase law letter."

The applicant also may submit this information in the form of a purchase order or some other submission that the ATF determines to be satisfactory to establish that the agency wants to purchase the NFA machinegun for the agency's official use.

If the application is approved and the NFA machinegun is transferred to the law enforcement agency, possession of that machinegun is restricted to official use by the law enforcement agency.

Thus, it was error for the Court to add requirements to the jury instructions that are found nowhere in the controlling statute or applicable law.

*Second*, the Government's case depends on these false interpretations. The Government clearly does not like what Wendt has done. It certainly never contemplated that anyone would be both the Chief of Police of the purchasing police department and the owner of gun store. Such, however, does not justify the Government's repeated and intentional conflating of unrelated things in order to make the law what it wishes.

Post-1986 machineguns may be either domestically manufactured or imported.  As to the former, no paperwork at all is required for a police department to purchase such machineguns other than an approved Form 5 from the transferor to the department.  It was uncontroverted at trial that a Chief of Police can merely call up anyone who has machineguns and say, "please send me machineguns." That person then submits a Form 5 to the ATF NFA Branch, and once the form is approved, the transferor is free to send the machineguns.  All of the experts (Swift, Funk, and Vasquez) agreed with this reality, but that is not what happened in Count 3 which involved the import of the MP7s into the United States. *See,* GX 251 (the so-called purchase law letter attached to an ATF Form 6 import application and not and ATF Form 5 transfer application).

As to an import, however, there is an additional step that must occur to get the machineguns into the United States.  In 1968 when Congress passed the Gun Control Act to,

among other things, ban the importation of certain firearms, it also amended the National

Firearms Act to include a provision with respect to the importation of machineguns:

> No [NFA] firearm shall be imported….into the United
> States….unless the importer establishes, under regulations as may
> be prescribed by the Secretary, that the firearm to be imported or
> brought in is – (1) <u>being imported or brought in for the use</u> of the
> United States or….any State of political subdivision thereof.

*See,* 26 U.S.C. 5844; Public Law 90-618 (October 22, 1968) (emphasis added).[10]  Thus, post-

1986 machineguns can only be imported for the "use" of a police department like the APD, not

its "official use" as argued by the Government and instructed by the Court, but there is no

statutory guidance about how the importer is to establish such fact.

ATF, however, then executed its Congressional charge by implementing a regulation to

put some meat on the proverbial bones of the statute.  Specifically, ATF created a procedure

(literally called "Procedure") to import post-1986 machineguns like the MP7s, and just like the

controlling statute, this procedure does not require the "official use" of the police department or

anyone else:

> No firearm shall be imported or brought into the United
> States….unless the person importing or bringing in the firearm
> establishes to the satisfaction of the Director that the firearm to be
> imported or brought in is being imported or brought in for:
>
> (1)      The <u>use</u> of the United States….or any State or possession or
> any political subdivision thereof.

*See,* 27 C.F.R. 479.111(a) (emphasis added).

The regulation then goes on to explain how the importer accomplishes this task,

specifically by submitting to the ATF Imports Branch (who unsurprisingly oversees imports), and

---

[10]      Of incredible significance for this case is the fact that Congress specifically included the necessary language to empower ATF to draft 27 C.F.R. 479.111, the implementing regulation that resulted from such empowerment.  That is the exact language that is lacking in 18 U.S.C. 922(o), thus rendering 27 C.F.R. 479.105 invalid as a matter of law as otherwise discussed herein.

not the ATF NFA Branch (who unsurprisingly oversees NFA transfers), whatever information it wishes along with its Form 6 import application that it believes constitutes a, "detailed explanation of why the importation of the firearm falls within the standards set out in this paragraph." *Id.* That is it, nothing more, and there is certainly no requirement of a made-up-by-the-Government "purchase law letter" that states that the import is for anyone's "official use." Then, once the Form 6 has been approved, the importer can import the machinegun into the United States which has nothing whatsoever to do with transferring the machinegun to anyone including the APD.

