IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: 4:22-cr-199 |
| Plaintiff, | |
| vs. | **DEFENDANT'S WENDT'S SENTENCING MEMORANDUM** |
| BRADLEY EUGENE WENDT, | |
| Defendant. | |

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................... 3

II.  BACKGROUND ..................................................................... 3

    A.  Brad Wendt .................................................................. 3

    B.  Family ......................................................................... 5

    C.  Community ................................................................... 6

III.  THE OFFENSE ..................................................................... 10

IV.  DISPUTED FACTUAL & LEGAL ISSUES ............................... 11

III.  SENTENCE .......................................................................... 20

    A.  Sentencing Guideline Calculation...................................... 20

    B.  Section 3553(a) Factors .................................................. 26

IV.  RELEASE .............................................................................. 29

    A.  Release Pending Execution............................................... 30

    B.  Release Pending Appeal .................................................. 31

        1.  Wendt Is Not A Flight Risk Or Danger And His Appeal Is Not For Purposes Of Delay ...................................................... 31

        2.  Wendt's Appeal Presents A Substantial Question That, If Resolved In His Favor, Will Likely Result In A Reversal, New Trial, Sentence Not Including Imprisonment, Or Reduced Sentence ............................... 32

            a.  Wendt's Appeal Raises Several Substantial Questions ............... 32

            b.  Resolution Of This Substantial Question In Wendt's Favor Would Likely Result In A Reversal, New Trial, Sentence Not Including Imprisonment, Or Reduced Sentence ........................................... 33

V.     CONCLUSION....................................................................................................... 35

## I.      INTRODUCTION

The Government's prosecution of Bradley Eugene Wendt ("Brad" or "Wendt") presents a truly unique case. First, the Government has presented a novel and unprecedented legal theory against Wendt that continues to evolve. Second, the Government has presented – and continues to present – an incomplete and inaccurate depiction of the facts. When the law and the facts are properly considered, there can be only one conclusion: putting Wendt in prison is not appropriate. Further, to the extent the Court would even consider a term of imprisonment, justice clearly requires that the execution of that sentence be stayed pending appeal.[1]

## II.     BACKGROUND

### A.      Brad Wendt

Brad was born in 1976, in Omaha, Nebraska, to parents of Stephen and Barbara Wendt. PSR ¶ 96. He had a great childhood and was raised by both parents and grew up in Woodbine and Anita, Iowa with two siblings. *Id.* ¶¶ 96, 102-03, 107. Brad's parents also raised foster children and Brad still considers some of his foster siblings "part of the family and as brothers." *See Ltr. from Sheri Karns*, BW005.

Brad's parents are supportive of him and he speaks to them daily. PSR ¶¶ 100-01; *Ltr. from Barbara Wendt*, BW008 ("There hasn't been a day go by that we have not contacted each other."). Brad's mother has cancer and Brad "sees her I and helps [his parents] with many things." *Ltr. from S. Mike Wendt*, BW009. Brad's father states that "Without Brad around his mother would have a harder time coping with her illness. *Id.*

Brad's passions include hunting and fishing, passions that he shares with his family. *Id.*; *see also Ltr. from Brynleigh Wendt*, BW001; *Ltr. from Brantley Donscheski*, BW002. Brad's

---

[1] Wendt hereby submits under seal four exhibits: (A) pictures; (B) letters of support; (C) recording of government interview of witness; and (D) government email to counsel.

father also inspired another passion of his, to become a police officer. *See Ltr. from Sheri Karns*, BW005 ("Since [Brad] was a small boy watching my dad put on his police uniform everyday he dreamed of becoming a police officer himself."). Terra, Brad's partner of over five years and the mother of his daughter Bristalyn, states that:

> [Brad's] lifelong passion is being a police officer. It certainly isn't for the pay, but rather he truly loves the profession and helping others. We've had many talks in our time together, and his desire to remain in this career stems heavily from watching his father walk in those same footsteps. Many people have asked him why he is even a cop since he runs a successful business already and his response each time is "because I enjoy it." He has missed birthdays, holidays, anniversaries and similar due to his schedule, but I always understand that it's not that he doesn't want to be home, but he has an unwavering duty to serve his community and make the world a safer place. I think I love him just a little more every day because of it.

*Ltr. from Terra Sell*, BW003.

Brad's passion for law enforcement is clear to many who know him. *See Ltr. from Jim Mink*, BW020 ("I believe Brad is a very genuine person who actually enjoys making our communities safer and doesn't work just for a paycheck."); *Ltr. from Ryan Donscheski*, BW034 ("He is the kind of officer people should want in a small town because he was not doing it for the paycheck [] he truly did to make a difference in the community and show people the[y] can come to cops for help no matter what."). It is undisputable that Brad is a great police officer who cares about his community.[2] *See Ltr. from Clint Fichter*, BW013 ("Brad stands out as the best police officer I have worked with by a large measure."); *Ltr. from Nate Christensen*, BW033 ("Brad is by far one of the best I have ever worked with. There are very few people I would trust with my life and Brad is one of them.").

---

[2] Allegations by the Government suggesting that Brad's employment history should cast doubt on the fact that he has dedicated his career to law enforcement are unsubstantiated, misleading, and offensive. The same goes for allegations as to his truthfulness based on another court's analysis of financial information provided under the advice of counsel and/or an accountant.

### B.      Family

Brad has three children, daughters Brynleigh and Bristalyn, and stepson Brantley. It is clear from the letters of support attached hereto that Brad's is nothing less than a dedicated and loving father. *See e.g.*, *Ltr. from Brian William Smith*, BW011 ("Brad is the kind of parent who shows up and when he does show up, he is supporting with clapping, cheering, and even encouraging of the other kids. As a coach, it is important that we have as many of those kinds of parents as possible."); *Ltr. from Michael Bremser*, BW027 ("I find him personally to be one of the most caring fathers I've had the pleasure of knowing."); *Ltr. from Donell Griffith*, BW017 ("he isn't a 'part-time' dad he is a hands on full-time great dad that teaches his girls about life!"); *Ltr. from Michael Scott Townley*, BW031 ("But what I think is most important to him is being the best dad he can be for his daughters."); *Ltr. from Ramona Sell*, BW037 ("He goes above and beyond for them in every way possible each and every day."); *Ltr. from Shellie Weed*, BW039 ("His children are his world and if he could give them the world, he would do it.").

Brynleigh is 10 years old and resides with Brad and Terra every other weekend during the school year and half of the summer. PSR ¶ 105(a). Brynleigh enjoys hunting, getting ice cream, exploring, and selling fireworks with her dad. *Ltr. from Brynleigh Wendt*, BW001. Terra reports that, despite their efforts to shield their children from this situation, Brynleigh is old enough to comprehend and the case is impacting her "quite heavily." *Ltr. from Terra Sell*, BW004. Brynleigh is "currently attending counseling to help cope with emotions and anxiety she has developed because of this situation and the thought of losing her father. *Id.* Brad attends Brynleigh's dance recitals "religiously" and Brynleigh is always looking for "Dad's help." *Ltr. from Nathan Boeckman*, BW032; *Ltr. from Jim Mink*, BW021. Brad attends Brynleigh's school events and when picking her up from the bus stop, she would "run from the bus into his arms."