As noted above, throughout the Court's consideration of the jury instructions, both the parties and the Court were primarily focused on Section 922(o), a statutory section of the GCA, and 27 C.F.R. 479.105, a regulatory section of the NFA. Just as Section 479.105(c), however, was improperly the basis of the Court's "official use" instructions for Count 15, it was also the improper basis of the Court's "official use" instructions for Count 3.[11]

*Third*, there is no "not for resale" requirement. The second error with the Court's instructions regarding Count 3 is the inclusion of yet another nonexistent legal requirement of "not for resale."[12] As clearly set forth above, the entirety of requirements that apply to the APD's purchase of the MP7s can be found in 18 U.S.C. 922(o), facially invalid 27 C.F.R. 479.105, 26 U.S.C. 5844, and 27 C.F.R. 479.111, and nowhere within any of this - or anything else - is there a legal requirement of anything being "not for resale." Thus, even putting aside the fact that the APD was not purchasing the MP7s for resale, but rather to replace certain older

---

[11] Wendt incorporates his arguments regarding the facial invalidity of Section 479.105, the Court's beliefs about an "official use" requirement, and the Public Law 99-308 language, as they all equally apply here.

[12] While there was testimony at trial about H&K, German export law, non-legal things or paperwork that H&K may or may not require, etc., none of that can have any bearing whatsoever on a criminal prosecution by the Government for the alleged criminal violation of a statutory legal requirement.

models, neither a criminal prosecution nor a jury instruction can properly be based on nonexistent legal requirements.

### C.      The Demonstration Law Letter Requirement

Counts 6 and 8-14 of the Indictment alleged that Wendt illegally requested BW Outfitters to obtain certain machineguns for demonstration to the APD.  The jury was instructed regarding these counts via Instruction Nos. 17-19 and 21-26.  Such instructions, however, do not properly state the law, and the Court erred in giving them to the jury.

*First*, section 922(o) does not permit gun dealers to acquire machine guns for purposes of demonstrations. Just as with Counts 3 and 15, Section 922(o) is short, simple, and easily understood on its face.    For present purposes, however, it has nothing whatsoever to do with demo letters and gun dealers acquiring post-1986 machineguns for purposes of demonstration. In fact, it specifically prohibits such conduct:  "….it shall be unlawful for any person to transfer or possess a machinegun." *See,* 18 U.S.C. 922(o)(1).  This, of course, begs the question of where demo letters came from and how Wendt was prosecuted for making use of them.

*Second,* ATF created demonstration letters after section 922(o) was enacted. After Congress passed FOPA and Section 922(o) was enacted in 1986 to ban post-1986 machineguns other than to law enforcement agencies, ATF decided to take further action regarding machineguns despite any language in the statute empowering it do so.  Specifically, it promulgated a temporary rule to implement the provisions of FOPA:

> This temporary rule implements provisions of Pub. L. 99-308 and Pub. L. 99-360, which amend several provision of the Gun Control Act of 1968[13]….Some of the new statutory provisions which necessitated regulation changes are….(10) Effective May 19, 1986, the possession or transfer of a machinegun is prohibited except for (a) a transfer to or by, or possession by or under the authority of, Government entities, or (b) any lawful transfer or lawful possession of a machinegun lawfully possessed before May 19, 1986.

---

[13] Public Law 99-360 relates solely to an unrelated provision regarding the interstate transportation of firearms.

*See,* 21 Fed.Reg. 39612 (October 29, 1986).  The rule was then finalized in March 1988, and

479.105(d) and its procedure for a gun dealer to obtain machineguns for demonstrations was born.

 *Third*, section 479.105(d) is directly contrary to section 922(o). Section 922(o) is clear in

its language and effect, and it bans post-1986 machineguns other than transfers to or possession

by law enforcement agencies:

> Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to — (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof;

*See,* 18 U.S.C. 922(o).  What this section does not do is provide any mechanism for a gun dealer

to obtain a post-1986 machinegun for purposes of demonstration.  Nor does it contain any

language that empowers ATF to promulgate any regulations beyond, perhaps and for example,

those that might relate to a new form to effectuate a transfer of a machinegun to a law

enforcement agencies.[14]

 Then, despite the lack of any statutory mandate or legal authority to do so, ATF took it

upon itself to create out of whole cloth an entire system whereby gun dealers such as BW

Outfitters can obtain post-1986 machineguns to demonstrate to law enforcement agencies such as

the APD:

> (e) ***Dealer Sales Samples***.  S*ubject to compliance with the provisions of this part, applications to transfer and register a machine gun manufactured or imported on or after May 19, 1986, to dealers qualified under this part will be approved if it is established by specific information the expected governmental customers who would require a demonstration of the weapon, information as to the availability of the machine gun to fill subsequent orders, and <u>letters from governmental entities expressing a need for a particular model or interest in seeing a demonstration of a</u>

---

[14] The question of where machine guns that law enforcement agencies want might come from is immaterial for present purposes.  Congress did what it did, and neither ATF nor this Court is free to counteract it.  One easy answer, however, is that such agencies can manufacturer their own machine guns which they could then also sell to other agencies.