*Ltr. from Jennifer M. Zupp*¸ BW044. A potential imprisonment here hurts his children far worse than it does Brad. *See Ltr. from Jessica A. Zupp*, BW048 ("Who will she pose with at her next dance recital? Who is going to bait her hook for ice fishing? How will she respond when her friends ask 'where's your dad today?'").

Brad and Terra's daughter Bristalyn is one year old. PSR ¶ 104(a). She recently learned how to walk and "worships" Brad:

> [E]very night when [Bristalyn] hears her dad open the door she runs up to greet him with the biggest smile on her face. She worships him, her first word was "dada" and to this day remains her favorite word. I can't imagine him not being around in her life as she grows older, losing time with her at this age is such a devastating thought and I'm worried about the impact it will have on her.

*Ltr. from Terra Sell*, BW004. Many others also note the special relationship between Bristalyn and her dad. *See Ltr. from Sheri Karns*, BW005 ("[Bristalyn] lights up when her dad comes home, she rarely says mom, its always about dad."); *Ltr. from Barbara Wendt*, BW008 ("The girls idealize there dad and spend hours with him.").

Brad has also accepted his stepson Brantley as his own. *See Ltr. from Terra Sell*, BW003; *Ltr. from Monica Kuhlman*, BW030; *Ltr. from Nathan Boeckman*, BW032; *Ltr. from Ryan Donscheski*, BW034-36; *Ltr. from Ramona Sell*, BW037. Brad "taught [Brantley] how to make macaroni and cheese and helped [him] kill his first deer." *Ltr. from Brantley Donscheski*, BW002. Brantley's father, Ryan Donscheski, describes Brad as "a blessing in disguise to not only me but to my son and my family" and a "hero in my eyes and my son's." *Ltr. from Ryan Donscheski*, BW035. *Id.* Ryan described the day where he had to tell Brantley of the verdict as "one of the hardest days" he has had in a while because Brantley became upset and did not understand how it could happen to "someone (Brad) who's done so much good." *Id.*

## C.     Community

Brad is an asset to his community. He volunteers his time to charities and community engagement, donates financially, employs Iowans through his businesses, mentors and trains young police officers, and is known by many as a generous and loyal friend. *See, e.g., Ltr. from Matt Nicholson*, BW016 ("I have witnessed him mentoring young officers, offering guidance and support, and always being the first to step up in times of crisis. His compassion and empathy extend beyond his professional duties, touching the lives of many. [] His positive influence as a family member, public servant, and community leader is undeniable, and his actions have consistently reflected his dedication to the well-being of others.").

For example, when a tornado recently hit Greenfield, Iowa, Brad "was one of the first people to offer a lending hand. He went out of his way to bring a dump trailer for us to use for the week to haul out rubble." *Ltr. from Donnell Griffith*, BW017.

### 1. Philanthropy and Community Involvement

Further, Brad actively supports many local charitable organizations, for example:

> Brad has been a very generous supporter of the Boys and Girls Club and has been a sponsor of the fundraiser each and every year through his business, BW Outfitters. He has donated several thousands of dollars in products to us at cost each year so that we can auction the items off for top dollar to produce significant income for the Club. He also has donated items completely at no cost out of the goodness of his heart so that we can earn even extra money as well. Sponsors such as Brad have helped enable us to generate funds to keep the Club operational each year and we greatly appreciate him and his support. He has told me that he understands the importance of the Boys and Girls Club in the community and wanted to help in any way that he could and definitely has shown that to us every year. It is my opinion that he will continue to support the Boys and Girls Club going forward as well.

*Ltr. from Brandy Rudy*, BW010. Brad also donates or is involved in "Crawford County Pheasants Forever, Ida County Pheasants Forever, Sac County Pheasants Forever, Ida County Turkey Foundation, Rocky Mountain Elk Foundation, Adair Kids Club, Crawford County

Speedway, and Crawford County CDC Halloween." *Ltr. from Mitch Flaherty*, BW029. BW

Outfitters is also an integral supporter of community efforts, for example:

> "For the last two years in Denison, we have held a Dia de los Muertos and
> Halloween celebration at a local park, which is free for all kids. We ask local
> businesses and groups to come set up a table and pass out treats []. Brad has had
> his business, BW Outfitters, participate the last two years. This past year, his
> family dressed up as characters from 101 Dalmations. It was so cute. This shows
> that Brad supports his community, gives back to others, and perhaps more-
> importantly, teaches his kids what it means to get involved and be active members
> of a community. Kids learn by watching and Brad sets a good example for them.

*Ltr. from Jennifer M. Zupp*, BW043.

### 2.    Business

Brad also employs Iowans at BW Outfitters: "[Brad] has made significant contributions

to our local economy. His business acumen and leadership have created jobs and opportunities

for many in our community, reflecting his dedication to improving the lives of those around

him." *Ltr. from Corey Utech*, BW014; *see also Ltr. from Matt Nicholson*, BW016 ("I recall

countless occasions where he went out of his way to support his employees."). As stated by one

of Brad's employees:

> Mr. Wendt has been a crucial part of my professional life, providing not only
> employment but also a work environment characterized by flexibility and
> understanding. This has allowed me to balance my life schedule in a way that
> supports both my family and personal responsibilities. The stability and financial
> security provided by my job with Mr. Wendt have been indispensable to me and
> my family.
>
> Sentencing Mr. Wendt to prison would be a significant detriment to me and my
> family. The potential loss of my job would lead to financial instability and disrupt
> the carefully maintained balance between my work and personal life.

*Ltr. from Kim Kinzie*, BW022.

Brad also often lends his business equipment to friends and other small businesses in

need. *See Ltr. from Brian William Smith*, BW011("[Brad] has helped me in business over the

years. [] [H]e has helped me by letting me use his equipment on short notice, no questions asked, and often doesn't charge me. As a small business owner, I appreciate that another small business owner would take the time and risk to help someone out in a pinch like me."); *Ltr. from Jennifer M. Zupp*, BW044 ("My husband has a small concrete construction company and there have been many times when my husband needed to borrow a trailer, or a skid loader, or similar equipment and Brad has been gracious enough to let my husband use it. Sometimes Brad charged, as he rightfully should, but many times Brad would simply let my husband use his equipment without any charge.").

There are countless examples in the letters of support of Brad's acts of kindness, and as his sister notes, "[Brad] often does things to help people without them knowing he helped." *Ltr. from Sheri Karns*, BW005 ("He also came to help me around my house with using his equipment to move a tree and anything else I would need."); *see also Ltr. from Kelly Lefeber*, BW023 ("[Brad brought] a whole crew to reroof my mother-in-law's house when she had very little money.").