<u>particular weapon</u>. Applications to transfer more than one machine gun of a particular model to a dealer must also establish the dealer's need for the quantity of samples sought to be transferred.

*See,* 27 C.F.R. 479.105(d) (emphasis added). Even putting the lack of implementing language aside, however, it is simply not possible to conclude that the NFA regulation promulgated by ATF has any relationship whatsoever to the GCA statute that it purportedly arises out of. Nevertheless, ATF created the law letter system, and with ATF's full knowledge, involvement, consent, and approval, hundreds of thousands of machineguns have been transferred to and from thousands of gun dealers on law letters for the last 35+ years….all without any proper legal basis.

*Fourth*, the Government's prosecution cannot stand because without ATF's illegal law letter system the law letters that formed the basis of the prosecution would never have existed. Accordingly, as previously noted, to be valid, regulations must be consistent with the statute under which they are promulgated. *See, U.S. v. Larionoff*, 431 U.S. 864, 873 (1977); *First Nat'l Bank v. National Ban of South Dakota,* 607 F.2d 708, 712 (8th Cir. 1981). An agency's interpretation cannot supersede the language chosen by Congress or alter or amend a law of Congress. *See, Mohasco Corp. v. Silver*, 447 U.S. 807, 825, (1980). Regulations that are inconsistent with a statute must be set aside as contrary to law. *Sikeston Production Credit Asso. v. Farm Credit Admin.,* 647 F.Supp. 1155, 1163-64 (E.D. Mo. 1986).

The APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See, Second Amendment Found., Inc. v. BATFE*, 2023 U.S. Dist. LEXIS 202589 (N.D. Tx. 2023); quoting 5 U.S.C. § 706(2)(C). "Even when acting within its authority, an agency is constrained by the language of the statute it must administer

and may not rewrite or redefine terms in a way that contradicts the original statute." *Id.*, *citing;*
*Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007) (*citing Massachusetts v. EPA*, 549
U.S. 497, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007)).

*Fifth*, even putting all of this aside, Instruction Nos. 17 and 24 were not correct.
Instruction No. 17 was entitled, "Demonstration Law Letters," and it twice instructed the jury -
in direct contravention of Section 479.105(d) and over Wendt's objection - that a machinegun
obtained by BW Outfitters on a demo letter signed by Wendt as Chief of Police must be "for
future potential purchase" by the APD.

Instruction No. 24 was entitled, "Law Letters," and it similarly included - over Wendt's
objection – reference to the fact that a demo machinegun may only be obtained by a gun dealer at
the request of a police chief, "for the agency's future possible purchase."

Section 479.105(d), however (and while invalid on its face), contains no such language or
requirement, instead only calling for: "letters from governmental entities expressing a need for a
particular model or interest in seeing a demonstration of a particular weapon (emphasis added)."
Now does ATF's own guidance that it put forth over the years:

> Thus, an application to transfer a post-1986 machinegun to a Federal firearms
> licensee and special (occupational) taxpayer must be submitted with a "law letter"
> evidencing a government agency's interest in a particular machinegun….The NFA
> Branch will look for the following information in the letter….identification of the
> agency's interest in the machinegun (for example, purchase, or demonstration).

*See,* DX 1029, ATF Open Letter, November 10, 1999 (emphasis added).

> Subject to compliance with the provisions of 27 CFR 179.105(d), applications to
> transfer and register a machinegun manufactured or imported on or after May 19,
> 1986 to dealers qualified under this part will be approved if it is established by
> specific information that….governmental entities express in the form of a letter, a
> need for a particular model or interest in seeing a demonstration of a particular
> weapon.

*See,* ATF Open Letter (July 30, 2002) (emphasis added).

Accordingly, there is absolutely no requirement in the law, the regulations, or ATF's own guidance that a post-1986 machinegun obtained by a gun dealer at the request of a police chief on a demo letter be for possible or potential purchase by the police department, and it was error for the Court to add such requirements to the jury instructions.