### 3.    Mentorship/Friendship

Finally, Brad has been a mentor and friend to many other officers.  One current officer described Brad's help when he told Brad he wanted to become a police officer: "Brad spent countless hours and time with me. [] Brad was always willing to lend me a hand. Brad had lent me a firearm and vest to use at the Law Enforcement academy." *Ltr. from Alex Ladwig*, BW026. He also supports fellow officers simply as a friend. In 2019, a fellow officer of Brad's was shot in a gunfight and taken on a life flight to a Des Moines hospital. *See Ltr. from Jim Mink*, BW021. He describes that "[o]ne of the very first people to greet me in the hospital room was Brad

Wendt. [] I feel I owe Brad a debt of gratitude for his support that night, he probably doesn't even realize how much relief he provided." *Id.*

Brad also volunteers to teach gun safety to many in the community: "He also volunteers his time to teach others gun safety. He has personally donated his time to teach a gun safety course to our community and has really helped people understand the different aspects of gun safety. He truly cares about his community and shows it." *Ltr. from Nathan Boeckman*, BW032; *see also Ltr. from Nate Christensen*, BW033 ("When I ran for sheriff in another county, Brad was there to help with my campaign. Brad taught a concealed weapons class sponsored by my campaign. The class was free of charge and open to any resident of the county. There were approximately 125 people who took the class free of charge. Brad gave up a pay day to help one of his fellow officers."); *Ltr. from Michael Jensen*, BW042 ("Brad took the time out of his day to assist the Woodbine P.D. with rifle instructor assistance. This occurred several years ago, but he has always been willing to assist if he was ever needed; whether that was through use of the indoor range located at his business or through his personal knowledge and assistance.").

## III.    THE OFFENSE

The Government charged Wendt with 20 counts but subsequently dismissed five of those counts before trial. At trial, after almost ten hours of deliberations, the jury returned a split verdict on those 15 counts. On Count 1, the jury found Wendt guilty of conspiracy to make false statements to the ATF (finding that conspiracy included Marcum and Williams), but not guilty to conspiring to deceive or defraud the ATF. On the so-called "purchase law letter" counts, the jury acquitted Wendt of Count 2 and found him guilty of Count 3. On the "demonstration law letter" counts, the jury The jury found Wendt guilty of Counts 6 and 8-14 and not guilty of Counts 4, 5, and 7. In other words, it found that what Wendt started doing was not illegal but that in early

2019 he crossed the line and must have been writing demonstration letters for machine guns that were not "requested for demonstration for future potential purchase by the Adair Police Department." Finally, the jury convicted Wendt of Count 15 – likely because it fell on the other side of the date where the jury drew the line and certainly because of the jury instructions that they must find Wendt guilty if they find it was not possessed on that date for "official use."

## IV.    DISPUTED FACTUAL & LEGAL ISSUES

There are several significant factual and legal issues that remain disputed. The defense understands the Court has ruled against us on some of these issues in its recent Order Denying Motion for Judgment of Acquittal and/or New Trial ("Order"). ECF 381. In that regard, the defense respectfully points out that there are substantial questions with regard to some of the issues in that Order. In addition, some of the factual and legal issues have not been decided in this case and are presented by way of the PSR.[3] Lastly, the defense identifies these issues in support of mitigation.[4]

1.    The evidence at trial demonstrated that machine guns are extremely common among law enforcement in Iowa. Specifically, the evidence showed 106 police departments in Iowa had a total of 544 machines gun registered to them (avg. 5.13); 83 of the 99 sheriff's offices had a total of 454 machine guns registered to them (avg. 5.47); and 13 state agencies had a total of 268 machine guns registered to them (avg. 20.62). Further, Wendt testified that he had previously obtained machine guns for a prior police department he worked for through a national program designed to provide such equipment to local law enforcement from the military.

---

[3] With regard to potential appellate issues, this list is not meant to be exhaustive. Rather, counsel merely intends to illustrate some of the reasons why an appeal will be so important in this case.
[4] The Government should not be permitted to somehow claim that defense counsel's arguments should in any way reflect on their client's acceptance of responsibility in this case.

2.      It was the City of Adair that approached Wendt to be its Police Chief and not the other way around as portrayed in the PSR. At trial, the defense called the following individuals from the relevant time period: two Adair City Council members, the Mayor, the City Clerk, and the City Attorney. The City Council members and the then-Mayor provided undisputed testimony that it was the City of Adair that approached and solicited Wendt to be their Police Chief and that, as part of that process, they asked him to prepare the proposal identified in the PSR.

3.      When Wendt became the Adair Police Chief, he immediately sought to revamp the department with new equipment. This effort included Wendt obtaining a new police vehicle, which the City approved and purchased. Wendt wanted to get machine guns for the Adair Police Department. He approached the then-Mayor, John Larsen, and Mayor Larsen told Wendt the City could not afford to purchase machine guns but that he could purchase them with his own money. Per the testimony of the City Council members, this authority was approved by the City Council. Wendt sought and received this permission even though legally it was not necessary. Further, the Mayor and City Council members testified that Wendt even showed them some of the law letters and the City Clerk testified that she even helped Wendt write the law letters.

4.      A police officer using his or her own money to purchase a machine gun for use by the police department is a practice that was specifically contemplated by Congress in enacting 18 U.S.C. §922(o). *See United States v. Vest*, 488 F. Supp. 2d 1002, at 1010-11 (S.D. Ill. 2006). This practice was also specifically contemplated and approved by the ATF – which both included such language in its sample law letter and approved the transfers in this case in which Wendt disclosed this arrangement (which he did in every transfer for the Adair Police Department).

5.      Wendt was in a truly unique position as both a licensed dealer (w/ an FFL-SOT) and a police chief. Plus, Wendt had the authority to purchase machine guns with his own money for the police department. This situation and Wendt's authority was fully known by the City of Adair and the ATF. Moreover, the ATF knew Wendt was both the owner of BW Outfitters and the Adair Police Chief. Not only did Wendt go out of his way to disclose that in the demonstration law letters but he also proactively told and discussed it with the chief of ATF's NFA branch – who in response told him he could then obtain any type of machine gun he wanted.

6.      The Mayor, who himself was a former career law enforcement officer, testified that, as Police Chief of Adair, Wendt was always considered to be "on duty." This was underscored by other witnesses who testified that Wendt was always the Police Chief and, as Police Chief, was in a uniquely responsible role of always being responsible for that position. Both Mayor Larsen and the City Council members testified that the machine gun shoot and the use of machine guns registered to the Adair Police Department was consistent with their understanding of Wendt's authority and the permission they gave him.

7.      The defense called BW Outfitters Manager, Sam Peterson, who testified and demonstrated through exhibits that neither BW Outfitters, Wendt, or Williams ever made money at the machine gun shoot and that it was never the idea to make money from it. Further, the defense called numerous law enforcement officers from Iowa: Ray Ohl, Shelby County Sheriff's Deputy; Royce Kemmen, Retired Lakeview Police Chief; Mitch Flaherty, Harrison County Chief Deputy; and Kevin Ewing, Monona County Sheriff. These witnesses established that law enforcement from the area were involved in the machine gun shoot, allowed to shoot for free, and that it was important training for them. In addition, the defense even called State Senator,

Jason Schultz, who was the State Senator representing the district where the machine gun shoot was held and who attended the machine gun shoot as well as participated in it. Senator Schultz testified how it even provided him with knowledge important to his role in the State Senate.