## V.      THE CHARGES WERE UNCONSTITUTIONALLY VAGUE

In addition, the charges against Wendt were unconstitutionally vague.[15] The only court to have dealt with these issues dismissed the case as unconstitutionally vague. In *United States v. Vest*, 448 F. Supp.2d 1002, 1004 (S.D. Ill. 2006), the Government charged Vest, who was an Illinois State Trooper and lead rifle instructor for the Illinois State Police, with knowingly possessing a machine gun, in violation of 18 U.S.C. 922(o), knowingly possessing a machine gun transferred in violation of 26 U.S.C. 5812, 5861(b) and 5871, and knowingly possessing a machine gun not registered to him in the National Firearms Registration and Transfer Record. As an initial matter, the court observed the following:

> Everyone can likely agree that the proper definition of who is to legally possess what kind of gun is not properly bestowed upon prosecutors, the judicial system or members of a jury. In a democracy which prides itself on the rights of due process, fair notice and warning, a particular situation has arisen that calls for the adherence to constitutional fundamentals.

*Id*. at 1003. The court determined it would be "inappropriate to allow the case to proceed on the merits, as it deems the statutes discussed within are unconstitutionally vague as applied to Vest." *Id*.

Apparently, when he was assigned as an equipment officer, Vest ordered a machine gun. *Id*. The machine gun was registered to the Illinois State Police and the government's theory was

---

[15] Further, the rule of lenity has long required a court to resolve any statutory ambiguity in favor of Wendt. *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *United States v. Wiltberger*, 18 U.S. 76, 93 (1820).

that Vest illegally seized Illinois State Police letterhead to compose a letter to acquire the machine gun. *Id*. As such, the government claimed Vest lacked the authority to purchase the machine gun on behalf of the Illinois State Police and therefore illegally possessed the machine gun. Vest, on the other hand, claimed he had inherent authority to legally possess it. *Id*.

Vest argued that without the requisite criminal intent present in the statutes, charging him with knowing possession of a machine gun when possession is an inherent part of his employment was unconstitutional. *Id*. at 105. He contended that the "under the authority" phrase is capable of differing interpretations and thus failed to give law enforcement officers proper notice of what behavior is prohibited. *Id*. at 106. "Vest posits the question: how do officers know when they have proper authority? Further, what *constitutes* authority?" *Id*. The court held this "lack of a structured definition for what constitutes proper 'authority' under the law enforcement exception is what makes the statutes susceptible to arbitrary enforcement." *Id*. Vest noted there had not been a prosecution of a police officer for possession of a machine gun under § 922(o) in the 20 years since the enactment of the statute. *Id*. at 107.

"Due process requires that a penal statute be sufficiently definite to give notice to a person of ordinary intelligence of the prohibited conduct, in order for that person to conform his or her conduct within the proscribed legal confines." *Id*. at 107. The court noted: "one may challenge the constitutionally of a penal statute based upon the argument that the statute is vague, as the 'vagueness doctrine incorporates notions of fair notice or warning.'" *Id*. (quoting *Smith v. Groguen*, 415 U.S. 566, 572-73 (1974)). A penal statute may be void for vagueness for two different reasons: (1) "a statute may be unconstitutionally vague if it fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or (2) "[a] statute may also be unconstitutionally vague if it fails to provide explicit standards to prevent arbitrary

and discriminatory enforcement by those enforcing the statute." *Id.* at 108 (internal quotations and citations omitted).

First, the court held the statute was unconstitutionally vague because 922(o) was not designed to apply to police officers" but rather its purpose was "to eliminate the use of machine guns and other various weapons used in crimes." *Id.* at 1011. In making this ruling, the court reviewed the legislative history which is on point with this case:

> In a colloquy put on the record, Senator Dole inquired about the law enforcement exception to § 922(*o*), stating that it is "somewhat ambiguous language." During his response, Senator Hatch stated that "[a]ny local police would be specifically covered by the language in this [law enforcement exception] provision permitting the transactions and possession to or by or under the authority of a subdivision of a State." Another explanatory statement made by Senator Hatch which the Court feels is particularly insightful when discussing the law enforcement exception was: "This amendment was designed to deal with *crime guns,* not weapons used to fight crime on a domestic or international scale."