8.      Wendt took the stand himself and explained every application to transfer a machine gun as well as the purpose of the machine gun shoot. Wendt also completely rebutted the Government's theory that he got his FFL-SOT for the purpose of acquiring machine guns (not true, it was to acquire silencers because of the change in state law) and that he became Police Chief of Adair to write law letters (not true, the undisputed evidence was that the City of Adair approached Wendt about becoming Police Chief). Further, Wendt's testimony and the other evidence established that he only sold four machine guns for a total profit of less than $50,000; that he attempted to sell two more for a total of approximately $30,000 but returned the money when it became apparent the ATF was not going to approve it; and that he only purchased 10 total machine guns for the Adair Police Department and 13 total machine guns for BW Outfitters. Further, the evidence showed every single one of those machine guns was where it was supposed to be when federal law enforcement showed up unannounced on August 31, 2022. In addition, the ATF approved all of the transfers in question (except for the minigun which the ATF subsequently approved Wendt to acquire) and had all of the relevant information before doing so. Lastly, Wendt received no improper benefit (nor intended to receive any improper benefit) from writing demonstration law letters to alleged co-conspirators Marcum and Williams.

9.      The PSR misrepresents the purchases and requested demonstrations of the machine guns. The undisputed evidence at trial established the following: the seller of the machine gun was the one who would submit the transfer application to the ATF. And it was the seller (manufacturer or dealer) who would provide the language of the law letter they believed

was required by the ATF to Wendt. This language for the law letter was based either on their understanding of the ATF requirements or, in the case of imports from H&K, what German law required as well. In other words, the law letters Wendt wrote all were directly or indirectly simply Wendt signing what was conveyed to him as ATF requirements.

10.     The evidence at trial established it was Wendt's understanding that the demonstration was simply to determine whether the firearm was suitable for use by law enforcement and the disconnect clearly was about the level of connection regarding a future sale. There was clearly a disconnect between Wendt's understanding of what the demonstration requirement meant and what the ATF's understanding of it. As for the purchase letters, Wendt was in a unique situation of being the Police Chief and being able to use his own money to purchase machine guns – and the undisputed fact that he got to keep the money if the machine gun was sold (either at his discretion or when required due to his departure from the police department). This arrangement is verified by the legislative history of the statute and demonstrated by Ray Ohl's situation.

11.     Wendt demonstrated every machine gun that he was allowed to do so by the dealer. He was genuinely interested in purchasing machine guns for the use by the Adair Police Department. Machine guns can be expensive and, certainly if you want to see several models, it can be cost prohibitive. It cost Wendt nothing to have another dealer purchase them and demonstrate them do him so he could see them.

12.     Marcum offered to show Wendt machine guns to help him with his future purchase decisions. Specifically, the first two letters Wendt wrote for Marcum were relevant models from FN and H&K (two letters because they had to go to two different manufacturers) – these two companies were leading manufacturers of machine guns. The third and final letter

Wendt wrote to Marcum was for a few additional machine guns Marcum offered to demonstrate to Wendt in the demonstration he told Wendt he was coming out to do for Wendt and other officers. However, the police chief writing the letter does not get notice from the ATF nor can he get any information from the ATF. Marcum no showed on the demonstrations, so Wendt had to get the demonstrations from someone else. Dealers are not required to go through with the demonstrations – in fact, the demonstrations are not required at all.

The Government does not have an explanation for what happened. Rather, it tries to have it both ways – and both ways were proven wrong at trial. The Government claimed that Wendt wrote demonstration law letters to Marcum for money. That was proven not to be true at trial. And the jury acquitted him of two of the three law letters. If the arrangement was as the Government said, the jury would not have acquitted him of these counts. As a matter of fact, at trial, Marcum testified – pursuant to a cooperation agreement with the Government – that he did not think Wendt ever intended to violate the law.

Marcum did not do the demonstrations because the ATF began investigating him and told him not to talk to Wendt. Wendt had no choice but to begin relying on himself people who were in Iowa. One of those individuals was Williams, who was local and a friend of Wendt's so he knew he could trust Williams to do the demonstrations.

13.    The timeline of the machine guns sales also contradicts the Government's theory of the case. Wendt only actually sold four machine guns. Two of them he did not make any profit. The other two he made a profit of approximately $46,000. However, the sales price is determined by the highest bidder – as is common. More importantly, the timeline of the sale of these two machine guns belies any assertion that he purchased them for profit. He ordered them on October 9, 2019, received them on November 30, 2020, and sold them on July 29, 2021. In

addition, these sales were after Wendt learned of the increase in price due to the sale of Ray Ohl's guns. Also, he was trying to replace them with different versions – as explained at trial. And he never sold any of the machine guns registered to BW Outfitters. Further, just because he had not used one of them would not demonstrate the purpose of the sale was for profit.

14.     Wendt never received any money or any other improper benefit for writing a demonstration law letter. Wendt did not receive any money from anyone regarding the letters – and was never promised any money. Nor is there any evidence that he received anything of value from Williams, Ohl, or anyone else beyond merely the demonstration of the machine guns. The Government has relented to an allegation that Wendt received some vague "good will" from writing these letters. That is ridiculous and weak. Nor did Wendt make any money from the renting out or letting others shoot the machine guns. The total of what the Government can identify here is a $50,000 profit on the sale of three machine guns plus another $30,000 that he would have made if the other sale had gone through. However, that does not consider the cost of any losses. Nor does the Government attempt to do any kind of financial analysis of what the other guns may have been worth or what kind of , if any, profit he would have made on them if sold. This is especially important given Wendt sold some MP5s and did not make a profit from them.

15.     Respectfully, the Court improperly relied upon ATF regulations and practices to define the criminal law. The Court held that identifying and apply an "official use" restriction is "[c]onsistent with its statutory authority." ECF, at 13. With respect to the so-called "official use" restriction, there is no actual case holding or relying upon a subsequent use restriction of that nature. The Court's ruling has for all intents and purposes allowed the ATF to amend 26 U.S.C.

§ 5861(l) to include something that was not even specifically set forth in a statute let alone a regulation.

Further, the Court's ruling relies upon a mistaken understanding of the definition of "written application." Specifically, a key part of the Court's analysis was its ruling that "the demonstration letter is part of the 'written application,' 26 U.S.C. §5812(a). . . ." However, that is clearly wrong. The "written application," as defined by that statute indisputably sets forth the precise requirements for it and that it be a "form" prescribed by the ATF. This is without a doubt the ATF Form 3 and 5. Those forms set forth the required information. Further, the Government has completely disavowed this interpretation wherein it concedes, as it must, that Wendt did not provide any false information in a record or "application" required by law under 26 U.S.C. § 5861(l).