> [. . .]

> **Mr. DOLE.** The language of this new section intends that a machine gun may be transferred under the authority of a State or a subdivision thereof. The House purposely did not choose to use the language "on behalf of" such an agency or subdivision, which is language contained in other provisions of current gun law. Could this be read to permit a State or local police force to authorize its officers to purchase for themselves a machine gun which they might use in the line of their law enforcement work but which would be owned by the officer, not the police force itself?

> **Mr. HATCH.** The Senator makes a good point. Some police forces with financial difficulties have authorized their officers to purchase and register automatic weapons to prevent themselves from being outgunned if they should ever confront well-armed drug dealers or organized criminals. This language appears to encompass that practice. *It seems to me, however, that under these circumstances regulations would be necessary to govern disposition of those weapons in the event the officer leaves the police force. In other words, possession or transfer of those weapons would cease to enjoy the authorization of the State agency or subdivision when the officer was no longer on the police force.* The police force would then have to exercise its authority to guarantee that the machine gun was transferred to another entity authorized by the State or the United States to possess such weaponry.

*Id.* at 1010-11 (cleaned up) (emphasis in original). It should be noted that this discussion hearkens back to Iowa Code § 724.2(1) which permits a law enforcement officer to possess a machine gun within the State of Iowa so long as that officer is not otherwise violating the law with it.

Second, the court also held that the statute was unconstitutionally vague because it allowed for arbitrary enforcement. *Id.* at 1012. The court noted "[t]he Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'" *Id.* (internal quotation and citation omitted). The court explicitly reasoned "because there is not a statutory definition of authority for Vest, it will be left to the jury to ultimately determine what type of authority is proper and whether Vest therefore had the proper authority in order for the law enforcement exception to exonerate him." *Id.* The court found that "§ 922(o)(2)(A) allows for arbitrary enforcement because it allows the prosecution to essentially define the criminal behavior." *Id.* Further, the court explicitly rejected the government's argument that the law enforcement exception was only meant to apply to law enforcement officers *in the performance of their official duties*. *Id.*

## VI.      THE EVIDENCE WAS INSUFFICIENT[16]

### A.      The Government's Case

The Government's case was based on scaring jurors about guns and hiding the ball on what really mattered. The Government took every opportunity to bring in guns to persuade the jury – some one by one for effect and others in groups. In fact, the Government even started off its case not with the case agent or some other witness to lay out the basics of the case but, instead, with the minigun. Indeed, you might say the minigun was the Government's star witness. This was despite the fact that Wendt did not acquire a minigun during this case and despite the fact that, during this case, the ATF turned around and granted him a license to make as many as he wished without any further approval of the ATF.

The Government admitted the paperwork related to the transfer applications and had some of the people from the companies on the other side of those transactions testify. Notably, none of these individuals claimed anything wrong with the transactions. The Government did not call former Co-Defendant Robert Williams and the other alleged co-conspirator, Jonathan Marcum, testified clearly that he did not believe either himself or Wendt ever made a false statement to the ATF or intended to brake the law in any way. Rather, the Government relied on cutting and pasting together Facebook messages from Wendt's 45,000 page Facebook Account.

Regarding the machine gun shoot that was the basis for the illegal possession charge, the Government relied on the following: The M60 was purchased by Wendt for the Adair Police Department. The Government then had the current Mayor testify that Wendt was not paid by the City of Adair the day of the machine gun shoot. And the Government had two Omaha police officers testify whom the ATF had go to the machine gun shoot in an undercover capacity. They

---

[16] Wendt does not yet have access to the transcript.

testified that the shot some of the machine guns and that the M60 was there, but they did not

know if they shot it or if it was even shot at all that day. And while they say they did not

recognize any law enforcement besides Wendt there, they admitted they would not recognize

local law enforcement as they are not from the area.