Likewise, the "under authority of" requirement is impermissibly vague as applied to this case. The Court's ruling in this regard is also inconsistent with state law. The Court misunderstood Wendt's argument regarding the effect of 922(o) on gun dealers. As defense counsel described at the hearing, their point is that the statutory scheme is, at best, vague regarding what dealers are permitted to do and how the scheme applies to this case. In other words, the Court relied upon a patently flawed regulation as providing clarity to this situation.

16.     The Court did not fully consider and address Wendt's arguments with respect to two key other issues. First, the Court did not analysis the proof and deviation problem with regard to "possibly" versus "potentially." Second, the Court did not address the *Harra* instruction issue and the ambiguity of those terms.

17.     The undisputed evidence at trial was that Wendt did not make any money on this machine gun shoot and that he never intended or desired to make money from it. Further, several

law enforcement witnesses testified about the value of this training opportunity for them. In fact, the Iowa State Senator who represented the district even testified that he attended the machine gun shoot and that it had value for him as a State Senator. Law enforcement attendees shot for free and the civilians paid the cost of the ammunition.

The Government's argument that Wendt was not in uniform is beside the point. Wendt has attended numerous firearms trainings outside of Adair out of uniform and not on the clock. Further, as demonstrated by the trial testimony, that is generally true of police officers as other law enforcement officers were there shooting the machine guns for training purposes and were not in uniform. Mayor Byers testified that Wendt did not get paid for his time that day. Mayor Larsen, who was the Mayor when the City of Adair hired Wendt (and was also a former police chief), testified that he considered Wendt to always be on-duty because of the nature of his role as Police Chief.

Lastly, there was no evidence that anyone fired the M60 registered to the Adair Police Department. As matter of fact, the evidence showed the undercover officer fired a different M60 that day and that there was a problem with the one registered to the Adair Police Department and it did not work. Further, as previously stated, there were several law enforcement officers who attended for training purposes and were there to shoot for free – which was a significant purpose of the shoot. Certainly, there would be nothing wrong with them shooting the M60 registered to the Adair Police Department that day.

In sum, Wendt believed the statements he made to be true. But the jury found they were false based on the Government's interpretation of them. Wendt was not allowed at trial to provide an alternative version of the interpretation, because the Court had already endorsed the Government's interpretation of the statements and committed it to the jury instructions.

Likewise, Brad thought he had the authority to possess the M60 machine gun that day for numerous reasons. Even the Mayor who authorized Wendt to get it thought he did. But the court imposed an official use restriction that has never been the subject of a holding in any case, and the jury convicted him based on it.

## III.   SENTENCE

### A.   Sentencing Guideline Calculation

#### 1.   Base Offense Level

The Government seeks to punish Wendt through a "back door" sentencing approach – attempting to punish him with crimes for which he was never charged. Probation misapplied the cross reference, USSG §2B1.1(c)(3), and the applicable guideline is USSG §2B1.1. The cross-reference provides as follows:

> If (A) neither subdivision (1) or (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (*e.g.*, 18 U.S.C. § 1001, § 1341, or § 1343); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

USSG §2B1.1(c)(3). The cross-reference only applies if "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline." *Id*.

First, the "count of conviction" is limited to the substantive offense set forth in the Indictment. In *United States v. Bah*, 439 F.3d 423, 427-28 (8th Cir. 2006), the Eighth Circuit confirmed this unambiguous reading of the cross-reference and held "this cross-reference is applicable 'only if the conduct alleged in the count of the indictment of which the defendant is convicted establishes the elements of another offense.'" (quoting *United States v. Genao*, 343 F.3d 578, 583 (2d Cir. 2003). "[N]umerous courts have analyzed the Guidelines, as a whole – including the definition of "offense of conviction" provided in Section 1B1.2(a) – and the history

of the Guidelines and determined that the phrase 'offense of conviction' describes only the precise conduct constituting the crime for which the defendant was convicted, and does not include non-offense relevant conduct." *United States v. Griffith*, 115 F. Supp 3d. 726, 733-34 (S.D. W. Va. 2015) (internal quotations omitted) (collecting cases).

Second, the count of conviction must be "specifically covered by another guideline." The guideline proposed by Probation, USSG §2K2.1 only applies to violations of the Gun Control Act – specifically, 18 U.S.C. §§ 922(a)-(p), (r)-(w), (x)(1), 924(a), (b), (e)-(i), (k)-(o), 932, 933, 1715, 2332g; 26 U.S.C. § 5861(a)-(l). Section 2K2.1 also provides: "For additional statutory provisions, *see* Appendix A (Statutory Index)." *Id*. However, no further relevant statutory provisions apply. The Statutory Index identifies 2K2.1 as applying to 18 U.S.C. § 371, but only if it involved a conspiracy to violate 18 U.S.C. § 924(c). It identifies 2C1.1 but only if the offense of conviction involved a conspiracy to defraud by interference with government functions. As such, USSG §2X1.1 applies to the Conspiracy conviction which, in turn, refers back to 2B1.1 as well. The only conviction USSG §2K2.1 applies to in this case in the Illegal Possession of a Machine Gun.

Importantly, this bait-and-switch tactic of charging and convicted someone of one offense and sentencing them for another offense is exactly what is prohibited. "A definition of 'offense of conviction' that includes only the substantive crime charged ensures that defendants have notice of the precise nature of the charges provided in the indictment or information." *United States v. Griffith*, 115 F. Supp. 3d at 734. This definition "preserves 'the compromise' made by the Sentencing Commission 'between real offense sentencing and charged offense sentencing' that forms the foundation of the entirety of the Guidelines." *Id.* (quoting *United States v. Fine*, 975 F.2d 596, 604 (9th Cir. 1992).

Here, the Conspiracy and False Statements convictions do not establish the elements of an offense identified in USSG §2K2.1. Without identifying any statutory citation or analysis, Probation initially only stated: "In this case, the conduct in the counts of conviction establishes the unlawful receipt, possession, or transportation of firearms or ammunition." PSR § 75. Wendt was a licensed dealer with an FFL-SOT as well as a police officer authorized to possess machine guns pursuant to Iowa law. Wendt identified that the only potential criminal provisions under the Gun Control Act that could conceivably have applied here required proof that the subject of false statements was information required for the transfer of the machine gun by federal gun laws, and the Government never charged such an offense. *See* 18 U.S.C. 922(a)(6) & (m); 26 U.S.C. § 5861(l).

Now, for the first time and only one week before the sentencing hearing, the Government has sought to ambush the defense and hold Wendt responsible for violations of 18 U.S.C. 922(a)(6). The elements of 922(a)(6) are (1) that the defendant made a false statement; (2) that the defendant knew the statement was false; (3) that the statement was made in connection with the acquisition of a firearm from a licensed firearm dealer; (4) that the statement was intended or was likely to deceive the licensed firearm dealer; and (5) that the alleged false statement was material to the lawfulness of the sale or disposition of the firearm. *Cody v. United States*, 460 F.2d 34, 36 (8th Cir. 1972). To the extent the Court intends to allow the Government to move forward on this basis and agrees with it, the defense would like time to respond. However, we do not believe that will be necessary.