The Government's case is most notable for what it did not include, though. The

Government did not call anyone from the City of Adair who was there when Wendt was

approved to acquire machine guns. Nor did the Government call a single state or local officer

from Iowa who came in and said there was any problem or concern with Wendt's activities or

conduct in this case. Mostly importantly, the Government did not call a single ATF witness who

was involved in the machine gun transfers – not the examiners, their supervisors, or the branch

heads. In fact, the Government did not even call the ATF case agent. Rather, the only ATF

employees it called as witnesses (aside from a few who had minor roles taking pictures at search

warrant locations), were two experts (William Swift and Austin Funk). However, neither of these

individuals were in their positions at the time in question. More importantly, both of them

contradicted the Government's positions in certain keys aspects – such as no additional

documentation being needed for a transfer of a machine gun to a law enforcement agency

(despite the Government's position about a so-called "purchase law letter" requirement), and the

"restricted registration" on the transfer applications only serving to designate the machine gun as

a post-1986 machine gun and not some kind of subsequent use restriction. Finally, the ATF

experts only stated that the lack of inclusion of the Government's charged language "could" have

resulted in an ATF denial of the transfer application.

### B.    The Defense Case

The defense not only put on a case but in many respects put on a more robust case than

the Government. From the relevant time period, the defense called two Adair City Council

members, the Mayor, the City Clerk, and the City Attorney. They established that Wendt had the authority to purchase machine guns with his own money for the benefit of the City of Adair. In addition, they established that they knew this would include demonstration letters. Though, it is important to note Wendt did not even need City approval to write demonstration letters. The Mayor, who himself was a former career law enforcement officer, testified that, as Police Chief of Adair, Wendt was always considered to be "on duty." This was underscored by other witnesses who testified that Wendt was always the Police Chief and, as Police Chief, was in a uniquely responsible role of always being responsible for that position.

Regarding the machine gun shoot, the defense called all the relevant witnesses. The defense called BW Outfitters Manager, Sam Peterson, who testified and demonstrated through exhibits that neither BW Outfitters, Wend, or Williams ever made money at the machine gun shoot and that it was never the idea to make money from it. Further, the defense called numerous law enforcement officers from Iowa: Ray Ohl, Shelby County Sheriff's Deputy; Royce Kemmen, Retired Lakeview Police Chief; Mitch Flaherty, Harrison County Chief Deputy; and Kevin Ewing, Monona County Sheriff. These witnesses established that law enforcement from the area were involved in the machine gun shoot, allowed to shoot for free, and that it was important training for them. In addition, the defense even called State Senator, Jason Schultz, who was the State Senator representing the district where the machine gun shoot was held and whom attended the machine gun shoot as well as participated in it. Senator Schultz testified how it even provided him with knowledge important to his role in the State Senate.

Also, the defense called its own expert, former ATF employee Rick Vasquez, who testified regarding the practice and requirements regarding the transfer of machine guns. His testimony was consistent with and supported the defense positions set forth above.

Wendt took the stand himself and explained every application to transfer a machine gun as well as the purpose of the machine gun shoot. Wendt also completely rebutted the Government's theory that he got his FFL-SOT for the purpose of acquiring machine guns (not true, it was to acquire silencers because of the change in state law) and that he became Police Chief of Adair to write law letters (not true, the undisputed evidence was that the City of Adair approached Wendt about becoming Police Chief). Further, Wendt's testimony and the other evidence established that he only sold four machine guns for a total profit of less than $50,000; that he attempted to sell two more for a total of approximately $30,000 but returned the money when it became apparent the ATF was not going to approve it; and that he only purchased 10 total machine guns for the Adair Police Department and 13 total machine guns for BW Outfitters. Further, the evidence showed every single one of those machine guns was where it was supposed to be when federal law enforcement showed up unannounced on August 31, 2022. In addition, the ATF approved all of the transfers in question (with the exception of the minigun which the ATF subsequently approved Wendt to acquire) and had all of the relevant information before doing so. Lastly, Wendt received no improper benefit (nor intended to receive any improper benefit) from writing demonstration law letters to alleged co-conspirators Marcum and Williams.

In addition to the legal errors Wendt identifies above, Wendt also respectfully notes his objections to the exclusion of certain key piece of evidence at trial.[17] First, Wendt was not allowed to admit internal ATF communications regarding Wendt and the transfers at issue. Second, Wendt was not allowed to admit evidence of ATF's approval of his license to manufacture machine guns. Third, Wendt was not allowed to admit evidence of ATF's evolving

---

[17] Wendt does not intend to waive any objections at this time; rather, Wendt preserves any and all objections until appeal.

positions on the interpretations of the regulations. For example, Wendt was not allowed to admit into evidence or question the ATF experts regarding the ATF open letter/guidance issued in 2023 with the express stated purpose of clarifying the requirements for machine gun transfers. Fourth, Wendt was not allowed to admit evidence of the City of Adair's position that Wendt had not abused his position of trust or in any other way violated the code of conduct for his position. This error is underscored by the fact that the City of Adair has decided to continue to want him to be its Chief of Police – specifically, on February 16, 2024, the City Council met to determine what to do in light of the jury's verdict and decided not to terminate him but instead put him on leave pending appeal.