As an initial matter, the Government has never propounded any theory that Wendt actually was attempting to deceive a dealer or manufacturer. Quite the opposite, the Government has often taken the position that the addressee of the law letters knew exactly Wendt's intentions.

*See* Exhibits C & D. Unless the Government disavows this theory, Wendt is entitled to discovery regarding the now alleged victims as co-conspirators.

Further, section 922(a)(6) requires an intent to deceive. The jury already found Wendt did not have an intend to deceive even the ATF. Further, the Court should not consider acquitted conduct. The jury found Wendt did not engage in any agreement with Marcum or Williams to defraud the ATF by using deceitful or dishonest means to impair, impede, obstruct, or defeat the lawful government functions of the ATF. ECF 330, at 11. Any theory under section 922(a)(6) would be flatly inconsistent with that finding.

More importantly, it would be absolutely ludicrous to find after all this time that Wendt was really intending to deceive the recipient of the law letter. This is especially true given the recipient of the law letter was often providing the template language. Additionally, this fact has separate significant because the dealer in that instance is acting as a government agent, *Abramski v. United States*, 573 U.S. 169 (2014), and further creating the ambiguity just as the ATF did, *see United States v. Harra*, 985 F.3d 196 (3d Cir. 2021).

Notably, the Government concedes – as it must and it has always – that Wendt did not violate 26 U.S.C. § 5861(l). That statute provides that it is illegal "to make, or cause the making of, a false entry on any application, return, or record required by this chapter, knowing such entry to false." 26 U.S.C. § 5861(l). In other words, the law letters at issue are not part of the "written application" required by 26 U.S.C. §5812(a).

Accordingly, the base offense level for the Conspiracy and False Statements counts is 6 per USSG §2B1.1. There was no loss and no specific offense characteristics apply. As admitted in the PSR and by the Government, there was no loss or victim in this case. And because there was no loss, any alleged gain is not relevant. USSG §2B1.1, Application Note 3(B) ("The court

shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."). Any contrary application of the Guidelines in this case would serve as the ultimate injustice of allowing the Government to "back door" Wendt into convictions of federal gun laws that Congress clearly did not intend. The base offense level for the Illegal Possession of a Machine Gun would appear to be 18 under USSG §2K2.1(a)(5), though the benefit of (b)(2) really should apply given the circumstances.

## 2.      Relevant Conduct

As an initial matter, the U.S. Sentencing Guidelines Commission has now promulgated a preliminary amendment to clarify that acquitted conduct cannot be including within relevant conduct. *See* Preliminary Amendment, USSG § 1B1.3(c), Application Note 10. Wendt was acquitted of the alleged conduct up through January 2019. The jury found Wendt not guilty of the following:

First, the jury found Wendt not guilty of agreeing with Marcum or Williams of "defrauding the ATF by using deceitful or dishonest means to impair, impeded, obstruct, or defeat the lawful functions of the ATF in the administration of the law and regulations of the National Firearms Act and Gun Control Act pertaining to machine guns." The jury specifically found Wendt not guilty of ever attempting to violate the National Firearms Act or the Gun Control Act.

Second, the jury found Wendt not guilty making a false statement in the so-called "purchase law letter," dated October 9, 2019, in which Wendt made the initial purchase of machine guns for the Adair Police Department. These firearms consisted of three MP7A2s, a G36K, and an HK416. These transfers were approved by the ATF on August 25, 2020, and

November 30, 2020. In other words, the jury found Wendt had the authority and did nothing wrong at least initially with purchasing machine guns for the Adair Police Department.

Likewise, the jury acquitted Wendt of the initial demonstration law letters he wrote to Marcum. None of this conduct formed the basis of the offenses that formed the bases of Wendt's conduct. Accordingly, this conduct should not be included as a basis for Wendt's sentence.

### 3.      Abuse of Position of Trust

Wendt did not abuse his position of trust. First, he had permission. Second, the City Council and former Mayor witnesses testified Wendt's actions were consistent with his permission and authority. Third, his conduct actually helped others and cost the City of Adair nothing. Lastly, nothing underscores this more than the City of Adair not terminating him or disciplining him even after he was convicted. The application of this enhancement would be paternalistic and wrong.

### 4.      Obstruction of Justice/Acceptance of Responsibility

The Government seeks a four-level upward adjustment for Wendt received a four-level swing in the Guidelines because Wendt did not plead guilty and, instead, took the stand in his own defense wherein the Government claims Wendt lied because he said he "believed" his statements in the letters were true. Even worse, the Government's sole justification for Wendt not receiving the same punishment as Williams, Marcum, or LaCourse is that he did not plead guilty. As the Court acknowledged in its most recent ruling, the trial was not really about a dispute over the facts. ECF, at 3 n.1. Wendt did believe the statements in his letters to be true. However, the Court adopted the Government's interpretation of those letters and denied the defense's request for a *Harra* ambiguity instruction. In other words, it did not matter at trial that Wendt believed the statements to be true. An obstruction of justice enhancement does not apply

25

to this case. Such a perverse result would add insult to injury in this truly unique case. Neither Probation nor the Government identified any testimony Wendt provided that was false. The enhancement does not and cannot apply based on Wendt exercising his constitutional rights to go to trial and to take the stand in his own defense. Further, the jury acquitted Wendt of several counts – including the charge that alleged he attempted to defraud the ATF. This enhancement will require a specific finding from the Court of what testimony, if any, was false. This would amount to ***the ultimate trial penalty***.

### 5.    Downward Departure

Finally, Wendt should receive a downward departure here based on the facts and circumstances. *See* USSG §5K2.0(a)(2),(3). For all the reasons previously described, Wendt's conduct in this case is clearly not what was contemplated by the federal gun statutes or the Guidelines.

### 6.    Adjusted Offense Level

The adjusted offense level should therefore be well within Zone A or B of the Sentencing Guidelines and allow for a sentence of probation.

### B.    Section 3553(a) Factors

The Sentencing Guideline calculation is an important first step of analysis, but it is "not the only consideration" when determining a proper sentence. *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 169 L.Ed.2d 445 (2007). While the Guideline "reflects a rough approximation of sentences that *might* achieve § 3553(a)'s objectives," *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (emphasis added), the Court must conduct an "individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. This individual assessment allows for sentencing deviations from the Guideline where it would allow the Court to "impose a sentence *sufficient,*

26

*but not greater than necessary*" to achieve § 3553(a)(2)'s goals of retribution, deterrence, incapacitation, and rehabilitation. *Kimbrough*, 552 U.S. at 111.

The factors the Court is required to consider in determining the appropriate sentence are, in relevant part, as follows: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence imposed, including the need to reflect the seriousness of the offense, the need for deterrence and the need to protect the public; (3) the kinds of sentences available; (4) the Guideline range; (5) any applicable policy statements; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to the victims. *See* 18 U.S.C. § 3553(a).

### 1. Nature and Circumstances of the Offense

The nature and circumstances of the offense here are important. Wendt did not attempt to deceive or defraud the ATF. He did not violate any federal gun laws with respect to the false statement charges. And the conviction for possessing the machine gun has to be the least egregious violation of § 922(o) in history.