### C.      The Verdict

After almost ten hours of deliberations over two days and submitting a question indicating they were every trouble reaching a consensus, the jury rendered a split verdict in this case.

### 1.      Conspiracy to Make False Statements (Count 1)

On Count 1, the jury found Wendt guilty of conspiracy to make false statements to the ATF and not guilty of conspiracy to defraud the ATF. With respect to co-conspirators, the jury found the two people with whom Wendt conspired in this regard to be Robert Williams and Jonathan Marcum. This apparently limited the jury's finding to a conspiracy (or two conspiracies) involving the demonstration letters.

*First*, this charge must be set aside for all the reasons the false statement counts must be set aside as explained below.

*Second*, Marcum clearly testified that he did not believe either he nor Wendt ever made a false statement to the ATF or intended to break the law in any way. Rather, Marcum was clear that he thought they were both following the law and ATF's purported requirements.

*Third*, Williams did not even testify. With regard to him, the conspiracy appears to be based on Wendt writing demonstration letters for machine guns Wendt did not have a sufficient intention to purchase. As explained below, that theory cannot sustain a verdict.

*Fourth*, Wendt never received nor intended to receive any improper benefit from the demonstration letters he wrote to Marcum or Williams.

*Fifth*, the underlying false statement charges are unconstitutionally vague and Wendt cannot be held criminally liable for a conspiracy to commit a crime if that crime was unconstitutionally vague.

## 2.      False Statements ("Purchase Law Letters") (Counts 2-3)

The jury acquitted Wendt of Count 2 and found him guilty of Count 3 in relation to the so-called "purchase law letters."

*First*, as Police Chief of Adair, Wendt had the authority to purchase machine guns.

*Second*, Wendt was given the authority by the Adair City Council to purchase machine guns using his own funds for the benefit of the City of Adair.

*Third*, Wendt was attempting to replace machine guns he had sold to get the versions he wanted in the first place – which were different.

*Fourth*, all the machine guns Wendt had purchased for the Adair Police Department came to City Hall, were actually used, and were kept and found exactly where they were supposed to be at the time of the search warrants.

*Fifth*, there was no indication that Wendt was purchasing these for the purpose of reselling them. To be clear, there is no such restriction. But even if that restriction existed, it would have to be interpreted as not being the sole reason for acquiring them. Such was clearly not the case here as Wendt was using these machine guns – and not just for the City of Adair expressly but also to aide neighboring law enforcement. Indeed, the machine guns Wendt did sell

had all be ordered over a year before he sold them and he had had them for months. The only

two Wendt made "profit" on he ordered over a year and a half ago and had them for eight

months. Further, he had a clear explanation for why he sold them.

*Sixth*, as Police Chief, Wendt had the authority to determine what official use was even if

that were a valid legal requirement.

*Seventh*, as minimum, it is impossible to say this charge as applied to Wendt's truly

unique circumstances was not unconstitutionally vague. All the Government has previously

offered with respect to these so-called required[18] (i.e., material) statements is that 18 U.S.C. §

1001 is not unconstitutionally vague. But that is a facial challenge and this is an as-applied

challenge.

### 3.    False Statements ("Demonstration Law Letters") (Counts 4-14)

The jury found Wendt guilty of Counts 6 and 8-14 and not guilty of Counts 4, 5, and 7. In

other words, it found that what Wendt started doing was not illegal but that in early 2019 he

crossed the line and must have been writing demonstration letters for machine guns that were not

"requested for demonstration for future potential purchase by the Adair Police Department."

*First*, Wendt was in a truly unique position as both an FFL-SOT and a Chief of Police.

However, this was disclosed to the ATF every time starting with the very first letter. In fact,

Wendt talked to the ATF NFA Branch Chief about it.