### 2. History and Characteristics of the Defendant

Wendt is a father and a career law enforcement officer. The numerous letters that were submitted on his behalf tell the Court exactly who Brad Wendt is as a person. He has no prior criminal history – quite the opposite, he has spent his life enforcing the law. In fact, the City of Adair though so much of him they kept him as their Police Chief through the pendency of this case and would still want him back if they could have him.

### 3. Unwarranted Sentencing Disparities

There are three related cases to Wendt's case: Williams, his co-defendant and alleged co-conspirator; Marcum, his alleged co-conspirator; and Daniel LaCourse, the police chief in Marcum's case, 1:20-cr-00342 (S.D. Indiana). Williams had all charges against him dismissed in favor of a plea by the company to a misdemeanor and a $40,000 fine. Marcum and LaCourse both received straight probation. Importantly, the conduct that Marcum and LaCourse were convicted of was far worse and far more egregious than Wendt's case.

The Government tries to analogize this case to two, unrelated cases. However, *Theunick* is inapposite. There, two prosecutors and a police chief were charged with violations of 26 U.S.C. § 5861. *U.S. v. Theunick*, 651 F.3d 578, 584 (6th Cir. 2011). The two prosecutors were purchasing machine guns without the knowledge of the county. After one was not reelected, they purportedly transferred the guns to a local police department. However, when that police department was raided, none of the weapons were there as the prosecutors had only submitted the paperwork as a guise but actually kept the firearms for their personal use. *Id.*

Likewise, *Kelerchian* is even more egregious. *United States v. Kelerchian*, 937 F.3d 895, 901 (7th Cir. 2019). It involved three individuals who plotted to acquire machine guns with the intent of cutting them up and selling them for parts who then laundered the money they made from the parts. *Id.* Kelerchian was also charged with violations of federal gun laws. There are no such allegations here and Wendt was not charged with such offenses. *Kelerchian* is not a useful guide. It was just a flat out scheme to defraud H&K and flip guns/parts into cash and also did not involve 922(o) but rather conspiracy, false demo letters, and money laundering. Kelerchian was a gun dealer who met two cops. They started buying MGs in big quantities (multiple transactions of dozens to 50 at a time), allegedly for the sheriff's office. They then got the guns and parted the guns out, shipped/sold the parts to another person who was also sent to prison in

his own case, and laundered/concealed the profits from their scheme.  The parts were worth way more than the guns.  That was the main scheme, and the court specifically stated, "No machineguns ever made it to the Sheriff's Department though."  It was just a flat out criminal enterprise to break the law and make money.  They were also buying restricted, high end lasers and then selling them to people under the same sort of money making scheme.  They weren't keeping, using, etc. any of it.  There were also some false demo letters where Kelerchian bought and then seemingly sold some demo guns, but that was the tale wagging the dog and is not really what the case was about.

> **4.      The Need for the Sentence Imposed – Including the Need to Reflect the Seriousness of the Offense, the Need for Deterrence, and the Need to Protect the Public**

There is absolutely no justice in putting Brad Wendt in prison in this case. His life has already been irreparably and devastatingly changed. Due to the felony conviction, he has (1) lost his law enforcement career; (2) will lose his business and livelihood; (3) lost the ability to pursue his passion of hunting and teaching his kids to hunt; (4) lost significant amounts of money; and (5) lost his reputation in the community he has grown up in, served, and is raising his family in. Whatever effect the Government was looking to have on the industry and on Brad as a person has been met and then some. There is no reason to compound that harm by taking him away from his young children. He is a good father and should be able to be there to raise his kids.

## IV.     RELEASE

This Court should release Wendt pending execution and appeal because he is not a flight risk, does not pose a danger to the community, and his appeal raises a substantial question of law. Under 18 U.S.C. § 3143, this Court may release Wendt pending execution and appeal. Here, to the extent the Court would impose a term of imprisonment, Wendt requests the Court allow

him to self-surrender to the Bureau of Prisons ("BOP") and that this Court stay the term of imprisonment pending ruling on the appeal. This aligns with the Probation Office's recommendation that Brad be allowed to self-surrender to the Bureau of Prisons. ECF 389.

### A.    Release Pending Execution

Under 18 U.S.C. § 3143(a)(1), a "judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, [. . .] be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released []." 18 U.S.C. § 3143(a)(1) (emphasis added).

As evidenced by the text of 18 U.S.C. § 3143(a)(1), there are two distinct periods recognized by the law—the period between a guilty plea or verdict and a sentencing hearing, and the period between the imposition and the execution of the sentence. In other words, a defendant who is awaiting execution of a sentence may also be released following the imposition of the sentence if the defendant is not likely to flee or pose a danger to the community. *See, e.g.*, *United States v. Wajda*, No. CRIM. A. 94-117, 1994 WL 716006, at *2 (E.D. La. Dec. 22, 1994) (drawing distinction between sentencing and execution of sentence: "defendant, although sentenced, is awaiting execution of sentence"). Here, the "imposition" of the sentence is when this Court sets it at the sentencing hearing or issues the written judgment and conviction. However, the "execution" of the sentence is not until Wendt must appear at the BOP institution. *See United States v. Nkanga*, 452 F. Supp. 3d 91, 94 (S.D.N.Y. 2020) (finding defendant's sentence was "executed" when he was delivered to a BOP facility).

Thus, if this Court were to order Wendt to be detained at the sentencing hearing, his sentence would not yet be "executed" because he would be taken to the Polk County Jail rather

30

than the BOP. The federal government merely pays the Polk County Jail rent for federal detainees. Therefore, this Court can order the execution of the sentence to be when Wendt is required by the BOP to self-report to the BOP institution. Therefore, this Court should grant Wendt release pending the execution of his sentence because he is not a flight risk and does not pose a danger to his community.

B.    Release Pending Appeal

A court may release a defendant pending appeal if it makes four findings: (1) "the defendant has met his burden of proving by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or to the community if released," (2) "the appeal is not for purpose of delay," (3) "the appeal raises a substantial question of law or fact," and (4) "if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *United States v. Affleck*, 765 F.2d 944, 953 (10th Cir. 1985) (citation omitted); 18 U.S.C. § 3143(b)(1). Wendt meets these requirements. This Court should therefore release him on appropriate conditions.

1.    Wendt Is Not A Flight Risk Or Danger And His Appeal Is Not For Purposes Of Delay

Wendt has established, through his conduct before and during trial and his presentations at all hearings, that he is neither a flight risk nor a danger to the community. Nor is his appeal for purposes of delay.

First, Wendt is not a flight risk. The Court has already determined, and the Government agreed that, at the time of conviction, Wendt was not likely to flee and did not a danger to the safety of any other person or the community. Wendt has been on pretrial release since the inception of this case and has not had any problems or issues. Wendt has deep ties to his

31

community where he lives near his parents, brother, partner, and two young daughters and also owns a business. *See United States v. Hart*, 906 F. Supp. 102, 105 (N.D.N.Y. 1995) (granting motion for release pending appeal and finding defendant unlikely to flee because she was a local businesswoman, had substantial community ties, was married, and had several children). Wendt has no history of violence and no prior criminal record. Wendt attended every pretrial and trial appearance without issue. Under these circumstances, he is not a flight risk.