*Second*, the Government confused "potential" with "possible." Not a single letter that

Wendt wrote had the charged language in it. The jury was likely confused by the Government

treating them as the same thing. The Oxford English dictionary defines "potential" as "having or

---

[18] *United States v. Johnson*, 937 F.2d 392, 399 (8th Cir. 1991) ("When the government has created an ambiguity upon which the defendant has reasonably relied in making his statement, the government will ordinarily be unable to negative the defendant's interpretation.").

showing the capacity to develop into something in the future" and "possible" as simply identifying something "that can be done or achieved." The distinction between these two adjectives is extremely important. Potential, on the one hand, identifies something that is likely to happen (i.e., a future purchase), whereas "possible" refers to merely something that is able to be done or within the capacity of someone or something (i.e., merely the author of the demonstration letter having the authority to purchase the machine gun). This distinction is further underscored by the jury instruction about an opinion not being a statement of fact but a statement of present intent can be considered a statement of fact. Here, the letters only stated that Wendt had the authority to make the purchase as opposed to Wendt having the intent to purchase. The importance of this distinction cannot be overstated as the jury clearly based its decision on the likelihood of the future purchases.

*Third*, at minimum, it is impossible to say the alleged legal requirement here is not unconstitutionally vague as applied to Wendt's unique circumstances. In other words, like with the other false statement counts, the Government's case was that the ATF required these phrases to be used – they were requirements according to the ATF – and the case depended upon whether Wendt fulfilled their meaning as determined by the ATF. This was no different than an applicant checking a box next to a purported legal requirement. In that regard, Wendt continues to assert he should have been given the *Harra* ambiguity instruction. In any event, the Government cannot argue that the terms did not come from them or that vagueness is limited to a facial reading of the statute.

### 4.      Illegal Possession of a Machine Gun (Count 15)

Finally, the jury convicted Wendt of Count 15 – likely because it fell on the other side of the date where the jury drew the line. Regardless, this charge is neither supported by the law or the facts and, at a minimum, is unconstitutionally vague.

*First*, Wendt had the legal authority to possession any machine gun according to both federal law and state law.

*Second*, Wendt did not make any money at the machine gun shoot nor intend to make any money at the machine gun shoot.

*Third*, it is impossible to say there was no law enforcement or official value to the machine gun shoot according to all the testimony.

*Fourth*, even though it was not required, Wendt cannot be said to have been acting outside the scope of his authority. Wendt was always on-duty according to Mayor Larsen. And according to everyone, he was always responsible for and acting as the Police Chief. Moreover, Wendt was able to carry out his official duties throughout the State of Iowa. In fact, the City of Adair representatives who gave Wendt permission to purchase the M60 even testified that they would not consider it to be outside the scope of that authority to take it to the machine gun shoot.

*Fifth*, at a minimum, this charge as applied to Wendt is unconstitutionally vague. Wendt has an even better argument than Vest regarding § 922(o). He was not just a firearms instructor but he was also the police chief – and, on top of that, he was a licensed dealer. Indeed, here, Iowa law even expressly permits the possession of a machine gun by a police officer or a dealer. Further, the Vest case explicitly sets forth why the Government cannot be saved by merely alleging Wendt was not acting within the scope of his official duties. Moreover, even the government in Vest conceded Vest could not be charged with aiding and abetting another person to illegally possess a machine gun. *Id*. at 1012. The legislative history of § 922(o) makes it clear as possible that the statute was not intended to apply to Wendt. In sum, the phrase "possession by or under the authority of" is unconstitutionally vague as applied to Wendt.

## VII.   CONCLUSION

In conclusion, Wendt requests that the Court enter a judgment of acquittal on all counts

or, in the alternative, that the Court grant him a new trial.


Dated: February 28, 2024                    **FAEGRE DRINKER BIDDLE & REATH LLP**

                                            */s/ Nick Klinefeldt*
                                            Nicholas A. Klinefeldt, AT0008771
                                            Rachel A. Yaggi, AT0014994
                                            801 Grand Avenue, 33rd Floor
                                            Des Moines, Iowa 50309
                                            Telephone: (515) 248-9000
                                            Fax: (515) 248-9010
                                            *nick.klinefeldt@faegredrinker.com*
                                            *rachel.yaggi@faegredrinker.com*

                                            ***ATTORNEYS FOR DEFENDANT WENDT***


## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, I electronically filed the foregoing

document with the Clerk of Court using the ECF system which will serve it on the appropriate

parties.


                                            */s/ Sandy Ellingson*