Second, Wendt is not a danger to the community. He is a career law enforcement officer with no history of violence and no prior criminal record.[5] There is no contention that Wendt is a danger to the community.

Third, Wendt's appeal is not for purpose of delay. Wendt raised and preserved a number of issues at trial and plans to vigorously pursue his appeal.

**2.      Wendt's Appeal Presents A Substantial Question That, If Resolved In His Favor, Will Likely Result In A Reversal, New Trial, Sentence Not Including Imprisonment, Or Reduced Sentence**

*a.      Wendt's Appeal Raises Several Substantial Questions*

A "substantial question" is "a close question or one that could go either way." *United States v. Powell*, 761 F.2d 1227, 1231 (8th Cir. 1985) (internal quotation marks omitted). The Eighth Circuit has explained:

> [A] defendant who wishes to be released on bail after the imposition of a sentence including a term of imprisonment must first show that the question presented by the appeal is substantial, in the sense that it is a close question or one that could go either way. It is not sufficient to show simply that reasonable judges could differ (presumably every judge who writes a dissenting opinion is still "reasonable") or that the issue is fairly debatable or not frivolous. **On the other hand, the defendant does not have to show that it is likely or probable that he or she will prevail on the issue on appeal.** If this part of the test is satisfied, the defendant must then show that the substantial question he or she seeks to present is so

---

[5] Wendt also faces increased risk in detention because he is a career law enforcement officer.

integral to the merits of the conviction that it is more probable than not that reversal or a new trial will occur **if the question is decided in the defendant's favor.** In deciding whether this part of the burden has been satisfied, the court or judge to whom application for bail is made must **assume that the substantial question presented will go the other way on appeal and then assess the impact of such assumed error on the conviction.**

*Id.* at 1233–34 (emphasis added) (adopting *United States v. Giancola*, 754 F.2d 898, 900 (11th Cir. 1985)).

The "substantial question" standard "does not require the district court to find that it committed reversible error." *United States v. Pollard*, 778 F.2d 1177, 1181–82 (6th Cir. 1985). As the Eleventh Circuit explained, "[we] are unwilling to attribute to Congress the intention to deny bail pending appeal unless a district court judge found that he or she had committed error but was obstinately unwilling to grant a new trial or other relief to correct the error." *Giancola*, 754 F.2d at 900; *see also Affleck*, 765 F.2d at 953 n.14. Rather, the Court must "evaluate the difficulty of the question" on appeal, and grant release pending appeal if it determines that the question is a close one or one that "very well could be" decided in the defendant's favor. *United States v. Shoffner*, 791 F.2d 586, 589 (7th Cir. 1986) (quoting *Giancola*, 754 F.2d at 901); *Powell*, 761 F.2d at 1233–34. Here, Wendt meets this standard for the reasons set forth above.[6]

> b. *Resolution Of This Substantial Question In Wendt's Favor Would Likely Result In A Reversal, New Trial, Sentence Not Including Imprisonment, Or Reduced Sentence*

The substantial questions here are "so integral to the merits of conviction that it is more probable than not that reversal or a new trial will occur if the question[s] [are] decided in the defendant's favor." *Powell*, 761 F.2d at 1234. Most Circuit courts, including the Eighth Circuit,

---

[6] Wendt has previously addressed these issues at length and will not repeat those arguments here for the sake of brevity; however, Wendt hereby incorporates the arguments in his Motion to Suppress and brief and reply in support (Dkt. 127, 137), Motion to Dismiss and brief and reply in support (Dkt. 211, 234), and Motion for Judgment of Acquittal and/or New Trial and brief and reply in support (Dkt. 356, 361).

> [H]ave held that § 3143(b)(1)(B) does not mean what it seems to say. "Read literally, this subsection might be taken to condition bail upon a district court's finding that its own judgment is likely to be reversed on appeal." However, as Judge Sloviter warned, such a construction would put federal judges "in the position of 'bookmakers' who trade on the probability of ultimate outcome." Such a role being undesirable, the correct approach is to ask whether a new trial or reversal would likely result, assuming the appellate court rules in defendant's favor. This interpretation has been universally adopted by the circuit courts of appeal.

*Hart*, 906 F. Supp. at 106 (internal citations omitted) (citing, among others, *Powell*, 761 F.2d at 1231).

Therefore, this Court must assume, for the purposes of analysis, that it committed error "and then assess the impact of such assumed error on the conviction." *Powell*, 761 F.2d at 1234. This standard does not require the Court to find that Wendt's appeal establishes a likelihood of reversal. *See United States v. Bayko*, 774 F.2d 516, 523 (1st Cir. 1985). In other words, Wendt does not have to show that it is substantially likely that his conviction will be reverse or that the Eighth Circuit would nonetheless grant him a shorter sentence that the duration of the appeal.

Defense counsel believes it has more than established a substantial question on all of the charges. However, even if the Eighth Circuit reversed only the illegal possession of a machine gun charge, the sentence on the remaining counts would certainly only justify a sentence of less than the expected appeal time. The appeal time here could easily be expected to approach two years given the nature and complexity of the case. And if it goes to the Supreme Court, that would easily be three years. This Court has recognized the existence of a substantial question as to that charge in part because of *United States v. Vest*, 448 F. Supp. 2d 1002 (S.D. Ill. 2006).

Further, even if the Eighth Circuit did not reverse any of the convictions, it could still easily determine that a sentence of less than two years in prison is great than necessary. The potential harm here of a loss of liberty is significant and irreversible. *See United States v. Seefried*, No. 21-CR-00287, 2024 WL 1299371, at *4 (D.D.C. Mar. 26, 2024) (granting

34

defendant's motion for release pending appeal) ("In our society liberty is the norm, not the exception. And every day that a man's liberty is wrongfully withheld extracts a dear cost.") (cleaned up).

Here, Wendt's appeal raises substantial questions that, if reversed on appeal, are likely to lead to a reversal, new trial, lesser sentence, or sentence shorter than appeal. Further, Wendt is not a danger to the community, is not a flight risk, and his appeal is not for purposes of delay. For the foregoing reasons, the Court should release Wendt on appropriate conditions pending appeal.

## V.    CONCLUSION

In conclusion, we request that the Court not impose a sentence of imprisonment and, instead, impose a sentence of probation/supervised release along with an appropriate fine. Alternatively, to the extent the Court does impose a term of imprisonment, we request the execution of that sentence be stayed pending appeal.

Dated: June 26, 2024                **FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Nick Klinefeldt*
Nicholas A. Klinefeldt, AT0008771
Rachel A. Yaggi, AT0014994
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309
Telephone: (515) 248-9000
Fax: (515) 248-9010
Email: *nick.klinefeldt@faegredrinker.com*
Email: *rachel.yaggi@faegredrinker.com*

***ATTORNEYS FOR DEFENDANT WENDT***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of June, 2024, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

*/s/ Paulette Ohnemus*